# EXHIBIT C

**TEVEN L. SUGARMAN & ASSOCIATES**
BY: **Steven L. Sugarman, Esquire / Elliot H. Berton, Esquire**
IDENTIFICATION NO.  **#32473**  /  #53060
1273 LANCASTER AVENUE          ATTORNEYS FOR PLAINTIFF, TERRAZZA COMMUNITY ASSOCIATION
BERWYN, PA 19312-1244
(610) 889-0700
FAX: (610) 993-0498

---

| | | |
|---|---|---|
| **TERRAZZA COMMUNITY ASSOCIATION** | : | Delaware County |
| | : | |
| v. | : | Court of Common Pleas |
| | : | |
| **BOZZUTO CONSTRUCTION COMPANY** | : | No. CV-2022-008878 |
| **BOZZUTO & ASSOCIATES, INC., t/a** | : | |
| **THE BOZZUTO GROUP** | : | |

## **NOTICE TO DEFEND**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYERS REFERENCE SERVICE
FRONT AND LEMON STREETS
MEDIA, PA 19063
610-566-6625

**STEVEN L. SUGARMAN & ASSOCIATES**
BY: **Steven L. Sugarman, Esquire / Elliot H. Berton, Esquire**
IDENTIFICATION NO.  **#32473**  /  #53060
1273 LANCASTER AVENUE          ATTORNEYS FOR PLAINTIFF, TERRAZZA COMMUNITY ASSOCIATION
BERWYN, PA 19312-1244
(610) 889-0700
FAX: (610) 993-0498

| | | |
|---|---|---|
| **TERRAZZA COMMUNITY ASSOCIATION** | : | Delaware County |
| | : | |
| v. | : | Court of Common Pleas |
| | : | |
| **BOZZUTO CONSTRUCTION COMPANY** | : | No. CV-2022-008878 |
| **BOZZUTO & ASSOCIATES, INC., t/a** | : | |
| **THE BOZZUTO GROUP** | : | |

## COMPLAINT

**COMES NOW,** Plaintiff, Terrazza Community Association (the "Association"), by and through its attorneys, Steven L. Sugarman & Associates, and respectfully requests this Honorable Court, sitting in equity, to impose liability against the Defendants, Bozzuto Construction Company, and Bozzuto & Associates, Inc., t/a The Bozzuto Group, for the Judgment entered heretofore by this Honorable Court on June 2, 2022 in favor of the Association and against the sham corporation, BCC Newtown Square, LLC., in the amount of $2,516,454.02, upon the Amended Award of Arbitrator, issued by the Honorable James F. Proud (Ret.) on March 28, 2022.  In support thereof, the Association avers as follows:

I.      The Parties.

1.      The Association is a non-profit corporation organized and existing under and pursuant to the laws of the Commonwealth of Pennsylvania, and pursuant to that certain Declaration, dated June 30, 2008, recorded in Delaware County, Pennsylvania, as of June 30, 2008, in Book 4391, Page 0467 *et seq*., and all Amendments thereto (collectively, the "Declaration").  The Declaration is incorporated herein by reference pursuant to Pa. R.C.P. No. 1019(g).

2.      The Association, by and through its Executive Board, administers a residential planned community known as Terrazza at Newtown Square, located at 300 Cornerstone Drive, Newtown Square, Pennsylvania (the "Community").

3.      The Community consists of 103 residential units within three (3) mid-rise buildings, together with common areas, including courtyards and landscaped areas, located above three subterranean parking garages containing 144 parking spaces (the "Garages").

4.      Although the Community is not an age-restricted regime, the vast majority of the unit owners are over the age of fifty-five (55).

5.      Defendant, Bozzuto Construction Company ("Bozzuto"), is a corporation organized and existing under and pursuant to the laws of the State of Maryland, which is registered as a foreign corporation in the Commonwealth of Pennsylvania, and which maintains a local place of business at 480 Swedesford Road, Suite 110, Wayne, Pennsylvania, 19087.

6.      Defendant, Bozzuto & Associates, Inc., t/a The Bozzuto Group ("Associates"), is a corporation organized and existing under and by virtue of the laws of the State of Maryland, which is registered as a foreign corporation in the Commonwealth of Pennsylvania, and which maintains a principal place of business at 6406 Ivy Lane, Suite 700, Greenbelt, Maryland, 20770.

7.      At all times relevant and material hereto, Bozzuto and Associates were affiliated corporations, with common officers and directors.

8.      At all times relevant and material hereto, Bozzuto was the sole managing member of BCC Newtown Square LLC ("BCC"), and both Bozzuto and Associates controlled and utilized BCC as a mere instrumentality and puppet to conduct business and perform the actions described herein.

9.      BCC is indebted to the Association in the amount of $2,516,454.02 pursuant to that certain Judgment entered in this Honorable Court at Case No. CV-2019-001944 upon the Amended Award of Arbitrator, the Honorable James F. Proud (Ret.) in the amount of $2,516,454.02 (the "Judgment").

10.      As a consequence of the conduct described below, Bozzuto and Associates are jointly and severally liable to the Association for the obligations and indebtedness of BCC to the Association, including the full amount of the Judgment.

### A. Creation of BCC Newtown Square, LLC

11. The Community was constructed and developed upon land owned by the Declarant, Cornerstone Newtown Square LLC. ("Cornerstone").

12. At all times relevant hereto, David Della Porta ("Della Porta") was the principal of Cornerstone.

13. Della Porta, who had a history of working with Bozzuto on other projects, engaged Bozzuto to serve as the general contractor for the construction of the improvements at the Community (the "Project").

14. However, Bozzuto and Associates, in an effort to avoid their liabilities attributable to the Project, elected to create and name a subsidiary entity, to wit, BCC, to serve as the general contractor for the Project.

15. On January 3, 2007, Daniel C. Murphy ("Murphy"), Senior Vice President of Bozzuto, executed that certain Operating Memorandum for BCC. A true and correct copy of said Operating Memorandum is attached hereto and incorporated herein as Exhibit "A."

16. As of January 3, 2007, Murphy was employed by Associates.

17. At all times relevant and material hereto:

a. Bozzuto was the sole member of BCC.

b. BCC did not have any employees or officers.

c. BCC had no office or office personnel.

d. All of BCC's records were kept and maintained by Bozzuto at Bozzuto's offices in Pennsylvania.

e. All of BCC's accounting was performed by Associates' employees.

f. BCC was never capitalized, except for an initial deposit of $100.00 from Bozzuto or Associates into a bank account at BB&T Bank as more specifically described below.

g. Work on the Project was supervised, managed and directed by David Mandes ("Mandes"), a Senior Vice-President of Bozzuto and employee of Associates.

18. Articles of Organization for BCC were not submitted to the Maryland Corporation Bureau until June 11, 2010. A true and correct copy of the Articles of Organization

3

of BCC is attached hereto and incorporated herein as Exhibit "B."

19.   Consequently, BCC was not formed as an entity until June 11, 2010.

20.   Even though BCC had not been properly formed, BCC entered into an AIA Standard Form of Agreement Between Owner and Contractor with Cornerstone, dated January 3, 2007, which, *inter alia*, designated BCC as the general contractor for the construction of the Project (the "Construction Agreement"). A true and correct copy of the Construction Agreement is attached hereto and incorporated herein as Exhibit "C."

21.   On January 24, 2007, the Construction Agreement was executed by Michael Schlegel ("Schlegel"), as President, ostensibly on behalf of BCC (*See*, Exhibit "C").

22.   On January 24, 2007, Schlegel was the President of Bozzuto.

23.   On January 24, 2007, and at all times relevant and material hereto, Schlegel was an employee of Associates.

24.   As of the date hereof, Schlegel is the Chief Operating Officer of Associates.

25.   All of the Exhibits to the Construction Agreement, including the contractor's qualifications and assumptions, list of allowances, preliminary construction schedule, and preliminary construction estimates, were prepared or compiled by Bozzuto.

**B.   BCC's Bank Account**

26.   On March 20, 2007, even though Articles of Organization for BCC had not been submitted to the Maryland Corporation Bureau, Bozzuto and Associates established a bank account for BCC with BB&T Bank (the "Bank Account") by depositing the sum of $100.00 therein.

27.   From inception of the Bank Account to the date it was closed, David Schorr ("Schorr") was an authorized signatory for the Bank Account and controlled the funds therein.

28.   On March 20, 2007, Schorr was a Vice-President and the Controller of Bozzuto.

29.   In 2018, Schorr became Associates' Chief Accounting Officer.

30.   Schorr is presently a Senior Vice President of Associates.

31.    At all times relevant and material hereto, Schorr was employed by Associates.

32.    Although BCC did not exist as an entity, initial payments from Cornerstone to BCC pursuant to the Construction Agreement were deposited into the Bank Account on March 27, 2007 and construction of the Project commenced at or about that time.

33.    As construction of the Project proceeded, Cornerstone remitted payments to BCC which were deposited into the Bank Account.

34.    Bozzuto transferred funds from the Bank Account to pay itself a monthly "construction fee."

35.    Payments to subcontractors who provided services for, and to suppliers of materials utilized in, the construction of the Project were paid from funds transferred by BCC to a central clearing account in the name of and controlled by Associates.

36.    In June of 2010, Bozzuto and Associates moved the Bank Account and the funds therein from BB&T Bank to Howard Bank solely for its benefit and unrelated to BCC's interests in the Project.

37.    At all times relevant and material hereto, the Bank Account and the payments made by Cornerstone under the Construction Agreement were BCC's sole assets and those assets were consistently transferred to and comingled with funds within the central clearing account controlled by Associates.

38.    On April 17, 2013, after receiving the final payments from Cornerstone under the Construction Agreement, final disbursements to subcontractors and materials suppliers were issued from the Bank Account through the Associates' clearing account, and the Defendants closed the Bank Account.

39.    From and after April 17, 2013, BCC had no assets.

C.    **Transition of Control and Settlement Agreement**

40.    On January 15, 2013, control of the Association and its Executive Board was turned over by Cornerstone to the homeowners at an Association election meeting.

41. Thereafter, the Association retained engineering firms, Kipcon, Inc. ("Kipcon") and Structural Design Associates, Inc. ("SDA") to, *inter alia*, evaluate the severe water intrusion into all three of the Garages and recommend remedial measures.

42. SDA ultimately determined that the water penetration into the Garages was due to the faulty installation of the waterproofing membrane in the courtyard areas located above the Garages, and therefore, recommend that the deficient membrane system be removed and replaced in order to preserve the structural integrity of the Garages.

43. After certain limited remedial efforts undertaken by BCC (or Bozzuto) to stop the water leakage failed, and in lieu of litigation, the Association entered into that certain Settlement Agreement and Release with Cornerstone and BCC, executed on March 4 and March 9, 2015 (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached hereto and incorporated herein as Exhibit "D."

44. The Settlement Agreement provided, *inter alia*, that in addition to other consideration, Cornerstone as Declarant, and BCC as General Contractor, would perform certain "corrective work," including the prevention and stoppage of water infiltration into the Garages. (See, Exhibit "D").

45. The Settlement Agreement also included an 18-month warranty period on all work performed (the "Warranty"). (See, Exhibit "D").

46. In exchange for the promised "corrective work," the Warranty, and other consideration described in the Settlement Agreement, the Association released claims it had against Cornerstone and BCC. (See, Exhibit "D").

47. Schlegel, an officer of both Bozzuto and Associates, executed the Settlement Agreement on behalf of BCC.

48. Both Cornerstone and the Association understood that BCC would be responsible to arrange for and complete the corrective work described in the Settlement Agreement.

49. In fact, Della Porta, on behalf of Cornerstone, repeatedly represented to and assured the Association that its general contractor, BCC, would "take care of" the corrective work set forth in the Settlement Agreement.

50.     Bozzuto and Associates knew that the Association was relying upon BCC to perform the corrective work under the Settlement Agreement and to honor the Warranty.

51.     However, at no time relevant to the Settlement Agreement did Bozzuto and/or Associates disclose to the Association that all of BCC's assets had been removed by the Defendants in April of 2013, and therefore, BCC had no ability to perform its obligations under the Settlement Agreement.

52.     Instead, Bozzuto and Associates continued to hide behind BCC as a shield for their own significant liabilities and exposure to the Association and its members.

53.     The Association relied upon BCC's status as a solvent, going concern, capable of performing the agreed upon corrective work when it entered into the Settlement Agreement.

54.     After the Settlement Agreement was executed, a liability on Bozzuto's accounting books was established by Schorr for the anticipated cost to perform the corrective work mandated by the Settlement Agreement.

**D.     Breach of the Settlement Agreement**

55.     After the Settlement Agreement was executed, Bozzuto engaged subcontractors, including Red Heart Restoration and Waterproofing, Inc. ("Red Heart"), in an attempt to resolve the water penetration issues adversely affecting the Garages.

56.     Between April of 2015 and approximately February of 2020, Red Heart performed certain work at the Garages in the Community at the request of Bozzuto, including, without limitation, the cutting and patching of ceiling cracks and the application of an elastomeric sealant.

57.     All of the work performed by Red Heart within the time period described above was billed by Red Heart to Bozzuto and paid for by Bozzuto on checks issued from Bozzuto's checking account at TD Bank.

58.     All of the attempted remedial work performed by Red Heart was supervised, managed and directed by Mandes, acting in his capacity as an officer of Bozzuto and an employee of Associates.

59. Bozzuto also retained its own engineering consultant, Wiss, Janney, Elstner Associates, Inc. ("Wiss, Janney"), in connection with the on-going water intrusion problems in the Garages.

60. Upon information and belief, Bozzuto was invoiced by and directly paid Wiss, Janney for its engineering services.

61. Bozzuto also engaged legal counsel, Gallagher, Evelius and Jones ("Gallagher"), a law firm which has historically represented Bozzuto, to address the Association's claims arising out of the Settlement Agreement.

62. Upon information and belief, Bozzuto was invoiced by and directly paid Gallagher for its legal services.

63. All of Bozzuto's repair efforts amounted to mere "band aids," and as a result, were completely ineffective.

64. By virtue of the failure of BCC and Cornerstone to stop the water leaks into the Garages as required under the parties' Settlement Agreement, the Association declared BCC and Cornerstone to be in default and breach of the Settlement Agreement.

**E.    The Arbitration Proceedings**

65. As a result of the breach of the Settlement Agreement by BCC and Cornerstone as described above, the Association demanded arbitration of the Association's claims in accordance with the provisions of the parties' Settlement Agreement.

66. However, neither BCC nor Cornerstone consented to submit the Association's claims to arbitration.

67. Consequently, the Association filed a Petition to Appoint Arbitrator, naming Cornerstone and BCC as Defendants, in this Honorable Court at Case No. CV-2019-001944 requesting the appointment of an arbitrator.

68. On April 16, 2019, the Court entered an Order appointing the Honorable James F. Proud (Ret.), to serve as the sole arbitrator to consider the Association's claims.

69. Without disclosing that it had transferred all of its remaining assets to Bozzuto and/or Associates and closed its only Bank Account nearly two (2) years before it

executed the Settlement Agreement, BCC vigorously defended and disputed the Association's arbitration claims for nearly three (3) years.

70.     Upon information and belief, Bozzuto was invoiced by and directly paid Gallagher for the legal services in connection with BCC's defense in the arbitration proceedings.

71.     On February 22, 2022, after multiple days of evidentiary hearings, Judge Proud entered an Award of Arbitrator in favor of the Association and against BCC and Cornerstone, jointly and severally, in the amount of $2,292,949.44.

72.     On March 28, 2022, Judge Proud issued an Amended Award of Arbitrator in favor of the Association and against BCC and Cornerstone, jointly and severally, in the amount of $2,516,454.02.

73.     Notwithstanding the Arbitrator's Amended Award, BCC and Cornerstone refused to remit payment to the Association.

74.     Subsequently, the Association filed a Petition to Confirm Amended Award of Arbitrator in this Court on April 28, 2022.

75.     By Order, dated May 26, 2022, this Honorable Court granted the Association's Petition to Confirm Amended Award of Arbitrator and directed the Office of Judicial Support to enter Judgment in favor of the Association and against Cornerstone and BCC, jointly and severally, in the amount of $2,516,454.02. A true and correct copy of the Court's Order is attached hereto and incorporated herein as Exhibit "E."

76.     Consistent with the foregoing Order of Court, the Office of Judicial Support entered Judgment in favor of the Association and against Cornerstone and BCC, jointly and severally, in the amount of $2,516,454.02 on June 2, 2022.

77.     Subsequent to the entry of the Judgment against BCC and Cornerstone, the Association made demand upon BCC to satisfy the Judgment.

78.     BCC, through its legal counsel, Gallagher, responded to the Association's demand by disclosing, for the first time, that BCC had no assets and that neither BCC nor Bozzuto were willing to satisfy BCC's indebtedness owed to the Association under the Judgment.

9

## COUNT I – PIERCING THE CORPORATE VEIL

79. The Association incorporates paragraphs 1 through 78 hereof as if set forth fully herein.

80. BCC was a sham that entered into the Construction Agreement in January 2007, long before its Articles of Organization were filed with the Maryland Corporation Bureau.

81. BCC did not exist when the Bank Account was established by Bozzuto.

82. Contracts, including, but not limited to, the Construction Agreement, were executed by Bozzuto's officers, all of whom were employed by Associates.

83. Bozzuto was the sole managing member of BCC, and Bozzuto and Associates controlled all of BCC's activities.

84. BCC was only capitalized with a nominal initial deposit in the amount of $100.00.

85. BCC's sole assets comprised the Bank Account and the payments made under the Construction Agreement.

86. All payments made under the Construction Agreement were deposited into the Bank Account.

87. The Bank Account was controlled by Bozzuto and Associates.

88. The Bank Account was utilized as a mere conduit for the monthly "construction fees" paid to Bozzuto.

89. The monthly "construction fees" paid to Bozzuto through Associates' central clearing account siphoned off BCC's only assets.

90. After the Bank Account was closed in April of 2013, BCC had no assets.

91. Nonetheless, Bozzuto and Associates utilized BCC, which remained nothing more than a sham corporation, to induce the Association to enter into the Settlement Agreement in May of 2015.

92. During the period that the Settlement Agreement was being negotiated, neither Bozzuto nor Associates disclosed that BCC had no assets or wherewithal to pay for the corrective work BCC committed to perform.

10

93.    Defendants knew that the Association expected BCC to perform the corrective work and to honor the Warranty in consideration for the Association's release of claims described in the Settlement Agreement.

94.    Defendants were aware that BCC had no assets or ability to pay for the corrective work required by the Settlement Agreement.

95.    Defendants intentionally withheld information about BCC's true financial status to induce the Association to enter into the Settlement Agreement.

96.    Defendants utilized BCC to deceive the Association.

97.    The Association relied upon BCC's ability to perform and pay for the corrective work when it agreed to enter into the Settlement Agreement.

98.    The Association had the right to rely upon BCC's ability to perform and pay for the corrective work required by the Settlement Agreement.

99.    Had the Association been informed that BCC had no assets or ability to pay for services, the Association would not have entered into the Settlement Agreement nor released its claims thereunder.

100.    The Association's reliance upon BCC's ability to perform and pay for the corrective work BCC expressly agreed to perform was justified.

101.    The Association was unable to discover BCC's financial circumstances at the time the Settlement Agreement was executed because Bozzuto and Associates intentionally withheld and hid such information, and instead, held BCC out as a viable and financially solvent entity.

102.    After the Settlement Agreement was executed, Bozzuto and Associates continued to maintain the same deceit and illusion of BCC's financial viability by secretly engaging and directly paying contractors, engineers and others to perform ineffective measures which ultimately failed to remediate the leaks into the Garages.

103.    Bozzuto and Associates thereafter perpetuated and continued the appearance of BCC's fictional existence by engaging and paying lawyers to oppose the Association's claims both before and during the arbitration proceedings.

11

104.    In fact, Bozzuto and Associates did not disclose the true state of BCC's financial status until after the Amended Award of Arbitrator was issued.

105.    As a consequence of Bozzuto's and Associates' subterfuge, the Association incurred costs and attorneys' fees in connection with the arbitration proceedings totaling more than $223,504.00.

106.    But for the deceptive conduct of Bozzuto and Associates as heretofore alleged, the Association would not have entered into the Settlement Agreement.

107.    Furthermore, but for Defendants' conduct as hereinabove described, the Association would not have incurred the costs and fees incident to the arbitration proceedings.

108.    Bozzuto's and Associates' conduct, as heretofore alleged, constitutes fraud.

109.    From its inception, BCC was a mere instrumentality utilized by Bozzuto and Associates to try to avoid responsibility for faulty construction of the Community and subsequently, as a means to escape the consequences of a Settlement Agreement which Defendants fraudulently induced the Association to execute.

110.    Defendants completely ignored and blatantly disregarded requisite corporate formalities, including, without limitation, the filing of Articles of Organization for BCC until well-after BCC had already executed the Construction Agreement, opened the Bank Account and engaged contractors to undertake work on the Project.

111.    After the Settlement Agreement was executed, Defendants did not utilize BCC to attempt to remedy the water leaks into the Garages.

112.    Instead, Bozzuto engaged and paid directly all contractors, engineers and attorneys in the performance of BCC's duties under the Settlement Agreement.

113.    Therefore, the BCC's corporate form should be disregarded by this Honorable Court, sitting in equity, to rectify the Defendants' fraudulent conduct.

114.    Furthermore, the BCC's phony corporate veil should be pierced to enforce a paramount equity.

115.    Fundamental equity and fairness dictate that Bozzuto and Associates be found liable for the obligations of BCC to the Association, including the Judgment.

12

116. As a consequence of Defendants' course of conduct as described hereinabove, the Association is also entitled to an award of punitive damages.

**WHEREFORE,** Plaintiff, Terrazza Community Association, requests entry of a judgment in its favor and against the Defendants, Bozzuto Construction Company and Bozzuto & Associates, Inc. t/a The Bozzuto Group, jointly and severally, in the amount of $2,516,454.02, together with interest on the Judgment described above, punitive damages, costs of this proceeding, and such other and further equitable relief as this Honorable Court deems just and proper.

## COUNT II – ALTER EGO

117. The Association incorporates paragraphs 1 through 116 hereof as if set forth fully herein.

118. As hereinabove described, BCC had no employees, officers, office locations or separate business records, and instead, Bozzuto and Associates completely dominated and controlled all of BCC's finances and conduct.

119. In fact, there was such a unity of interest and ownership between BCC and the Defendants that BCC never actually operated as a separate entity.

120. As demonstrated above, BCC was created as a conduit or mere instrumentality for services rendered by the Defendants, who were the real parties in interest under the Construction Agreement, and subsequently, the Settlement Agreement.

121. By reason of the foregoing, adherence to the fiction that BCC was a separate limited liability company would sanction a fraud and promote injustice.

122. At all times relevant and material hereto, BCC was a mere alter ego of Bozzuto and Associates.

123. Because BCC was at all times utilized as Defendants' alter ego, justice mandates that Bozzuto and Associates be liable for BCC's obligations, including the Judgment.

124. The Honorable James F. Proud (Ret.) clearly determined that the Association had established a meritorious claim for breach of the Settlement Agreement in entering the Award of Arbitrator, as amended, in favor of the Association.

13

125.   As a consequence of Bozzuto's and Associates' deceptive and improper conduct, the Association suffered, and continues to suffer, substantial damages and injury, including an outstanding and substantial Judgment as more fully described above.

126.   In view of the foregoing, it would be unjust and inequitable to allow Defendants to escape liability through the use and abuse of a sham and puppet entity that had, and has, no financial ability whatsoever to fulfill its contractual obligations and liabilities owed to the Association.

**WHEREFORE,** Plaintiff, Terrazza Community Association, requests entry of a judgment in its favor and against the Defendants, Bozzuto Construction Company and Bozzuto & Associates, Inc. t/a The Bozzuto Group, jointly and severally, in the amount of $2,516,454.02, together with interest on the Judgment described above, punitive damages, costs of this proceeding, and such other and further equitable relief as this Honorable Court deems just and proper.

## COUNT III – ENTERPRISE LIABILITY

127.   The Association incorporates paragraphs 1 through 126 hereof as if set forth fully herein.

128.   Bozzuto and Associates are affiliated entities, which jointly provide services, including residential construction.

129.   Bozzuto and Associates have common directors and officers, and at all times relevant and material hereto, Bozzuto's officers were employed  by Associates.

130.   Construction services in connection with the Project that were purportedly provided under the name of BCC were actually managed and controlled as a single enterprise by and for the benefit of Bozzuto and Associates.

131.   In fact, Defendants paid such scant attention to proper corporate formalities with respect to BCC that the Articles of Organization for BCC were not filed until June 11, 2010, long after BCC's role as general contractor for the Project commenced.

132.   From inception, BCC was dramatically undercapitalized, and its assets limited to an initial $100.00 deposit to open the Bank Account, and thereafter, payments made

14

to BCC under the Construction Agreement were all promptly transferred to Bozzuto and/or Associates.

133. Subcontractors and suppliers who provided services for or materials used on the Project were paid from by funds transferred from the Bank Account to a central clearing account maintained and controlled by Associates.

134. By virtue of the deficient construction of the improvements in the Community, the Association became an involuntary creditor of BCC, Bozzuto and Associates

135. After removing all funds from BCC, Bozzuto and Associates induced the Association to enter into the Settlement Agreement with BCC as part of their improper and fraudulent effort to shield and protect the interests and assets of Bozzuto and Associates.

136. By siphoning off funds from the Bank Account, paying contractors and material suppliers through a central clearing account, and creating a liability on Bozzuto's books for the corrective work mandated by the Settlement Agreement, the assets of BCC were consistently intermingled with those of Bozzuto and Associates.

137. Bozzuto and Associates did not treat BCC as a separate and distinct entity, and at all times relevant and material hereto, Bozzuto, as the sole managing member of BCC, directly controlled and directed the activities of BCC.

138. Instead, Bozzuto and Associates blurred the lines among the entities and utilized BCC as nothing more than a bogus instrumentality for a single enterprise, to wit, the construction of the Project, and subsequently, to improperly shield their own obligations arising out of the Settlement Agreement and Judgment.

139. Bozzuto and Associates derived improper advantages by misusing BCC for their own benefit and to the great detriment of the Association.

140. By virtue of the Defendants' misuse of BCC to defraud the Association, equity and justice mandate that Bozzuto and Associates be liable for BCC's obligations to the Association, including the Judgment.

**WHEREFORE,** Plaintiff, Terrazza Community Association, requests entry of a judgment in its favor and against the Defendants, Bozzuto Construction Company and Bozzuto & Associates, Inc. t/a The Bozzuto Group, jointly and severally, in the amount of $2,516,454.02,

15

together with interest on the Judgment described above, punitive damages, costs of this proceeding, and such other and further equitable relief as this Honorable Court deems just and proper.

STEVEN L. SUGARMAN & ASSOCIATES

By:_____
Steven L. Sugarman, Esquire
Elliot H. Berton, Esquire
Attorneys for Plaintiff

16

## **VERIFICATION**

I, Anthony Matern, President of Terrazza Community Association, verify that the statements made in the foregoing Complaint, are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsification to authorities.

Date: 1/16/2023

_____
Anthony Matern, President

EXHIBIT "A"

## OPERATING MEMORANDUM
## FOR
## BCC NEWTOWN SQUARE, LLC

**THIS OPERATING MEMORANDUM** (as amended from time to time in accordance with the provisions hereof, this "Memorandum") is made by BOZZUTO CONSTRUCTION COMPANY, a Maryland corporation (the "Member") to be effective as of January 3, 2007.

## ARTICLE I

### Introduction

**Section 1.1.**    **Formation of Limited Liability Company.**  The Member, desiring to form a Maryland limited liability company under the Maryland Limited Liability Company Act, Title 4A of the Corporations and Associations Article of the Annotated Code of Maryland (as amended from time to time, the "Act"), has made this Memorandum and has caused the Articles of Organization attached hereto as Exhibit B (the "Articles") to be executed and filed with the Maryland State Department of Assessments and Taxation.  The Company's business shall be conducted under the name "BCC Newtown Square, LLC."  This Memorandum is subject to, and governed by, the Act and the Articles.  In the event of a direct conflict between the provisions of this Memorandum and either the Articles or the mandatory provisions of the Act, such provisions of the Articles or the Act, as the case may be, will be controlling.

**Section 1.2.**    **Defined Terms.**  The terms defined in the Preamble hereto and in Section 1.1 shall have the meanings specified therein, and all other capitalized terms used in this Memorandum shall have the meanings set forth below.

1.2.1.  "Accountants" means such accounting firm as may be retained from time to time by the Member.

1.2.2.  "Additional Member" means any individual or Entity admitted as a Member pursuant to Section 2.6 hereof.

1.2.3.  "Affiliate" or "Affiliated Person" means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, a Member.  The term "control" as used in the immediately preceding sentence, means, with respect to a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the controlled corporation, and, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

1.2.4.  "Authorized Person" means each of those persons who shall be authorized by the Member acting pursuant to Article III to execute or file documents on behalf of the Company and to otherwise act as its agent.

1.2.5.  "Available Cash"  of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Member and cash funds obtained from loans to the Company) after (i) payment of all operating

#777241
006100-0419

BCCNSLLC00001

expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

1.2.6. "Capital Account" of the Member means the account established and maintained for the Member pursuant to Section 2.4 hereof.

1.2.7. "Capital Contribution" means the total value of cash and agreed fair market value of tangible and intangible property contributed and agreed to be contributed to the Company by the Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Memorandum to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member in respect of the interest of the then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein.

1.2.8. "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

1.2.9. "Company" means BCC Newtown Square, LLC, the limited liability company that was formed under the Act upon the filing of the Articles, and that is the subject of this Memorandum.

1.2.10. "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, joint stock association, joint venture, firm, trust, syndicate, business trust or cooperative, and any foreign associations of like structure.

1.2.11. "Interest" in the Company means the entire ownership interest of the Member in the Company at any particular time, including the right of the Member to any and all benefits to which the Member may be entitled as provided in this Memorandum and under the Act, together with the obligations of the Member to comply with all of the terms and provisions of this Memorandum.

1.2.12. "Managing Member" or "Member" means Bozzuto Construction Company, a Maryland corporation, and any Additional Member.

1.2.13. "Person" means any individual or Entity.

1.2.14. "Principal Office" means the principal business office of the Company as established from time to time by the Member, initially being 7850 Walker Drive, Suite 400, Greenbelt, Maryland 20770.

1.2.15. "Regulations" means the federal income tax regulations promulgated under the Code, as amended from time to time, and including corresponding provisions of succeeding regulations.

1.2.16. "Resident Agent" means the resident agent as provided in the Articles attached hereto as Exhibit B, and any successor resident agent as provided in the Act.

#777241
006100-0419

2

BCCNSLLC00002

1.2.17. "Term" shall refer to the term of this Company, beginning on the date the Articles were filed and being perpetual in duration, unless terminated pursuant to the Act or the terms of this Memorandum.

**Section 1.3.    Company Purpose.** The purposes for which the Company is organized shall include: (1) to perform construction and construction management services; and (2) to do and perform all acts necessary or desirable to carry out any of the foregoing purposes; and to engage in any other lawful act or activity which may be carried on by a limited liability company under the Act which the Member may from time to time authorize or approve pursuant to the provisions of this Memorandum, whether or not related to the business described in the Articles or to any other business at the time or heretofore engaged in by the Company.

## ARTICLE II

## Members and Membership Interests

**Section 2.1. Name and Address of Member; Principal Office.** The Member, the Member's address, and its initial Capital Contribution to the Company are set forth on Exhibit A attached hereto and made a part hereof.

**Section 2.2.  Form of Contributions.** The initial Capital Contribution was in the form and in the amounts or values provided in Exhibit A. Subsequent contributions shall be in such amounts and may be in any type of property as may be determined by the Member. The Member shall not be required to make any Capital Contribution to the Company other than the initial Capital Contribution, except as may be provided under Section 2.4 hereof.

**Section 2.3.  Member Loans or Services.** Loans by the Member to the Company shall not be considered contributions to the capital of the Company. Services may be considered contributions to capital if so determined by the Member.

**Section 2.4.  Capital and Capital Accounts.**

2.4.1. An individual Capital Account shall be established and maintained on behalf of each Member, including any Additional Member or Substitute Member who shall hereafter receive an Interest in the Company. The Capital Account of each Member shall consist of: (i) the amount of cash such Member has contributed to the Company plus (ii) the agreed fair market value of any tangible or intangible property such Member has contributed to the Company, net of any liabilities assumed by the Company or to which such property is subject, plus (iii) the amount of profits or income (including tax-exempt income and any other item required to be credited for proper maintenance of capital accounts by the Regulations under Section 704(b) of the Code) allocated to such Member, less (iv) the amount of losses and deductions allocated to such Member, less (v) the amount of all cash distributed to such Member, less (vi) the fair market value of any property distributed to such Member, net of any liability assumed by such Member or to which such property is subject, and less (vii) such Member's share of any other expenditures which are not deductible by the Company for federal income tax purposes and which are not allowable as additions to the basis of Company property; all, however, subject to such other adjustments as may be required for proper maintenance of capital accounts by the Regulations under Section 704(b) of the Code. The Capital Account of a Member shall not be affected by any adjustments to basis made pursuant to Section 743

#777241
006100-0419

3

BCCNSLLC00003

of the Code, but shall be adjusted with respect to adjustments to basis made pursuant to Section 734 of the Code.

2.4.2.    The opening entry for the Member shall be the Member's Capital Contribution as set forth on Exhibit A.  No interest shall be paid on any Capital Contribution.

**Section 2.5.    Contribution of Additional Capital.**  Additional capital may be contributed to the Company.

**Section 2.6.    Admission of Additional Members.**  The Member may admit to the Company additional Member(s) who will participate in the profits, losses, available cash flow and ownership of the assets of the Company on such terms as are determined by the Member. Such Additional Members shall be allocated gain, loss, income, or expense by such method as may be provided in this Memorandum.

**Section 2.7.    Limitation of Liability.**  The Member shall not be liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as otherwise required by law, it being the intent of the Member to have the fullest limitation of liability allowed by law.  The Member shall not be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, the Member shall not be required to make any contribution to the Company by reason of any negative balance in the Member's Capital Account, nor shall any negative balance in the Member's Capital Account create any liability on the part of the Member to any third party.

## ARTICLE III

## Management and Control of Business

**Section 3.1.    Overall Management Vested in Member.**  Management for the purpose of the business of the Company shall be vested in the Member and all powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Member.  The Member may appoint any natural person as an Authorized Person and may appoint such officers and hire such employees, and may charge such officers and employees with such duties, as the member deems appropriate.

**Section 3.2.    Officers.**  The Member may appoint such officers of the Company and hire such employees, and invest such officers and employees with such duties, as the Member deems appropriate.  All such officers and employees of the Company shall be subject to removal by the Member.

**Section 3.3.    Authorized Persons.**  Any Authorized Person may execute any document or instrument authorized to be executed on behalf of the Company without the necessity of joinder by the Member of any other person.  Any Authorized Person and any officer or employee designated by the Member shall have authority to sign checks.

BCCNSLLC00004

## ARTICLE IV

## Accounting and Records

**Section 4.1.    Records and Accounting.**

4.1.1.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

4.1.2.  The Member may engage a Person to be responsible for: authenticating the records of the Company, including keeping correct and complete books of account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Member shall designate.  Such employee shall have such other duties as the Member may from time to time prescribe, but under no circumstances shall such employee have any of the rights, powers, responsibilities or duties of the Member of the Company as prescribed herein or by law.

**Section 4.2.    Accounting Decisions.**  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Member.  The Member may rely upon the advice of the Accountants as to whether such decisions are in accordance with applicable accounting methods for federal income tax or general accounting purposes.

**Section 4.3.    Federal Income Tax Elections.**  The Company may make all elections for federal income tax purposes, including but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Member's Interest or the distribution to the Member of Company property, the election pursuant to Sections 734, 743 and 754 of the Code to adjust the basis of the assets of the Company.

## ARTICLE V

## Allocations; Distributions; Interests

**Section 5.1.    Allocation of Net Income, Net Loss or Capital Gains.**  In accordance with the Code and Resolutions, all net income or net loss and/or capital gains of the Company for each fiscal year of the Company shall be allocated to the Member.

**Section 5.2.    Distribution of Available Cash.**  Upon the decision of the Member, the Available Cash of the Company shall be distributed to the Member, or in such other manner as the Member may decide.  Available Cash of the Company shall not be distributed if such cash is required to maintain a reasonable working capital reserve for the Company.

#777241
006100-0419

5

BCCNSLLC00005

**Section 5.3.    Allocation of Income and Loss and Distributions in Respect of Interests Transferred.**

5.3.1.    If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction or credit of the Company for such fiscal year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Interest in the Company at the close of such day. For the purpose of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a monthly period (commencing with the monthly period including the date hereof) as having been consummated on the first day of the calendar month following such monthly period, regardless of when during such monthly period such transfer, increase or decrease actually occurs (i.e., sales and dispositions made during any month will be deemed to have been made on the first (1st) day of the next calendar month).

5.3.2.    Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE VI

### Changes in Members

**Section 6.1.    Dissolution.**  There shall be no events of dissolution except as required by applicable law, or by Section 7.1.1. Upon the occurrence of a mandatory event of dissolution under applicable law, the Company shall dissolve and its affairs shall be wound up and its properties liquidated, in accordance with Section 7.1.2.

**Section 6.2.    Transfer and Assignment of Member's Interest; Admission of Additional Members.**  The Member shall be entitled to assign, convey, sell, pledge, hypothecate, encumber or in any way alienate (hereinafter, collectively a "Transfer") all or any part of its Interest in the Company. No transferee or Additional Member shall become a Member, however, unless or until such transferee agrees in writing to be bound by this Memorandum as the same may be amended to accommodate such admission.

BCCNSLLC00006

**Section 6.3. Effect of Transfer.** Any permitted transfer of all or any portion of the Member's Interest in the Company will take effect on the first (1ˢᵗ) day of the month following such transfer.

## ARTICLE VII

### Termination

**Section 7.1.    Termination of the Company.**

7.1.1.   The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(i)      a determination by the Member that the Company should be so dissolved;

(ii)     the occurrence of a mandatory event of dissolution under applicable law;

(iii)    the termination of the Member's existence; or

(iv)     at such earlier time as may be required by applicable law.

7.1.2.   In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment in the following order, all as required by the Act:

(i)      liabilities to creditors, in the order of priority as provided by law, except liabilities to the Member of the Company on account of its contributions;

(ii)     liabilities to the Member of the Company in respect of its share of the profits and other compensation by way of income on its contributions; and

(iii)    liabilities to the Member of the Company in respect of its contributions to capital.

## ARTICLE VIII

### Indemnification

**Section 8.1.    Liability and Indemnification of the Member and Authorized Persons.**

8.1.1.   No Authorized Person shall be liable, responsible or accountable, in damages or otherwise, to the Member for any act performed by it within the scope of the authority conferred on it by this Memorandum, except for acts of fraud, willful misconduct or gross negligence.

8.1.2.   The Member and each Authorized Person shall be entitled to indemnity from the Company for any act performed by it in good faith and within the scope of the authority conferred on it by or pursuant to this Memorandum, except for acts of fraud, willful misconduct or gross

#777241
006100-0419

7

BCCNSLLC00007

negligence and for damages arising from any material misrepresentation herein or material breach of warranty herein.

8.1.3.   Any indemnity under this Section 8.1 shall be provided out of and to the extent of Company assets only, and the Member shall not have any personal liability on account thereof beyond its Capital Contribution.

8.1.4.   The Company may purchase and maintain insurance for its benefit, the benefit of the Member or any Authorized Person who is entitled to indemnification under this Section or both, against any liability asserted against or incurred by the Member or Authorized Person in any capacity or arising out of the Member's or such Authorized Person's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE IX

## Miscellaneous

**Section 9.1.**   **Effect of Memorandum.**  This Memorandum is intended to be the Operating Memorandum of the Company within the meaning of Section 4A-402 of the Act.

**Section 9.2.**   **Governing Law.**  This Memorandum and the rights of the parties hereunder will be governed by, interpreted and enforced in accordance with, the laws of the State of Maryland.

**Section 9.3.**   **Binding Effect.**   Subject to the provisions of this Memorandum relating to transferability, this Memorandum will be binding upon and inure to the benefit of the Member and its respective distributees, heirs, successors and assigns.

**Section 9.4.**   **Terms.**   Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

**Section 9.5.**   **Headings.**  All headings herein are inserted only for convenience and ease of reference and in no way define, limit or describe the scope of this Memorandum or the intent of the provisions thereof and are not to be considered in the construction or interpretation of any provision of this Memorandum.

**Section 9.6.**   **Severability.**  If any provision of this Memorandum is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Memorandum, such provision will be fully severable; this Memorandum will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Memorandum, but with due regard to the intent of the Member, and the remaining provisions of this Memorandum will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Memorandum.

**Section 9.7.**   **No Third Party Beneficiary.**  This Memorandum is made solely and specifically by and for the benefit of the party hereto, and its respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person will have any

BCCNSLLC00008

rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Memorandum as a third party beneficiary or otherwise.

**Section 9.8.    Amendments.**  This Memorandum may not be amended except by written amendment signed by the Member.

**Section 9.9.    Title to Company Property.**  Legal title to all property of the Company will be held and conveyed in the name of the Company.

[Signatures appear on the following page]

#777241
006100-0419

9

BCCNSLLC00009

IN WITNESS WHEREOF, the undersigned has executed this Memorandum as of the date first above written.

**MEMBER:**

**BOZZUTO CONSTRUCTION COMPANY**, a Maryland corporation

By: _____

Name:  Daniel C. Murphy

Title:   Senior Vice President

[Signature Page to Operating Memorandum for BCC Newtown Square, LLC]

#777241
006100-0419

BCCNSLLC00010

## EXHIBIT A

| Member | Capital Contribution |
|---|---|
| Bozzuto Construction Company<br>7850 Walker Drive, Suite 400<br>Greenbelt, Maryland 20770 | $10.00 |

A-1

#777241
006100-0419

BCCNSLLC00011

# EXHIBIT B

[attached]

B-1

#777241
006100-0419

BCCNSLLC00012

EXHIBIT "B"

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE**    ** KEEP WITH DOCUMENT **

DOCUMENT CODE __46__    BUSINESS CODE __20__

\# _____

Close _____  Stock _____  Nonstock _____

P.A. _____  Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

Affix Barcode Label Here
ID # W13610039 ACK # 1000361999899358
PAGES: 0004
BCC NEWTOWN SQUARE, LLC

MAIL
BACK

06/11/2010  AT 11:26 A WO # 0001883042

New Name _____

_____

**FEES REMITTED**

| | |
|---|---|
| Base Fee | _100_ |
| Org. & Cap. Fee: | |
| Expedite Fee: | _90_ |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | _23_ |
| Certificates | |
| Certificate of Status Fee: | _20_ |
| Personal Property Filings: | |
| Mail Processing Fee: | _5_ |
| Other: | |
| **TOTAL FEES** | _238_ |

Credit Card _____  Check _X_  Cash _____

_____ Documents on _____ Checks

Approved By: _____  A·01

Keyed By: _____

COMMENT(S): _____

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
          and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name

_____ Other Change(s)

Code __027__

Attention: Beth Crosswoller

Mail: Name and Address

_____

_____

_____

_____

_____

**Stamp Work Order and Customer Number HERE**

CUST ID:0002440004
WORK ORDER:0001883042
DATE:06-11-2010 11:26 AM
AMT. PAID:$238.00

B-2

#777241
006100-0419

BCCNSLLC00013

## ARTICLES OF ORGANIZATION
## OF
## BCC NEWTOWN SQUARE, LLC

The undersigned, acting as an authorized agent of one or more persons desiring to organize a limited liability company under and pursuant to the Maryland Limited Liability Company Act, Title 4A of the Corporations and Associations Article of the Annotated Code of Maryland (the "Act"), hereby organizes a limited liability company and hereby adopts the following Articles of Organization for said Limited Liability Company:

### ARTICLE I.

### NAME OF COMPANY

The name of the limited liability company (the "Company") is "BCC Newtown Square, LLC".

### ARTICLE II.

### PERIOD OF DURATION

The Company shall be deemed to exist as of the date these Articles of Organization are filed, and the duration of the Company shall be perpetual.

### ARTICLE III.

### PURPOSE

The purposes for which the Company is organized shall include:

1.    to perform construction and construction management services; and

2.    to do and perform all acts necessary or desirable to carry out any of the foregoing purposes; and

3.    to engage in any other lawful act or activity which may be carried on by a limited liability company under the Act which the Member may from time to time authorize or approve pursuant to the provisions of the Company's Operating Memorandum, whether or not related to the business described elsewhere in this Article III or to any other business at the time or heretofore engaged in by the Company.

# 401345
006103-0063

B-3

#777241
006100-0419

BCCNSLLC00014

## ARTICLE IV.

### PRINCIPAL OFFICE AND RESIDENT AGENT

The Company's principal place of business in Maryland is:

> 7850 Walker Drive
> Suite 400
> Greenbelt, MD 20770

The name and address of the initial resident agent of the Company is:

> Richard L. Mostyn
> 7850 Walker Drive
> Suite 400
> Greenbelt, MD 20770

## ARTICLE V.

### OPERATING MEMORANDUM

The Operating Memorandum of the Company, which is intended to be the operating agreement of the Company within the meaning of Section 4A-402 of the Act, and all amendments thereto, may be oral or in writing, and if in writing shall be executed by each Member of the Company and shall set forth all provisions for the affairs of the Company and the conduct of its business to the extent that such provisions are not inconsistent with law or these Articles.

## ARTICLE VI.

### AUTHORITY OF MEMBERS

Only the Member and any officers, agents, or employees of the Company appointed and authorized by the Member shall have authority to act for and bind the Company in any matter. If the Member is an entity, it may act for the Company through any duly authorized officer, agent or employee.

## ARTICLE VII.

### FILING OF ARTICLES OF ORGANIZATION

The Member intended to file these Articles of Organization on January 1, 2007. Due to administrative error, the Articles were not filed until as of the date hereof.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization as of this 11th day of June, 2010.

WITNESS:

_Elizabeth M. Cresswell_          _Kirsten A. Woelper_ _____ (SEAL)

Kirsten Andrews Woelper

# 401345
006103-0063

B-4

#777241
006100-0419

BCCNSLLC00015

## RESIDENT AGENT CONSENT

I HEREBY CONSENT TO ACT AS RESIDENT AGENT IN MARYLAND FOR THE

ABOVE-NAMED ENTITY.

Richard L. Mostyn

```
CUST ID:0002440004
WORK ORDER:0001883042
DATE:06-11-2010 11:26 AM
AMT. PAID:$238.00
```

B-5

#777241
006100-0419

BCCNSLLC00016

EXHIBIT "C"

ORIGINAL

# ▩AIA® Document A114™ – 2001

## Standard Form of Agreement Between Owner and Contractor
where the basis of payment is the Cost of the Work Plus a Fee without a Guaranteed Maximum Price

**AGREEMENT** made as of the <u>3rd</u> day of <u>January</u> in the year <u>2007</u>
*(In words, indicate day, month and year)*

**BETWEEN** the Owner
*(Name, address and other information):*

<u>Cornerstone Newtown Square Associates, L.P.</u>
<u>Radnor Building</u>
<u>771 East Lancaster Avenue</u>
<u>Villanova, Pennsylvania 19095</u>

and the Contractor
*(Name, address and other information):*

<u>BCC Newtown Square, LLC</u>
<u>7850 Walker Drive, Suite 400</u>
<u>Greenbelt, MD 20770</u>

The Project is
*(Name and address):*

<u>Terrazza at New Town Square</u>
<u>105 Condominium Units in 3 Buildings</u>
<u>Route 252</u>
<u>Newtown Township, Delaware County, PA</u>

The Architect is
*(Name, address and other information):*

<u>Heffner Architects, P.C.</u>
<u>604 Montgomery Street</u>
<u>Alexandria, VA 22314</u>

The Owner and Contractor agree as follows.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

EXHIBIT
1

RECEIVED

JAN ⬚ ⬚ ⬚

BOZZUTO CONSTRUCTION CO.



**AIA Document A114™ – 2001. Copyright © 2001** by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                               (501208957)

1

TABLE OF ARTICLES

1.    THE CONTRACT DOCUMENTS

2.    THE WORK OF THIS CONTRACT

3.    RELATIONSHIP OF THE PARTIES

4.    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

5.    CONTRACT SUM

6.    CONTROL ESTIMATE AND CONTRACT TIME

7.    COSTS TO BE REIMBURSED

8.    COSTS NOT TO BE REIMBURSED

9.    DISCOUNTS, REBATES AND REFUNDS

10.    SUBCONTRACTS AND OTHER AGREEMENTS

11.    ACCOUNTING RECORDS

12.    PAYMENTS

13.    TERMINATION OR SUSPENSION

14.    MISCELLANEOUS PROVISIONS

15.    ENUMERATION OF CONTRACT DOCUMENTS

16.    INSURANCE AND BONDS


AIA Document A114™ – 2001. Copyright © 2001 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                                                                  (501208957)

## ARTICLE 1  THE CONTRACT DOCUMENTS

§ 1.1 The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to the execution of this Agreement, other documents listed in this Agreement, and Modifications issued after execution of this Agreement. These listed form the Contract and are all as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 15. If anything in the other Contract Documents is inconsistent with this Agreement, this Agreement shall govern.

Notwithstanding the preceding, in the event of any conflict or inconsistency in the terms and conditions of the Contract Documents, such a conflict or inconsistency shall be resolved in the following order of priority: (A) any executed Change Order to this Agreement, (B) this AIA-A114 Agreement form as modified, (C) the attached Exhibit B – Contractor's Qualifications and Assumptions, (C) the AIA-A201 General Conditions, (D) the Drawings, if any, (E) the Specifications, if any, and (F) the balance of the Contract Documents in order of priority from greater detail to lesser detail.

## ARTICLE 2  THE WORK OF THIS CONTRACT

§ 2.1 The Contractor shall execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3  RELATIONSHIP OF THE PARTIES

§ 3.1 The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish or approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 4.1 The date of commencement of the Work shall be the date of this Agreement, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement, or if applicable, state that the date will be fixed in a notice to proceed.)*

The date of Commencement for each building shall be seven (7) working days from the latter of the following to occur:  receipt of a "Notice to Proceed" from the Owner, receipt of any necessary building permits, execution of this Agreement, and receipt of all Owner furnished items necessary to fully commence construction.

§ 4.2 The Contract Time shall be measured from the date of commencement.

§ 4.3 The Contractor shall achieve Substantial Completion of the entire Work not later than (—Three Hundred Sixty Five (365 ) days from the date of commencement for each building or as follows:
*(Insert the number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

**Portion of Work**                                    **Substantial Completion date**

, subject to adjustments of this Contract Time as provided in Section 6.2.4.



**Init.** AIA Document A114™ – 2001. Copyright © 2001 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                (501208957)

*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

If Substantial Completion of the Work is not achieved within the Contract Time, the Contractor shall be liable for and, at the Owner's request, shall pay to the Owner as Liquidated Damages and not as a Penalty the following:

**There will be no liquidated, consequential or actual damages assessed against the Contractor for failure to complete the project on time.**

The above amounts are per day, for each calendar day of delay in achieving Substantial Completion of a unit beyond the Contract Time (subject to adjustments in the Contract Time as provided for in the Contract Documents).

It is mutually agreed by the parties hereto that time shall be an essential part of this Contract with respect to the delivery of the entire Project because the Owner has entered into and will enter into time sensitive binding agreements with regard to delivery of the apartment units comprising the Project, and the if the Contractor fails to complete any of the individual condominium units within the Contract time, the Contractor shall be liable for and shall pay the Owner the sums stipulated above as Liquidated Damages for each calendar day of delay until the work is Substantially Complete.

The Owner and Contractor agree that actual damages incurred by the Owner as a result of the delay will be difficult to calculate with specificity and that the foregoing Liquidated Damages represent a good faith estimate of what the parties believe to be the amount of actual damages to be incurred by the Owner on account of the delay.

## ARTICLE 5 CONTRACT SUM

**§ 5.1** The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the actual Cost of the Work as defined in Article 7 plus the Contractor's Fee.

The Contractor shall use good faith efforts to minimize the Cost of the Work. If the final Cost of the Work of the Contractor's General Conditions, Structures, plus the Contractor's Fee is less than the total amount in the attached Preliminary Control Estimate (Exhibit G), excluding Owner upgrades made to the project in the interest of marketing and excluding homeowner options, the resulting amount shall be deemed Savings. Twenty Five Percent (25%) of any Savings shall inure to the benefit of the Contractor and shall be paid to the Contractor as additional Fee along with the final payment to the Contractor as described in Article 12.2.1.

Further, the Contractor shall receive 12.5% of the Owner's net hard cost profit from the sale of homeowner options.

**§ 5.2** The Contractor's Fee is:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee, and describe the method of adjustment of the Contractor's Fee for changes in the Work.)*

5.2.1 The Contractor shall be paid a Fee equal to Six percent (6%) of the Cost of the Work except as noted in Article 5.2.2 below.

5.2.2 For the portion of the project associated with the site infrastructure construction including mass grading, sediment and erosion control, roads, site utilities, paving, curb and gutter (more specifically, the scope of work described in the agreement related to this Project between the Owner and Lyons and Hohl, Inc.), the Contractor shall not be paid a Fee.

**§ 5.3** If the extent of changes is such that application of the adjustment provisions herein will cause substantial inequity to the Owner or Contractor, in the aggregate, the Contractor's Fee shall be equitably adjusted on the basis of the Fee established for the original Work.



**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                (501208957)

**4**

## ARTICLE 6   CONTROL ESTIMATE AND CONTRACT TIME

§ 6.1 The Contractor shall prepare and submit to the Owner, in writing, a Control Estimate. The Control Estimate shall include the estimated Cost of the Work plus the Contractor's Fee. The Control Estimate shall be used to monitor actual costs.

§ 6.2 The Control Estimate shall include:

.1    the documents enumerated in Article 15, including all Addenda thereto and the Conditions of the Contract;

.2    a list of the clarifications and assumptions made by the Contractor in the preparation of the Control Estimate, including assumptions under Section 6.4, to supplement the information provided by the Owner and contained in the Drawings and Specifications;

.3    a statement of the estimated Cost of the Work organized by trade categories or systems and the Contractor's Fee;

.4    a project schedule indicating proposed Subcontractors, activity sequences and durations, milestone dates for receipt and approval of pertinent information, schedule of shop drawings and samples, procurement and delivery of materials or equipment requiring long-lead time, and the Owner's occupancy requirements showing portions of the Project having occupancy priority; and

.5    contingencies for further development of design and construction as required by Section 6.4.

§ 6.3 The Contractor shall meet with the Owner and Architect to review the Control Estimate. In the event that the Owner or Architect discovers any inconsistencies or inaccuracies in the information presented, they shall promptly notify the Contractor, who shall make appropriate adjustments to the Control Estimate. When the Control Estimate is acceptable to the Owner, the Owner shall acknowledge it in writing. The Owner's acceptance of the Control Estimate does not imply that the Control Estimate constitutes a Guaranteed Maximum Price.

§ 6.4 To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor shall provide in the Control Estimate for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated in a revised Control Estimate by mutual agreement of the parties.

§ 6.5 The Contractor shall develop and implement a detailed system of cost control that will provide the Owner with timely information as to the anticipated total Cost of the Work. The cost control system shall compare the Control Estimate with the actual cost for activities in progress and estimates for uncompleted tasks and proposed changes. This information shall be reported to the Owner, in writing, no later than the Contractor's first Application for Payment and shall be revised at mutually agreed-upon intervals.

## ARTICLE 7   COSTS TO BE REIMBURSED

§ 7.1 Cost of the Work

The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.7, which includes all of the items of Work set forth in the Control Estimate.

§ 7.2 Labor Costs

§ 7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's approval, at off-site workshops.

See Article 14 for further clarification.

§ 7.2.2 Wages or salaries of the Contractor's supervisory and administrative personnel when stationed at the site with the Owner's approval.
*(If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal or other offices shall be included in the Cost of the Work, identify the personnel to be included, whether for all or only part of the time and the rates at which time will be charged to the Work.)*


**AIA Document A114™ – 2001. Copyright © 2001 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                     (501208957)

| Person included | Status (full-time/part-time) | Rate ($ 0.00) | Rate (unit of time) |
|---|---|---|---|
| | | | |

**§ 7.2.3** Wages and salaries of the Contractor's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

See Article 14 for further clarification.

**§ 7.2.4** Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 7.2.1 through 7.2.3.

**§ 7.3** Subcontract Costs

**§ 7.3.1** Payments made by or due from the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

**§ 7.4** Costs of Materials and Equipment Incorporated in the Completed Construction

**§ 7.4.1** Costs including transportation and storage at the site of materials and equipment incorporated, or to be incorporated, in the completed construction.

**§ 7.4.2** Costs of materials described in the preceding Section 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ 7.5** Costs of Other Materials and Equipment, Temporary Facilities and Related Items

**§ 7.5.1** Costs, including transportation and storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost (less salvage value) of such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items previously used by the Contractor shall mean fair market value.

**§ 7.5.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates of Contractor-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ 7.5.3** Costs of removal of legally disposed debris from the site.

**§ 7.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 7.5.5** That portion of the reasonable travel and subsistence expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work.

**§ 7.5.6** Costs of materials and equipment stored off-site at a mutually acceptable location, if approved in advance by the Owner.

**§ 7.6** Miscellaneous Costs

**§ 7.6.1** That portion of insurance and bond premiums that can be directly attributed to this Contract.

 **AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                                          (501208957)

**§ 7.6.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Contractor is liable.

**§ 7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections the Contractor is required by the Contract Documents to pay.

**§ 7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201-1997 or other provisions of the Contract Documents, and which do not fall within the scope of Section 7.7.3.

**§ 7.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. Such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee, however. If such royalties, fees and costs are excluded by the last sentence of Section 3.17.1 of AIA Document A201-1997 or other provisions of the Contract Documents, they shall not be included in the Cost of the Work.

**§ 7.6.6** Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.

**§ 7.6.7** Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval, which shall not be unreasonably withheld.

**§ 7.6.8** Expenses incurred in accordance with the Contractor's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the Owner.

**§ 7.7** Other Costs and Emergencies

**§ 7.7.1** Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

**§ 7.7.2** Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.6 of AIA Document A201-1997.

**§ 7.7.3** Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Contractor and only to the extent that the cost of repair or correction is not recovered by the Contractor from insurance, sureties, Subcontractors or suppliers.

7.7.4  Cost associated with data processing and software licenses directly associated with the project.

## ARTICLE 8  COSTS NOT TO BE REIMBURSED
**§ 8.1** The Cost of the Work shall not include:

    **.1**    Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Sections 7.2.2 and 7.2.3, or as may be provided in Article 14.

    **.2**    Expenses of the Contractor's principal office and offices other than the site office.

    **.3**    Overhead and general expenses, except as may be expressly included in Article 7.

    **.4**    The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

    **.5**    Rental costs of machinery and equipment, except as specifically provided in Section 7.5.2.



**AIA Document A114™ – 2001. Copyright © 2001** by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
**User Notes:**                                                                                                          (501208957)

.6    Except as provided in Section 7.7.3 of this Agreement, costs due to the negligence or failure to fulfill a specific responsibility of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable.

.7    Any cost not specifically and expressly described in Article 7.

## ARTICLE 9  DISCOUNTS, REBATES AND REFUNDS

§ 9.1 Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefore from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be obtained.

§ 9.2 Amounts that accrue to the Owner in accordance with the provisions of Section 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10  SUBCONTRACTS AND OTHER AGREEMENTS

§ 10.1 Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons from whom, or entities from which, the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Contractor and Architect, which bids will be accepted. The Contractor shall not be required to contract with anyone to whom there is reasonable objection on the Contractor's part.

§ 10.2 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement and shall not be awarded on the basis of Cost Plus a Fee without the prior consent of the Owner.

## ARTICLE 11  ACCOUNTING RECORDS

§ 11.1 The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract, and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to, and shall be permitted to audit and copy, the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Contractor shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## ARTICLE 12  PAYMENTS

§ 12.1 Progress Payments

§ 12.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 12.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

§ 12.1.3 Provided that an Application for Payment is received by the Architect not later than the  25th  day of a month, the Owner shall make payment to the Contractor not later than the  10th  day of the  following  month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than  fifteen  ( 15 ) days after the Architect receives the Application for Payment.

§ 12.1.4 With each Application for Payment, the Contractor shall submit partial release of liens, payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those


**Init.**

**AIA Document A114™ – 2001. Copyright © 2001 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.**
**User Notes:**                                                                                                  (501208957)

payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment; plus (4) retainage provided in Section 12.1.6.2, if any, applicable to prior progress payments.

**§ 12.1.5** Applications for Payment shall show the Cost of the Work actually incurred by the Contractor through the end of the period covered by the Application for Payment and for which the Contractor has made or intends to make actual payment prior to the next Application for Payment.

**§ 12.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1    take the Cost of the Work as described in Article 7;

.2    add the Contractor's Fee, less retainage ~~of ( )~~ as described below. The Contractor's Fee shall be computed upon the Cost of the Work described in the preceding Section 12.1.6.1 at the rate stated in Section 5.2; or if the Contractor's Fee is stated as a fixed sum in that paragraph, an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work in the preceding clause bears to a reasonable estimate of the probable Cost of the Work upon its ~~completion;~~completion

**Retainage:**
- An amount equal to 10% of the total cumulative draw amount shall be held as retainage by the Owner (as modified below) until the Project is fifty percent (50%) complete (as determined by the requisition) at which time no further retainage will be withheld from payments.
- No retainage shall be held on the following items:  rough carpentry materials, trusses, cabinets, appliances, general requirements, Fee, and other purchase orders for material to be utilized in performing the Work.

Within thirty (30) days of Substantial Completion, Contractor shall be paid an amount equal to the total amount payable under this Agreement (including the Cost of the Work, Fee, Contractor's share of any Savings, and retainage), less an amount equal to the value of any incomplete work and 150% of the value of any other outstanding items on the punchlist.  Furthermore, 100% payment shall be made on a line item basis within sixty (60) days after substantial completion of the following items: demolition, excavation, support of excavation, special foundations, site utilities, paving, concrete and others as mutually agreed to by the parties;

.3    subtract the aggregate of previous payments made by the Owner;

.4    subtract the shortfall, if any, indicated by the Contractor in the documentation required by Section 12.1.4 or resulting from errors subsequently discovered by the Owner's accountants in such documentation; and

.5    subtract amounts, if any, for which the Architect has withheld or withdrawn a Certificate for Payment as provided in the Contract Documents.

**§ 12.1.7** Additional retainage, if any, shall be as follows:

**§ 12.1.8** Except with the Owner's prior approval, payments to Subcontractors shall be subject to retainage of not less than ~~( )~~ that which the Owner is holding on the Contractor. The Owner and Contractor shall agree on a mutually acceptable procedure for review and approval of payments and retention for Subcontractors.

**§ 12.1.9** In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections; or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.



**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®️ Document is protected by U.S. Copyright Law and International Treaties.** Unauthorized reproduction or distribution of this AIA®️ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
**User Notes:**                                                                                                      (501208957)

§ **12.2** Final Payment

§ **12.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work, as provided in Section 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2 a final Certificate for Payment has been issued by the Architect.

§ **12.2.2** The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

§ **12.2.3** The Owner's accountants will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the Architect by the Contractor. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Contractor's final accounting, and provided the other conditions of Section 12.2.1 have been met, the Architect will, within seven days after receipt of written report of the Owner's accountants, either issue to the Owner a final Certificate for Payment with a copy to the Contractor or notify the Contractor and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of AIA Document A201-1997. The time periods stated in this Section 12.2.3 supersede those stated in Section 9.4.1 of AIA Document A201-1997.

§ **12.2.4** If the Owner's accountants report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to demand arbitration of the disputed amount without a further decision of the Architect. Such demand for arbitration shall be made by the Contractor within 30 days after the Contractor's receipt of a copy of the Architect's final Certificate for Payment. Failure to demand arbitration within this 30-day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Contractor. Pending a final resolution by arbitration, the Owner shall pay the Contractor the amount certified in the Architect's final Certificate for Payment.

§ **12.2.5** If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment.

## ARTICLE 13  TERMINATION OR SUSPENSION

§ **13.1** The Contract may be terminated by the Contractor, or by the Owner, as provided in Article 14 of AIA Document A201-1997. However, the amount to be paid to the Contractor under Section 14.1.3 of AIA Document A201-1997 shall not exceed the amount the Contractor would be entitled to receive under Section 13.2 below.

§ **13.2** The Contract may be terminated by the Owner for cause or for convenience as provided in Article 14 of AIA Document A201-1997; however, the Owner shall then only pay the Contractor an amount calculated as follows:

.1 Take the Cost of the Work incurred by the Contractor to the date of termination;

.2 Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.2 or, if the Contractor's Fee is stated as a fixed sum in that Paragraph, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and

.3 Subtract the aggregate of previous payments made by the Owner.

§ **13.3** The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Section 13.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the

**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
**User Notes:**                                                                                                                (501208957)

payments referred to in this Article 13, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

§ 13.4 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997; in such case, the Contract Sum and Contract Time shall be increased as provided in Section 14.3.2 of AIA Document A201-1997, except that the term "profit" shall be understood to mean the Contractor's Fee as described in Sections 5.2 and 5.3 of this Agreement.

## ARTICLE 14  MISCELLANEOUS PROVISIONS
§ 14.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 14.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any)*

The Prime Interest Rate as established by Bank of America plus 2%.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 14.3 The Owner's representative is:
*(Name, address and other information)*

David Della Porta
Cornerstone Newtown Square Associates, L.P.
Radnor Building
771 East Lancaster Avenue
Villanova, Pennsylvania  19095

§ 14.4 The Contractor's representative is:
*(Name, address and other information)*

David Mandes
BCC Newtown Square, LLC
7850 Walker Drive
Suite 400
Greenbelt, MD  20770

§ 14.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

§ 14.6 Dispute Resolution
§ 14.6.1 Claims, disputes or other matters in question between the parties to this Agreement shall be resolved by mediation or by arbitration. Prior to arbitration, the parties shall endeavor to reach settlement by mediation.
*(Refer to Sections 4.4 through 4.6 of AIA Document A201-1997, General Conditions of the Contract for Construction, for specific requirements related to mediation and arbitration provisions.)*



**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes: (501208957)

**§ 14.7** Other provisions:

14.7.1   Wages and salaries, including benefits of the following personnel will be considered a Cost of the Work, whether stationed onsite or offsite.  The following billing rates will be utilized for this Project (based on a 2,080 hour work year), subject to an escalation factor of five percent each year on April 1.

| | |
|---|---|
| Project Manager | $ 108.68/hour - 100% of their time will be billed to the Project |
| Assistant Project Manager(s) | $ 65.98/hour - 100% of their time will be billed to the Project |
| Project Cost Manger | $ 42.12/hour - 50% of their time will be billed to the Project |
| Project Administrator | $ 38.88/hour - 50% of their time will be billed to the Project |
| Project Superintendent | $ 92.35/hour - 100% of their time will be billed to the Project |
| Assistant Project Superintendent(s) | $ 65.70/hour - 100% of their time will be billed to the Project |
| Turnover Coordinator(s) | $ 48.18/hour - 100% of their time will be billed to the Project |

**§ 14.7.2**  Additional miscellaneous provisions:

**§ 14.7.3**  The Owner shall obtain written certification from the Architect that the Project has been designed in accordance with, and meets all applicable "Fair Housing" guidelines.  A copy of this certification shall be provided to the Contractor prior to the Date of Commencement.

**§ 14.8**   Provisions relating to non-rental dwelling community projects:

**§ 14.8.1**  Notwithstanding anything to the contrary in the Agreement, in the event of a conflict between any provision contained in this Article 14.8 and any other provision or requirement of the Agreement, the provisions of this Article 14.8 shall prevail.

**§ 14.8.5**   With respect to the formation of the Owner's condominium registration documents, sales agreements, instruments, similar documents, etc. (collectively the "Sales Documents) if any:

**§ 14.8.5.1**  Contractor will be provided the opportunity to review and comment on the Sales Documents before they are submitted for recordation.  Owner may revise the Sales Documents to take into account Contractor's comments.

**§ 14.8.5.2**   Sales Documents shall be drafted in such a way as to provide for (i) all disputes involving any unit owners or association of unit owners (collectively "Buyers") and related to the Property to be addressed through the dispute resolution provisions outlined in such documents, (ii) a jury trial waiver that will be valid and enforceable, and (iii) provisions that require the Buyers to engage, in good faith, in alternative dispute resolution procedures before there is a right to bring a lawsuit.

**§ 14.8.6**  The Owner, upon becoming aware of an issue with the Buyers and/or being advised by the Buyers that it has a claim that may involve construction defects, will (i) immediately inform Contractor of any such issues, (ii) provide the Contractor with an opportunity to review all documents relating to such issues, and (iii) provide the Contractor with an appropriate opportunity to participate in any further discussions with the Buyers related to such issues.

**§ 14.8.7**  The Contractor shall be provided a copy of all meeting minutes, and other such documentation created by the Buyers within 10 days of the Owner's receipt thereof.

**§ 14.8.8**  The Owner shall establish a 'pro-active' customer service program to provide for prompt and reasonable resolution of any issues raised by the Buyers.  Such customer service program shall remain in place for a period not less than any applicable warranty period.  Contractor shall have the right to review and approve such customer service program prior to the Owner closing on any unit.

**§ 14.8.11**  The Owner shall maintain an insurance program which shall include sufficient coverage for, among other risks, (i) the acts or omissions of its design professionals and (ii) property insurance, including coverage for inherent defects, until such time as no further liability exists for the parties to this Agreement (so-called "Completed Operations" coverage).  To the extent the Owner fails to purchase or maintain such insurance, the Owner agrees to



**AIA Document A114™ – 2001. Copyright © 2001** by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
**User Notes:**
(501208957)

**12**

indemnify, defend and hold Contractor harmless from any claim that is, or should have been, covered by such insurance program.

**§ 14.8.12** To the fullest extent permitted by law, but except with respect to claims based on Contractor's failure to perform the Work in accordance with this Agreement, the Owner shall indemnify, defend and hold harmless the Contractor, and its agents and employees, from and against all claims, damages, losses and expenses, including, but not limited to, attorneys' fees and consultants' fees, arising out of or resulting from suits and or claims of any kind by the Buyers made directly against the Contractor. This shall in no way limit or reduce the Owner's ability to make a claim directly against the Contractor as further described elsewhere within this Agreement.

14.9 The Owner has engaged the Contractor to supervise the site infrastructure work on this project, more specifically, the scope of work described in the agreement related to this Project between the Owner and Lyons and Hohl, Inc.. The Contractor will not be entitled to earn any Fee for supervising this work. The Contractor shall, however, be paid for its actual Cost of Work as described in Article 7 and Article 14 for supervising this scope of work.

## ARTICLE 15 ENUMERATION OF CONTRACT DOCUMENTS
§ 15.1 The Contract Documents include:

 .1 The Agreement is this executed 2001 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A114.

 .2 The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201.

 .3 The Supplementary and other Conditions of the Contract are as follows:

| ~~Document~~ | ~~Title~~ | ~~Pages~~ |
| --- | --- | --- |

§ 15.1.4 The Specifications and Addenda, if any, are as follows:
*(Either list here or refer to an exhibit attached to this Agreement)*

Title of Specifications exhibit:   ( See Article 15.1.6)

Title of Addenda exhibit:  ( See Article 15.1.6)

| ~~Section~~ | ~~Title~~ | ~~Pages~~ |
| --- | --- | --- |

| ~~Number~~ | ~~Date~~ | ~~Pages~~ |
| --- | --- | --- |

§ 15.1.5 The Drawings are as follows, and are dated unless a different date is shown below:
*(Either list here or refer to an exhibit attached to this Agreement)*

Title of Drawings exhibit:  ( See Article 15.1.6)

| ~~Number~~ | ~~Title~~ | ~~Date~~ |
| --- | --- | --- |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 15.

§ 15.1.6 Other Documents, if any, forming part of the Contract Documents are as follows:



**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes: (501208957)

**13**

*(List here any additional documents, such as a list of allowances or unit prices that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements, such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid, are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

**The Contract Documents also include the following Exhibits:**
- Exhibit A – List of Drawings and Specifications
- Exhibit B  – List of Contractor's Qualifications and Assumptions
- Exhibit C – List of Allowances
- Exhbit D – Insurance Certificate
- Exhibit E – Preliminary Construction Schedule
- Exhibit F – Boilerplate Subcontract Agreement
- Exhibit G – Preliminary Control Estimate
- Exhibit H – Lender letter / Contractor's Consent

## ARTICLE 16  INSURANCE AND BONDS
**§ 16.1** The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201-1997.
*(List required limits of liability for insurance and bonds. AIA Document A201-1997 gives other specific requirements or insurance and bonds.)*

**Type of insurance**                                   **Limits of liability ($ 0.00)**

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

**OWNER**                                               **CONTRACTOR**

Cornerstone Newtown Square Associates, L.P.            BCC Newtown Square, LLC
By:  Cornerstone Newtown Square, LLC,
General Partner

_(Signature)_                                          _(Signature)_                1/24/07
David Della Porta, Member                              Michael Schlegel, President
_(Printed name and title)_                             _(Printed name and title)_


**AIA Document A114™ – 2001. Copyright** © 2001 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:38:03 on 01/24/2007 under Order No.1000272247_2 which expires on 11/29/2007, and is not for resale.
User Notes:                                                                                                   **14**

(501208957)



# AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

**for the following PROJECT:**
*(Name and location or address):*
Terrazza at New Town Square
05 Condominium Units in 3 Buildings
Route 252
Newtown Township, Delaware County, PA

**THE OWNER:**
*(Name and address):*
Cornerstone Newtown Square Associates, L.P.
Radnor Building
771 East Lancaster Avenue
Villanova, Pennsylvania  19095

**THE ARCHITECT:**
*(Name and address):*
Heffner Architects,  P.C.
604 Montgomery Street
Alexandria, VA  22314

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America

## TABLE OF ARTICLES

1        GENERAL PROVISIONS

2        OWNER

3        CONTRACTOR

4        ADMINISTRATION OF THE CONTRACT

5        SUBCONTRACTORS

6        CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7        CHANGES IN THE WORK

8        TIME

9        PAYMENTS AND COMPLETION

10       PROTECTION OF PERSONS AND PROPERTY

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

11      INSURANCE AND BONDS

12      UNCOVERING AND CORRECTION OF WORK

13      MISCELLANEOUS PROVISIONS

14      TERMINATION OR SUSPENSION OF THE CONTRACT

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                        2

                                                                                                        (893685214)

## INDEX

(Numbers and Topics in Bold are Section Headings)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
**3.16, 6.2.1, 12.1**
Accident Prevention
4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1, 9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3
Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, **4**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
**Allowances**
**3.8**
All-risk Insurance
11.4.1.1
**Applications for Payment**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5, 9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2, 13.4.2, 13.5
**Arbitration**
4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1, 11.4.9, 11.4.10
**Architect**
**4.1**
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2, 7.3.6, 7.4, 9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1, 9.10.3, 12.1, 12.2.1, 13.5.1, 13.5.2, 14.2.2, 14.2.4
Architect, Limitations of Authority and Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 4.4, 5.2.1, 7.4, 9.4.2, 9.6.4, 9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
**Architect's Administration of the Contract**
3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12, 13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
**Boiler and Machinery Insurance**
11.4.2
Bonds, Lien
9.10.2
Bonds, Performance, and Payment
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

3

(893685214)

9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8, 4.2.8, 4.3.4,
4.3.9, 5.2.3, 7.1, **7.2**, 7.3, 8.3.1, 9.3.1.1, 9.10.3,
11.4.1.2, 11.4.4, 11.4.9, 12.1.2
Change Orders, Definition of
7.2.1
**CHANGES IN THE WORK**
3.11, 4.2.8, **7**, 8.3.1, 9.3.1.1, 11.4.9
Claim, **Definition of**
**4.3.1**
**Claims and Disputes**
3.2.3, **4.3**, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8, 9.3.3, 9.10.4,
10.3.3
**Claims and Timely Assertion of Claims**
**4.6.5**
**Claims for Additional Cost**
3.2.3, 4.3.4, **4.3.5**, 4.3.6, 6.1.1, 7.3.8, 10.3.2
**Claims for Additional Time**
3.2.3, 4.3.4, **4.3.7**, 6.1.1, 8.3.2, 10.3.2
**Claims for Concealed or Unknown Conditions**
**4.3.4**
Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3,
11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1
**Cleaning Up**
**3.15, 6.3**
**Commencement of Statutory Limitation Period**
**13.7**
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 4.3.5, 5.2.1,
5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1,  11.4.1, 11.4.6,
11.5.1
Commencement of the Work, Definition of
8.1.2
**Communications Facilitating Contract**
**Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8,
9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**
Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
9.10.4.2, 12.2, 13.7
Compliance with Laws

1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6.4,
4.6.6, 9.6.4, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14.1.1, 14.2.1.3
Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,  13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
**1.1.4, 6**
Construction Change Directive, Definition of
7.3.1
**Construction Change Directives**
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3**, 9.3.1.1
Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
**Contingent Assignment of Subcontracts**
**5.4, 14.2.2.2**
**Continuing Contract Performance**
**4.3.3**
Contract, Definition of
1.1.2
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.4.9, **14**
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating
to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
**Contract Documents, The**
**1.1, 1.2**
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
**Contract Sum**
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2,
9.5.1.4, 9.6.7, 9.7, 10.3.2, 11.4.1,  14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4, 8.1.1, 8.2,
8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1,  14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
**3**
Contractor, Definition of
3.1, 6.1.2
**Contractor's Construction Schedules**
1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

4

(893685214)

3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1,
**Contractor's Liability Insurance**
**11.1**
Contractor's Relationship with Separate Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2, 12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2, 11.4.1.2, 11.4.7, 11.4.8
Contractor's Relationship with the Architect
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1, 3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12, 13.4.2, 13.5
Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2
Contractor's Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1, 10
Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
4.3.10, 14.1
Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.5.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12, 14
Contractual Liability Insurance
11.1.1.8, 11.2, 11.3
Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications
1.6, 2.2.5, 3.11
Copyrights
1.6, 3.17
Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, 12.2, 13.7.1.3
**Correlation and Intent of the Contract Documents**
**1.2**
Cost, Definition of
7.3.6
Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2, 6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8, 9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1, 12.2.1, 12.2.4, 13.5, 14
**Cutting and Patching**

6.2.5, **3.14**
Damage to Construction of Owner or Separate Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6, 11.1, 11.4, 12.2.4
Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4
Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
Date of Commencement of the Work, Definition of
8.1.2
Date of Substantial Completion, Definition of
8.1.3
Day, Definition of
8.1.4
Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4
**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3
Defective Work, Definition of
3.5.1
Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1
**Delays and Extensions of Time**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8
**Documents and Samples at the Site**
**3.11**
Drawings, Definition of
1.1.5
Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3
Effective Date of Insurance
8.2.2, 11.1.2
**Emergencies**
4.3.5, **10.6**, 14.1.1.2
Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1
Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Execution and Progress of the Work

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7, 3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4, 8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3
Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2
**Failure of Payment**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Faulty Work
(*See* Defective or Nonconforming Work)
**Final Completion and Final Payment**
4.2.1, 4.2.9, 4.3.2, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5
Fire and Extended Coverage Insurance
11.4
**GENERAL PROVISIONS**
**1**
**Governing Law**
**13.1**
Guarantees (*See* Warranty)
Hazardous Materials
10.2.4, **10.3**, 10.5
Identification of Contract Documents
1.5.1
Identification of Subcontractors and Suppliers
5.2.1
**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7
**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
**Injury or Damage to Person or Property**
**4.3.8, 10.2, 10.6**
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.2, 9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2, 13.5.2
Insurance
3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4, 9.9.1, 9.10.2, 9.10.5, 11
**Insurance, Boiler and Machinery**
11.4.2
**Insurance, Contractor's Liability**
11.1
Insurance, Effective Date of
8.2.2, 11.1.2
**Insurance, Loss of Use**
11.4.3
**Insurance, Owner's Liability**
11.2

**Insurance, Project Management Protective Liability**
11.3
**Insurance, Property**
10.2.5, **11.4**
Insurance, Stored Materials
9.3.2, 11.4.1.4
**INSURANCE AND BONDS**
**11**
Insurance Companies, Consent to Partial Occupancy
9.9.1, 11.4.1.5
Insurance Companies, Settlement with
11.4.10
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
**Interest**
**13.6**
**Interpretation**
1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
4.6.4
**Judgment on Final Award**
**4.6.6**
**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Liens
2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
**Limitation on Consolidation or Joinder**
**4.6.4**
Limitations, Statutes of
4.6.3, 12.2.6, 13.7
Limitations of Liability
2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10, 3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 9.10.4, 10.3.3, 10.2.5, 11.1.2, 11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14
**Loss of Use Insurance**
**11.4.3**
Material Suppliers
1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
Materials, Hazardous
10.2.4, 10.3, 10.5

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23, 3.12, 3.13,
3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3,
9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
4.4.8
**Mediation**
4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2, 8.3.1, 10.5
**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**
**MISCELLANEOUS PROVISIONS**
**13**
Modifications, Definition of
1.1.1
Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1,
9.7, 10.3.2, 11.4.1
**Mutual Responsibility**
**6.2**
**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**
Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2, 9.9.3, 9.10.4,
12.2.1, 13.7.1.3
Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4, 3.12.9, 4.3,
4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 11.1.3,
11.4.6, 12.2.2, 12.2.4, 13.3, 13.5.1, 13.5.2, 14.1, 14.2
**Notice, Written**
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Notice of Testing and Inspections
13.5.1, 13.5.2
Notice to Proceed
8.2.2
**Notices, Permits, Fees and**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5
Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1
**OWNER**
**2**
Owner, Definition of
2.1
**Owner, Information and Services Required of the**
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3,
6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3,
11.2, 11.4, 13.5.1, 13.5.2, 14.1.1.4, 14.1.4
Owner's Authority

1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2,
4.1.3, 4.2.4, 4.2.9, 4.3.6, 4.4.7, 5.2.1, 5.2.4, 5.4.1,
6.1, 6.3, 7.2.1, 7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1,
9.9.1, 9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3, 11.4.10,
12.2.2, 12.3.1, 13.2.2, 14.3, 14.4
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5
**Owner's Liability Insurance**
**11.2**
Owner's Loss of Use Insurance
11.4.3
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
**Owner's Right to Carry Out the Work**
**2.4, 12.2.4, 14.2.2.2**
**Owner's Right to Clean Up**
**6.3**
**Owner's Right to Perform Construction and to**
**Award Separate Contracts**
**6.1**
**Owner's Right to Stop the Work**
**2.3**
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
**Ownership and Use of Drawings, Specifications**
**and Other Instruments of Service**
1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1, 4.2.12, 5.3
**Partial Occupancy or Use**
9.6.6, **9.9**, 11.4.1.5
**Patching, Cutting and**
**3.14, 6.2.5**
Patents
3.17
**Payment, Applications for**
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1, 9.8.5,
9.10.1, 9.10.3, 9.10.5, 11.1.3, 14.2.4, 14.4.3
**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7.1, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of**
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6
Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1,
11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3
**Payment Bond, Performance Bond and**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
**PAYMENTS AND COMPLETION**
**9**
Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 11.4.8,
14.2.1.2
PCB
10.3.1

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

**Performance Bond and Payment Bond**
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
**Permits, Fees and Notices**
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
**PERSONS AND PROPERTY, PROTECTION OF**
**10**

Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4
**Progress Payments**
4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
**Project Management Protective Liability Insurance**
**11.3**
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.4**
**PROTECTION OF PERSONS AND PROPERTY**
**10**
Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 4.4.8, 4.6,
9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1,
13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1,
9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1, 5.1.2,
13.2.1
**Resolution of Claims and Disputes**
**4.4, 4.5, 4.6**
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2, 6.3, 9.5.1,
10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field Conditions by Contractor**
1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner and Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and Samples by Contractor
3.12
**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4, 4.5, 4.6, 5.3,
5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3,
12.2.2, 12.2.4, **13.4**, 14
**Royalties, Patents and Copyrights**
**3.17**
Rules and Notices for Arbitration
4.6.2
**Safety of Persons and Property**
**10.2, 10.6**
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3.1, **10.1**, 10.2, 10.6
Samples, Definition of
3.12.3
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and**
**3.11**
**Schedule of Values**
**9.2, 9.3.1**
Schedules,
1.4.1.2, 3.10, 3.Construction12.1, 3.12.2, 4.3.7.2,
6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6, 8.3.1,
11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
Site, Use of
**3.13, 6.1.1, 6.2.1**
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
**Specifications, The**
1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11, 3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
**SUBCONTRACTORS**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                    (893685214)

**8**

**5**

Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2, 9.6.7

**Subcontractual Relations**
**5.3, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7, 11.4.8, 14.1, 14.2.1, 14.3.2**

Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3

**Subrogation, Waivers of**
6.1.1, 11.4.5, **11.4.7**

**Substantial Completion**
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1, 9.10.3, 9.10.4.2, 12.2, 13.7

Substantial Completion, Definition of
9.8.1

Substitution of Subcontractors
5.2.3, 5.2.4

Substitution of Architect
4.1.3

Substitutions of Materials
3.4.2, 3.5.1, 7.3.7

Sub-subcontractor, Definition of
5.1.2

Subsurface Conditions
4.3.4

**Successors and Assigns**
**13.2**

**Superintendent**
**3.9, 10.2.6**

**Supervision and Construction Procedures**
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3, 6.1.3, 6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2, 10, 12, 14

Surety
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2

Surety, Consent of
9.10.2, 9.10.3

Surveys
2.2.3

**Suspension by the Owner for Convenience**
**14.4**

Suspension of the Work
5.4.2, 14.3

Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14

**Taxes**
**3.6, 3.8.2.1, 7.3.6.4**

**Termination by the Contractor**
4.3.10, **14.1**

**Termination by the Owner for Cause**
4.3.10, 5.4.1.1, **14.2**

Termination of the Architect
4.1.3

Termination of the Contractor
14.2.2

**TERMINATION OR SUSPENSION OF THE CONTRACT**
**14**

**Tests and Inspections**
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 10.3.2, 11.4.1.1, 12.2.1, **13.5**

**TIME**
**8**

**Time, Delays and Extensions of**
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Time Limits
2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11, 3.12.5, 3.15.1, 4.2, 4.3, 4.4, 4.5, 4.6, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5, 13.7, 14

**Time Limits on Claims**
**4.3.2, 4.3.4, 4.3.8, 4.4, 4.5, 4.6**

Title to Work
9.3.2, 9.3.3

**UNCOVERING AND CORRECTION OF WORK**
**12**

**Uncovering of Work**
**12.1**

Unforeseen Conditions
4.3.4, 8.3.1, 10.3

Unit Prices
4.3.9, 7.3.3.2

Use of Documents
1.1.1, 1.6, 2.2.5, 3.12.6, 5.3

**Use of Site**
**3.13, 6.1.1, 6.2.1**

**Values, Schedule of**
**9.2, 9.3.1**

Waiver of Claims by the Architect
13.4.2

Waiver of Claims by the Contractor
4.3.10, 9.10.5, 11.4.7, 13.4.2

Waiver of Claims by the Owner
4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5, 11.4.7, 12.2.2.1, 13.4.2, 14.2.4

**Waiver of Consequential Damages**
**4.3.10, 14.2.4**

Waiver of Liens
9.10.2, 9.10.4

**Waivers of Subrogation**
6.1.1, 11.4.5, **11.4.7**

**Warranty**
**3.5, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2, 13.7.1.3**

Weather Delays
4.3.7.2

Work, Definition of
1.1.3

Written Consent

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                          (893685214)

1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4, 9.3.2,
9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2
Written Interpretations
4.2.11, 4.2.12, 4.3.6
**Written Notice**

2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3, 4.4.8, 4.6.5,
5.2.1, 8.2.2, 9.7, 9.10, 10.2.2, 10.3, 11.1.3, 11.4.6,
12.2.2, 12.2.4, **13.3**, 14
Written Orders
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1, 12.2,
13.5.2, 14.3.1

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

## ARTICLE 1  GENERAL PROVISIONS
### § 1.1 BASIC DEFINITIONS
### § 1.1.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements).

### § 1.1.2 THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

### § 1.1.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### § 1.1.4 THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### § 1.1.5 THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### § 1.1.6 THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### § 1.1.7 THE PROJECT MANUAL

The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS

§ 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

§ 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

§ 1.2.3 Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

**11**

## § 1.3 CAPITALIZATION
**§ 1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

## § 1.4 INTERPRETATION
**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

## § 1.5 EXECUTION OF CONTRACT DOCUMENTS
**§ 1.5.1** The Contract Documents shall be signed by the Owner and Contractor. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

**§ 1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

## § 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
**§ 1.6.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

## ARTICLE 2  OWNER
### § 2.1 GENERAL
**§ 2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

**§ 2.1.2** The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

## § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
**§ 2.2.1** The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:**

**12**

(893685214)

continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

**§ 2.2.2** Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**§ 2.2.3** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

**§ 2.2.4** Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

**§ 2.2.5** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

### § 2.3 OWNER'S RIGHT TO STOP THE WORK
**§ 2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

### § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
**§ 2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

### ARTICLE 3  CONTRACTOR
### § 3.1 GENERAL
**§ 3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**§ 3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**§ 3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

### § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
**§ 3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                    (893685214)

13

Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

§ 3.2.2 Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

§ 3.2.3 If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES
§ 3.3.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

§ 3.3.3 The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## § 3.4 LABOR AND MATERIALS
§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                    (893685214)

14

## § 3.5 WARRANTY

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## § 3.6 TAXES

§ 3.6.1 The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES AND NOTICES

§ 3.7.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

§ 3.7.4 If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES

§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

§ 3.8.2 Unless otherwise provided in the Contract Documents:
- .1     allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;
- .2     Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;
- .3     whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2.

§ 3.8.3 Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT

§ 3.9.1 The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                      (893685214)

communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

§ 3.10.1 The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

§ 3.10.2 The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.

§ 3.10.3 The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

§ 3.11.1 The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

§ 3.12.1 Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

§ 3.12.2 Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

§ 3.12.3 Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

§ 3.12.4 Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

§ 3.12.5 The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

§ 3.12.6 By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

§ 3.12.7 The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                                          (893685214)

16

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

### § 3.13 USE OF SITE
**§ 3.13.1** The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

### § 3.14 CUTTING AND PATCHING
**§ 3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

**§ 3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### § 3.15 CLEANING UP
**§ 3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

**§ 3.15.2** If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes: 17 (893685214)

## § 3.16 ACCESS TO WORK
§ 3.16.1 The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

## § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
§ 3.17.1 The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

## § 3.18 INDEMNIFICATION
§ 3.18.1 To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Section 11.3, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4  ADMINISTRATION OF THE CONTRACT
## § 4.1 ARCHITECT
§ 4.1.1 The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

§ 4.1.3 If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

## § 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
§ 4.2.1 The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Section 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

§ 4.2.2 The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                  (893685214)

18

deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 4.2.4 Communications Facilitating Contract Administration. Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

§ 4.2.6 The Architect will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 4.2.7 The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.

§ 4.2.9 The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                          (893685214)

19

**§ 4.2.11** The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

**§ 4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by hoth Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

**§ 4.2.13** The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

## § 4.3 CLAIMS AND DISPUTES
**§ 4.3.1** Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**§ 4.3.2** Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

**§ 4.3.3** Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**§ 4.3.4** Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.

**§ 4.3.5** Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

**§ 4.3.6** If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:** (893685214)

**20**

§ 4.3.7 Claims for Additional Time
§ 4.3.7.1 If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

§ 4.3.7.2 If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

§ 4.3.8 Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

§ 4.3.9 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

§ 4.3.10 Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1    damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

## § 4.4 RESOLUTION OF CLAIMS AND DISPUTES

§ 4.4.1 Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

§ 4.4.2 The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.

§ 4.4.3 In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.

§ 4.4.4 If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                    (893685214)

21

**§ 4.4.5** The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

**§ 4.4.6** When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

**§ 4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

## § 4.5 MEDIATION

**§ 4.5.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

**§ 4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**§ 4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## § 4.6 ARBITRATION

**§ 4.6.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

**§ 4.6.2** Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.

**§ 4.6.3** A demand for arbitration shall be made within the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                    (893685214)

22

**§ 4.6.4** Limitation on Consolidation or Joinder. No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 4.6.5** Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 4.6.6** Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5   SUBCONTRACTORS
### § 5.1 DEFINITIONS
**§ 5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**§ 5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
**§ 5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

**§ 5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**§ 5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

**§ 5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                    (893685214)

23

## § 5.3 SUBCONTRACTUAL RELATIONS

§ 5.3.1 By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## § 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1   assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2   assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

§ 5.4.2 Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6   CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS
## § 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

§ 6.1.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Section 4.3.

§ 6.1.2 When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

§ 6.1.3 The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

§ 6.1.4 Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

## § 6.2 MUTUAL RESPONSIBILITY

§ 6.2.1 The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                            (893685214)

24

**§ 6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**§ 6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**§ 6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

### § 6.3 OWNER'S RIGHT TO CLEAN UP
**§ 6.3.1** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

### ARTICLE 7  CHANGES IN THE WORK
### § 7.1 GENERAL
**§ 7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**§ 7.1.2** A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

**§ 7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

### § 7.2 CHANGE ORDERS
**§ 7.2.1** A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:
.1      change in the Work;
.2      the amount of the adjustment, if any, in the Contract Sum; and
.3      the extent of the adjustment, if any, in the Contract Time.

**§ 7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Section 7.3.3.

### § 7.3 CONSTRUCTION CHANGE DIRECTIVES
**§ 7.3.1** A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**§ 7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                    (893685214)

25

**§ 7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

.1    mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2    unit prices stated in the Contract Documents or subsequently agreed upon;

.3    cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

.4    as provided in Section 7.3.6.

**§ 7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**§ 7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Section 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3    rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

.4    costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.5    additional costs of supervision and field office personnel directly attributable to the change.

**§ 7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.8** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

**§ 7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## § 7.4 MINOR CHANGES IN THE WORK

**§ 7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                              (893685214)

## ARTICLE 8   TIME
### § 8.1 DEFINITIONS
§ 8.1.1 Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

§ 8.1.2 The date of commencement of the Work is the date established in the Agreement.

§ 8.1.3 The date of Substantial Completion is the date certified by the Architect in accordance with Section 9.8.

§ 8.1.4 The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

### § 8.2 PROGRESS AND COMPLETION
§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ 8.2.2 The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

§ 8.2.3 The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

### § 8.3 DELAYS AND EXTENSIONS OF TIME
§ 8.3.1 If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

§ 8.3.2 Claims relating to time shall be made in accordance with applicable provisions of Section 4.3.

§ 8.3.3 This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9   PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
§ 9.1.1 The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
§ 9.2.1 Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
§ 9.3.1 At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

27

(893685214)

payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

§ 9.3.1.1 As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

§ 9.3.1.2 Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

§ 9.3.2 Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

§ 9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## § 9.4 CERTIFICATES FOR PAYMENT
§ 9.4.1 The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

§ 9.4.2 The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION
§ 9.5.1 The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Section 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of:
    .1    defective Work not remedied;

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

28

(893685214)

.2    third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3    failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5    damage to the Owner or another contractor;

.6    reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7    persistent failure to carry out the Work in accordance with the Contract Documents.

**§ 9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

## § 9.6 PROGRESS PAYMENTS

**§ 9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**§ 9.6.7** Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

## § 9.7 FAILURE OF PAYMENT

**§ 9.7.1** If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:**
(893685214)

## § 9.8 SUBSTANTIAL COMPLETION

§ 9.8.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

§ 9.8.2 When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ 9.8.3 Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

§ 9.8.4 When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ 9.8.5 The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

## § 9.9 PARTIAL OCCUPANCY OR USE

§ 9.9.1 The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

§ 9.9.2 Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

§ 9.9.3 Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## § 9.10 FINAL COMPLETION AND FINAL PAYMENT

§ 9.10.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:**

(893685214)

30

the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:
- .1 liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
- .2 failure of the Work to comply with the requirements of the Contract Documents; or
- .3 terms of special warranties required by the Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10  PROTECTION OF PERSONS AND PROPERTY
## § 10.1 SAFETY PRECAUTIONS AND PROGRAMS
**§ 10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

## § 10.2 SAFETY OF PERSONS AND PROPERTY
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:
- .1 employees on the Work and other persons who may be affected thereby;
- .2 the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
- .3 other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:**                                                                                                    (893685214)

31

§ **10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

§ **10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

§ **10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

§ **10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

§ **10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

### § 10.3 HAZARDOUS MATERIALS
§ **10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

§ **10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

§ **10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

§ **10.4** The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
**User Notes:**                                                                                   (893685214)

§ 10.5 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

### § 10.6 EMERGENCIES
§ 10.6.1 In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

### ARTICLE 11  INSURANCE AND BONDS
### § 11.1 CONTRACTOR'S LIABILITY INSURANCE
§ 11.1.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

- .1 claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;
- .2 claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;
- .3 claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;
- .4 claims for damages insured by usual personal injury liability coverage;
- .5 claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;
- .6 claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;
- .7 claims for bodily injury or property damage arising out of completed operations; and
- .8 claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

§ 11.1.2 The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

§ 11.1.3 Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

### § 11.2 OWNER'S LIABILITY INSURANCE
§ 11.2.1 The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

### § 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE
§ 11.3.1 Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

**33**

**§ 11.3.2** To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

**§ 11.3.3** The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability Insurance coverage under Section 11.1.

## § 11.4 PROPERTY INSURANCE
**§ 11.4.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

**§ 11.4.1.1** Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

**§ 11.4.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.

**§ 11.4.1.3** If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

**§ 11.4.1.4** This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

**§ 11.4.1.5** Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

**§ 11.4.2** Boiler and Machinery Insurance. The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

**§ 11.4.3** Loss of Use Insurance. The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                          (893685214)

**34**

§ **11.4.4** If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

§ **11.4.5** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

§ **11.4.6** Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

§ **11.4.7** Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

§ **11.4.8** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

§ **11.4.9** If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

§ **11.4.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

## § 11.5 PERFORMANCE BOND AND PAYMENT BOND
§ **11.5.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**AIA Document A201™ – 1997. Copyright** © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA**® **Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA**® **Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes: **35**

(893685214)

§ 11.5.2 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

## ARTICLE 12   UNCOVERING AND CORRECTION OF WORK
## § 12.1 UNCOVERING OF WORK
§ 12.1.1 If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2 If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

## § 12.2 CORRECTION OF WORK
## § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION
§ 12.2.1.1 The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

## § 12.2.2 AFTER SUBSTANTIAL COMPLETION
§ 12.2.2.1 In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Section 2.4.

§ 12.2.2.2 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

§ 12.2.2.3 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

§ 12.2.3 The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4 The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

§ 12.2.5 Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                          (893685214)

Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## § 12.3 ACCEPTANCE OF NONCONFORMING WORK
§ 12.3.1 If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 13   MISCELLANEOUS PROVISIONS
### § 13.1 GOVERNING LAW
§ 13.1.1 The Contract shall be governed by the law of the place where the Project is located.

### § 13.2 SUCCESSORS AND ASSIGNS
§ 13.2.1 The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

§ 13.2.2 The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

### § 13.3 WRITTEN NOTICE
§ 13.3.1 Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

### § 13.4 RIGHTS AND REMEDIES
§ 13.4.1 Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

§ 13.4.2 No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### § 13.5 TESTS AND INSPECTIONS
§ 13.5.1 Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

§ 13.5.2 If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:

(893685214)

§ 13.5.3 If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

§ 13.5.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

§ 13.5.5 If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

§ 13.5.6 Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## § 13.6 INTEREST
§ 13.6.1 Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

## § 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD
§ 13.7.1 As between the Owner and Contractor:
- .1 Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;
- .2 Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and
- .3 After Final Certificate for Payment. As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT
## § 14.1 TERMINATION BY THE CONTRACTOR
§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:
- .1 issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;
- .2 an act of government, such as a declaration of national emergency which requires all Work to be stopped;
- .3 because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents; or
- .4 the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Section 2.2.1.

§ 14.1.2 The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                      (893685214)

by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

**§ 14.1.3** If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**§ 14.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

### § 14.2 TERMINATION BY THE OWNER FOR CAUSE
**§ 14.2.1** The Owner may terminate the Contract if the Contractor:
- .1 persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;
- .2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;
- .3 persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or
- .4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

**§ 14.2.2** When any of the above reasons exist, the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:
- .1 take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;
- .2 accept assignment of subcontracts pursuant to Section 5.4; and
- .3 finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**§ 14.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**§ 14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

### § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE
**§ 14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**§ 14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:
- .1 that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or
- .2 that an equitable adjustment is made or denied under another provision of the Contract.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes: (893685214)

## § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

**§ 14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

    **.1**    cease operations as directed by the Owner in the notice;

    **.2**    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

    **.3**    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**§ 14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:42:14 on 09/28/2006 under Order No.1000261133_1 which expires on 9/28/2007, and is not for resale.
User Notes:                                                                                                                                          (893685214)

40

# Exhibit A

# List of Contract Documents

## *(to be inserted)*

## Newtown Square
Newtown Township, PA

### Exhibit "A" - Contract Documents

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| | 01 - Drawings | | |
| **Architectural** | | **Design Firm:** Heffner Architects, P.C. | |
| AC1.00 | COVER SHEET | 6/23/2006 | 0 |
| AS1.00 | SITE PLAN ADDRESS PLAN | 6/23/2006 | 0 |
| A2.10 | (BLDG# 1) GARAGE FLOOR PLAN | 6/23/2006 | 0 |
| A2.11 | 1ST FLOOR PLAN (BLDG# 1) | 6/23/2006 | 0 |
| A2.12 | 2ND & 3RD FLOOR (SIMILAR) FLOOR PLAN | 6/23/2006 | 0 |
| A2.13 | PENTHOUSE FLOOR PLAN | 6/23/2006 | 0 |
| A2.14 | REFLECTED CEILING PLAN (BLDG# 1) | 6/23/2006 | 0 |
| A2.20 | GARAGE FLOOR PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A2.21 | 1ST FLOOR PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A2.22 | 2ND & 3RD (SIMILAR) FLOOR PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A2.23 | PENTHOUSE FLOOR PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A2.24 | REFLECTED CEILING PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A2.30 | (BLDG# 3) GARAGE FLOOR PLAN | 6/23/2006 | 0 |
| A2.31 | 1ST FLOOR PLAN (BLDG# 3) | 6/23/2006 | 0 |
| A2.32 | REFLECTED CEILING PLAN (BLDG# 3) | 6/23/2006 | 0 |
| A3.11 | ROOF PLAN (BLDG# 1 & 3) | 6/23/2006 | 0 |
| A3.21 | ROOF PLAN (BLDG# 2) | 6/23/2006 | 0 |
| A4.11 | BUILDING 1 & 3 ELEVATIONS | 6/23/2006 | 0 |
| A4.12 | BUILDING #1 & 3 ELEVATIONS | 6/23/2006 | 0 |
| A4.13 | BUILDING #1 & 3 ELEVATIONS | 6/23/2006 | 0 |
| A4.14 | BUILDING #3 ELEVATIONS | 6/23/2006 | 0 |
| A4.21 | BUILDING #2 ELEVATIONS | 6/23/2006 | 0 |
| A4.22 | BUILDING #2 ELEVATIONS | 6/23/2006 | 0 |
| A4.23 | BUILDING #2 ELEVATIONS | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| A5.11 | UNIT PLANS A & B | 6/23/2006 | 0 |
| A5.12 | UNIT PLANS B1 & C | 6/23/2006 | 0 |
| A5.13 | UNIT PLANS C1 | 6/23/2006 | 0 |
| A5.14 | UNIT PLANS D | 6/23/2006 | 0 |
| A5.15 | UNIT PLANS E | 6/23/2006 | 0 |
| A5.16 | UNIT PLANS E | 6/23/2006 | 0 |
| A5.21 | ANSI UNITS PLANS A & C | 6/23/2006 | 0 |
| A5.31 | INTERIOR ELEVATIONS | 6/23/2006 | 0 |
| A5.32 | INTERIOR ELEVATIONS | 6/23/2006 | 0 |
| A6.01 | (BLDG# 1 & 3) CORE PLANS | 6/23/2006 | 0 |
| A6.02 | (BLDG# 1 & 3) CORE PLANS | 6/23/2006 | 0 |
| A6.11 | STAIR PLANS/SECTION BUILDING TYPE 1 & 3 | 6/23/2006 | 0 |
| A6.12 | STAIR PLANS/SECTION | 6/23/2006 | 0 |
| A6.21 | STAIR DETAIL | 6/23/2006 | 0 |
| A7.11 | BUILDING SECTION TYPICAL | 6/23/2006 | 0 |
| A7.12 | BUILDING SECTION TYPICAL | 6/23/2006 | 0 |
| A8.11 | EXTERIOR WALL SECTIONS | 6/23/2006 | 0 |
| A8.12 | EXTERIOR WALL SECTIONS | 6/23/2006 | 0 |
| A8.21 | INTERIOR WALL SECTIONS | 6/23/2006 | 0 |
| A8.22 | INTERIOR WALL SECTIONS | 6/23/2006 | 0 |
| A8.31 | WALL SECTIONS | 6/23/2006 | 0 |
| A8.32 | WALL SECTIONS | 6/23/2006 | 0 |
| A9.10 | SCHEDULE | 6/23/2006 | 0 |
| A9.20 | ASSEMBLIES | 6/23/2006 | 0 |
| A9.20-B | ASSEMBLIES | 6/23/2006 | 0 |
| A9.20-C | ASSEMBLIES | 6/23/2006 | 0 |
| A9.21 | WALL TYPES | 6/23/2006 | 0 |
| A9.22 | FLOOR/CEILING TYPES | 6/23/2006 | 0 |
| A9.30 | FIRESTOP ASSEMBLIES | 6/23/2006 | 0 |
| A9.31 | FIRESTOP ASSEMBLIES | 6/23/2006 | 0 |
| A9.32 | FIRESTOP DETAILS | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| A9.40 | DOOR DETAILS | 6/23/2006 | 0 |
| A9.41 | WINDOW DETAILS | 6/23/2006 | 0 |
| A9.50 | FLASHING DETAILS | 6/23/2006 | 0 |
| A9.60 | DETAILS BELOW GRADE WATERPROOFING | 6/23/2006 | 0 |
| A9.61 | DETAILS FLAT ROOF | 6/23/2006 | 0 |
| A9.62 | DETAILS ASPHALT SHINGLE ROOF | 6/23/2006 | 0 |
| A9.63 | DETAILS PLAZA DECK WATERPROOFING | 6/23/2006 | 0 |
| A9.64 | DETAILS PLAZA DECK WATERPROOFING | 6/23/2006 | 0 |
| A9.65 | DETAILS ROOFING TABLES | 6/23/2006 | 0 |
| A9.66 | DETAILS METAL PANEL ROOFING | 6/23/2006 | 0 |
| A9.67 | DETAILS TRAFFIC BEARING COATINGS | 6/23/2006 | 0 |
| A9.68 | DETAILS MISC. WATERPROOFING | 6/23/2006 | 0 |
| ACH-0.00 | COVER SHEET | 6/23/2006 | 0 |
| ACH1.0 | CLUBHOUSE BASEMENT FLOOR PLAN | 6/23/2006 | 0 |
| ACH1.1 | CLUBHOUSE 1ST FLOOR PLAN | 6/23/2006 | 0 |
| ACH2.1 | CLUBHOUSE REFLECTED CEILING PLAN BASEMENT FLOOR PLAN | 6/23/2006 | 0 |
| ACH2.2 | CLUBHOUSE REFLECTED CEILING PLAN FIRST FLOOR PLAN | 6/23/2006 | 0 |
| ACH3.1 | CLUBHOUSE ROOF PLAN | 6/23/2006 | 0 |
| ACH4.1 | CLUBHOUSE FRONT & REAR ELEVATIONS | 6/23/2006 | 0 |
| ACH4.2 | CLUBHOUSE SIDE ELEVATIONS | 6/23/2006 | 0 |
| ACH4.3 | CLUBHOUSE PORTICO ELEVATIONS | 6/23/2006 | 0 |
| ACH5.1 | CLUBHOUSE SCHEDULES | 6/23/2006 | 0 |
| ACH5.2 | CLUBHOUSE INTERIOR ELEVATIONS | 6/23/2006 | 0 |
| ACH6.0 | CLUBHOUSE ENLARGED STAIR FLOOR PLANS | 6/23/2006 | 0 |
| ACH7.1 | CLUBHOUSE SECTIONS | 6/23/2006 | 0 |
| ACH7.2 | CLUBHOUSE SECTIONS | 6/23/2006 | 0 |
| ACH7.3 | CLUBHOUSE SECTIONS | 6/23/2006 | 0 |
| ACH8.1 | EXTERIOR WALL SECTIONS | 6/23/2006 | 0 |
| ACH9.1 | DOOR DETAILS | 6/23/2006 | 0 |
| ACH9.2 | WINDOW DETAILS | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| ACH9.3 | MISC. DETAILS | 6/23/2006 | 0 |
| ACH9.4 | ASPHALT DETAILS | 6/23/2006 | 0 |
| ACH9.5 | BELOW GRADE WATERPROOFING DETAILS | 6/23/2006 | 0 |
| **Electrical** | **Design Firm:** Summit Engineers, Inc. | | |
| E0.00 | COVER SHEET ELECTRICAL | 6/23/2006 | 0 |
| E1.10A | BLDG 1 GARAGE FLOOR PLAN ELECTRICAL | 6/23/2006 | 0 |
| E1.10B | BLDG 2 GARAGE FLOOR PLAN ELECTRICAL | 6/23/2006 | 0 |
| E1.10C | BLDG 3 GARAGE FLOOR PLAN ELECTRICAL | 6/23/2006 | 0 |
| E1.11 | ELECTRICAL TYPICAL FIRST FLOOR PLAN BUILDING 1 & 3 BUILDING 2 SIM. | 6/23/2006 | 0 |
| E1.12 | TYPICAL 2nd-4th FLOORS PLANS BUILDINGS 1&3 ELECTRICAL | 6/23/2006 | 0 |
| E1.13 | ELECTRICAL TYPICAL ROOF PLAN BUILDING 1&3 BUILDING SIM. | 6/23/2006 | 0 |
| E2.10 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.11 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.12 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.13 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.14 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.15 | ELECTRICAL UNIT PLANS | 6/23/2006 | 0 |
| E2.16 | ELECTRICAL ANSI UNIT PLANS: | 6/23/2006 | 0 |
| E3.10 | ELECTRICAL TYPICAL PANEL SCHEDULES & POWER RISER BUILDING 1,2 & 3 | 6/23/2006 | 0 |
| E3.20 | ELECTRICAL TYPICAL RISER DIAGRAMS BUILDING 1, 2 & 3 | 6/23/2006 | 0 |
| ECH1.00 | CLUBHOUSE LOWER LEVEL: ELECTRICAL | 6/23/2006 | 0 |
| ECH1.10 | CLUBHOUSE UPPER LEVEL: ELECTRICAL | 6/23/2006 | 0 |
| **Mechanical** | **Design Firm:** Summit Engineers, Inc. | | |
| M0.01 | MECHANICAL COVER | 6/23/2006 | 0 |
| M2.10 | MECHANICAL PLAN BUILDING NO.1 GARAGE | 6/23/2006 | 0 |
| M2.11 | MECHANICAL PLAN BUILDING NO.1 & NO. 3 FIRST FLOOR | 6/23/2006 | 0 |
| M2.12 | MECHANICAL PLAN BUILDING NO.1 & NO. 3 SECOND & THIRD FLOOR | 6/23/2006 | 0 |
| M2.13 | MECHANICAL PLAN BUILDING NO.1 & NO. 3 PENTHOUSE/FOURTH FLOOR | 6/23/2006 | 0 |
| M2.14 | MECHANICAL PLAN BUILDING NO.1 & NO 3 ROOF | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| M2.20 | MECHANICAL PLAN BUILDING NO. 2 GARAGE | 6/23/2006 | 0 |
| M2.21 | MECHANICAL PLAN BUILDING NO. 2 FIRST FLOOR | 6/23/2006 | 0 |
| M2.22 | MECHANICAL PLAN BUILDING NO. 2 SECOND & THIRD FLOOR | 6/23/2006 | 0 |
| M2.23 | MECHANICAL PLAN BUILDING NO. 2 PENTHOUSE/FOURTH FLOOR | 6/23/2006 | 0 |
| M2.24 | MECHANICAL PLAN BUILDING NO. 2 ROOF | 6/23/2006 | 0 |
| M2.30 | MECHANICAL PLAN | 6/23/2006 | 0 |
| M5.11 | MECHANICAL PLAN UNITS A | 6/23/2006 | 0 |
| M5.12 | MECHANICAL PLAN UNITS B | 6/23/2006 | 0 |
| M5.13 | MECHANICAL PLAN UNITS B1 | 6/23/2006 | 0 |
| M5.14 | MECHANICAL PLAN UNITS B1 & C | 6/23/2006 | 0 |
| M5.15 | MECHANICAL PLAN UNITS C | 6/23/2006 | 0 |
| M5.16 | MECHANICAL PLAN UNITS C1 | 6/23/2006 | 0 |
| M5.17 | MECHANICAL PLAN UNITS D | 6/23/2006 | 0 |
| M5.18 | MECHANICAL PLAN UNITS D AND E | 6/23/2006 | 0 |
| M5.19 | MECHANICAL PLAN UNITS E | 6/23/2006 | 0 |
| M5.20 | MECHANICAL PLAN UNITS E1 | 6/23/2006 | 0 |
| MCH0.01 | MECHANICAL COVER CLUBHOUSE | 6/23/2006 | 0 |
| M-CH1.0 | MECHANICAL PLAN CLUBHOUSE BASEMENT | 6/23/2006 | 0 |
| M-CH1.1 | MECHANICAL PLAN CLUBHOUSE FIRST FLOOR | 6/23/2006 | 0 |

**Plumbing**                                   **Design Firm:** Summit Engineers, Inc.

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| P0.01 | PLUMBING COVER | 6/23/2006 | 0 |
| P2.10A | PLUMBING GARAGE BELOW SLAB PLAN BUILDING NO. 1 | 6/23/2006 | 0 |
| P2.10B | PLUMBING GARAGE ABOVE CIELING PLAN BUILDING NO. 1 | 6/23/2006 | 0 |
| P2.10C | PLUMBING EXTERIOR BELOW GRADE DRAINAGE PLAN BUILDING #1 | 6/23/2006 | 0 |
| P2.11 | PLUMBING FIRST FLOOR PLAN BUILDING NO. 1 | 6/23/2006 | 0 |
| P2.12 | PLUMBING SECOND & THIRD FLOOR PLAN BUILDING NO. 1, 2 3 | 6/23/2006 | 0 |
| P2.13 | PLUMBING FOURTH FLOOR PLAN BUILDING NO.1,NO.2 & NO.3 | 6/23/2006 | 0 |
| P2.14 | PLUMBING ROOF PLAN BUILDING NO.1,NO.3 & NO.2 MIRROR | 6/23/2006 | 0 |
| P2.20A | PLUMBING GARAGE BELOW SLAB PLAN BUILDING NO.2 | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| P2.20B | PLUMBING GARAGE BELOW SLAB PLAN BUILDING NO.2 | 6/23/2006 | 0 |
| P2.20C | PLUMBING EXTERIOR DRAINAGE PLAN BUILDING #2 | 6/23/2006 | 0 |
| P2.21 | PLUMBING FIRST FLOOR PLAN BUILDING #2 | 6/23/2006 | 0 |
| P2.30A | PLUMBING GARAGE BELOW SLAB PLAN BUILDING NO.3 | 6/23/2006 | 0 |
| P2.30B | PLUMBING GARAGE ABOVE CEILING PLAN BUILDING NO.3 | 6/23/2006 | 0 |
| P2.30C | PLUMBING EXTERIOR DRAINAGE PLAN BUILDING NO.3 | 6/23/2006 | 0 |
| P2.31 | PLUMBING FIRST FLOOR PLAN BUILDING #3 | 6/23/2006 | 0 |
| P3.11 | PLUMBING SUPPLY RISER | 6/23/2006 | 0 |
| P3.12 | PLUMBING UNIT SUPPLY RISER | 6/23/2006 | 0 |
| P3.13 | PLUMBING UNIT SUPPLY RISER | 6/23/2006 | 0 |
| P4.11 | PLUMBING DRAINAGE RISER | 6/23/2006 | 0 |
| P4.12 | PLUMBING WASTE AND VENT RISER | 6/23/2006 | 0 |
| P5.11 | PLUMBING PLANS UNITS A, B AND B1 | 6/23/2006 | 0 |
| P5.12 | PLUMBING PLANS UNITS C AND C1 | 6/23/2006 | 0 |
| P5.13 | PLUMBING PLANS UNITS D AND E | 6/23/2006 | 0 |
| P5.14 | PLUMBING PLANS UNIT E1 AND PARTIALS | 6/23/2006 | 0 |
| PCH0.01 | PLUMBING CLUBHOUSE COVER | 6/23/2006 | 0 |
| PCH1.0 | PLUMBING CLUBHOUSE PLAN BASEMENT | 6/23/2006 | 0 |
| PCH1.1 | PLUMBING CLUBHOUSE PLAN FIRST FLOOR | 6/23/2006 | 0 |
| PCH2.1 | PLUMBING CLUBHOUSE RISERS | 6/23/2006 | 0 |

**Structural**                                                    **Design Firm:**  Cates Engineering, LTD

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| S0.1 | GENERAL NOTES | 6/23/2006 | 0 |
| S1.1 | BLDG. 1 FOUNDATION PLAN | 6/23/2006 | 0 |
| S1.2 | BLDG. 1 ELEVATED SLAB PLAN | 6/23/2006 | 0 |
| S1.3 | BLDG. 1 SLAB DIM./OPNG. PLAN | 6/23/2006 | 0 |
| S1.4 | BLDG. 2 FOUNDATION PLAN | 6/23/2006 | 0 |
| S1.5 | BLDG. 2 ELEVATED SLAB PLAN | 6/23/2006 | 0 |
| S1.6 | BLDG. 2 SLAB DIM./OPNG. PLAN | 6/23/2006 | 0 |
| S1.7 | BLDG. 3 FOUNDATION PLAN | 6/23/2006 | 0 |
| S1.8 | BLDG. 3 ELEVATED SLAB PLAN | 6/23/2006 | 0 |

| Number | Title | Revision Date | Revision Number |
|---|---|---|---|
| S1.9 | BLDG. 3 SLAB DIM./OPNG. PLAN | 6/23/2006 | 0 |
| S2.1 | FOUNDATION AND SLAB DETAILS | 6/23/2006 | 0 |
| S2.2 | TYPICAL CONCRETE DETAILS | 6/23/2006 | 0 |
| S2.3 | TYPICAL CONCRETE DETAILS | 6/23/2006 | 0 |
| S2.4 | CONCRETE SECTIONS | 6/23/2006 | 0 |
| S3.1 | BLDG. 1 & 3 2ND FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S3.2 | BLDG. 1 & 3 2ND FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S3.3 | BLDG. 1 & 3 4TH FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S3.4 | BLDG. 2 2ND FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S3.5 | BLDG. 2 3RD FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S3.6 | BLDG. 2 4TH FLR. FRAMING PLAN | 6/23/2006 | 0 |
| S4.1 | BLDG. 1 7 3 ROOF FRAMING PLAN | 6/23/2006 | 0 |
| S4.2 | BLDG. 2 ROOF FRAMING PLAN | 6/23/2006 | 0 |
| S5.1 | FRAMING DETAILS | 6/23/2006 | 0 |
| S5.2 | FRAMING DETAILS | 6/23/2006 | 0 |
| S5.3 | ROOF FRAMING DETAILS | 6/23/2006 | 0 |
| SC0.1 | GENERAL NOTES | 6/23/2006 | 0 |
| SC1.1 | CLUBHOUSE FOUNDATION PLAN | 6/23/2006 | 0 |
| SC2.1 | FOUNDATION AND SLAB DETAILS | 6/23/2006 | 0 |
| SC2.2 | FOUNDATION AND SLAB DETAILS | 6/23/2006 | 0 |
| SC3.1 | CLUBHOUSE FIRST FLOOR FRAMING PLAN | 6/23/2006 | 0 |
| SC4.1 | CLUBHOUSE ROOF FRAMING PLAN | 6/23/2006 | 0 |
| SC5.1 | FRAMING DETAILS | 6/23/2006 | 0 |
| SC5.2 | FRAMING DETAILS | 6/23/2006 | 0 |

## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
9/15/06

### General:

1. These Contract Clarifications are to serve as a summary of what we've assumed and what has been incorporated into the documents.

2. This budget considers the construction of three (3) 4-story buildings over parking garages and one (1) clubhouse with the following assumptions:
   a. Sitework is to be contracted by the owner and managed by BCC with all overhead items associated with the sitework being billed through the General Conditions portion of the contract.
   b. Sitework is to include all of the work as described in the Chester Valley Engineers civil plan.

3. Should seasonal and/or extreme weather conditions cause any delays in the schedule not directly the fault of the Contractor, the schedule shall be extended without penalty to the Contractor.

4. Isolation of sound at walls, ceilings, rooftops and specifically over the parking garages has been engineered by others, hence not the liability of the Contractor. BCC recommends that all plans be reviewed by a sound engineering consultant.

5. The construction industry is an ever changing marketplace with regards to pricing. BCC in conjunction with the owner will devise a purchasing timeline so as to ensure the best possible price and value to the owner and mitigate the risk that this market lends itself to.

6. We have assumed that the project and all of its parcels have been designed to the full extent of, and in total compliance with, all applicable standards for Fair Housing, ADA, ANSI and any other requirement posed by other agencies. Should any portion of this project be found in violation of any applicable standards, having been built to the design and specifications set forth by the Architect and Engineers of Record, the contractor shall not be found liable for the violations and shall be held harmless for any costs, direct or indirect, incurred in the correction of such violation(s) or in defense thereof.

7. We assume the Owner will pay all local fees including, but not limited to, tap fees, connection fees, power company (or other such utility) fees, system development changes, lost parking meter revenue fees, water meter fees, and obtain all site approvals. Fees for the site work permits and the building permits/trade permits have not been included. We have not included



Page 1 of 20

# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
.9/15/06

public improvement bonds of any type, nor other fees or costs for which developers are typically responsible.

8. The owner will provide structural engineering and geotechnical inspections as recommended by BCC.

9. We have included certain allowances in the preparation of our pricing. These allowances include all labor, material, equipment and other costs associated with, or related to, the subject work, unless otherwise indicated

10. We have assumed that the Owner will provide the Payment & Performance Bonds, General & Excess Liability insurance and Builder's Risk insurance policies for the project.

11. We have priced the project based on a saleable condominium project; therefore, we have not included any down time (remobilization) between construction of each building.

12. We have priced this Project based upon a reasonable interpretation of the most current set of Drawings available to us at this time. While applicable to the Construction Drawings and intended for future use, any details, sketches, schedules, matrices, notes, addenda, RFI responses, electronic communication, or other modifications have been excluded from this proposal, unless otherwise expressly specified herein.

### Div. 2 - Sitework:

1. Spoils for building construction are to be lost on site. Currently no haul or import of soils is anticipated.

2. We have assumed that the Owner provide all geotechnical testing.

3. We exclude any work associated with the handling, transporting, disposing or containment of any contaminated soils.

4. We have assumed sewer tie-in to be within 5' of the associated building and water tie-in to be terminated in the water room of the associated building.

5. We have included an allowance for secondary electrical distribution based on 50 feet per building in aluminum. Non concrete encasement is included.



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

6. The Contractor will coordinate the public utility contractors on-site (gas, phone, electric, cable television, etc.). The Owner shall pay all fees for the installation of the services, procure the designs, execute necessary agreements and obtain required approvals in a timely manner, so that the Contractor may perform the work in a normal sequence and in a timely manner. The Contractor will, in good faith, schedule these utility contractors in accordance with their lead-time requirements, taking into account the overall project schedule, without assuming responsibility for the performance of these utility contractors.

7. We have assumed that the base-paving course has been designed to adequately support / withstand construction loading. The Owner will be responsible for costs associated with repairs to asphalt damaged due to construction traffic loading.

8. We have assumed that any and all utility work will be performed during normal work hours. Any required night-tapping and other after-hours work required by entities other than BCC has been excluded.

9. We have assumed adequate access to the site.

### Div. 3 - Concrete:

1. Concrete installation at Buildings 1, 2 and 3. Building spread and continuous footers; basement perimeter walls; basement interior stairwell walls; elevator pit mat, sump and walls; basement garage columns and drop out panels; 5" garage slab on grade, including beams and slab folds; 11" thick first floor structural slab; pan filled stairs and landings.

2. Concrete installation at one (1) Clubhouse. Building spread and continuous footers; basement stairwell mat; elevator pit mat; bulk pour footer placed on continuous foots at the pool area; basement perimeter walls; elevator pit walls; basement stairwell walls; 4" basement slab on grade with turn down haunch at the pool interior perimeter; CIP stairs for the basement stairwell' 4" exterior porch slab on grade (2 each)' pan filled stairs and landing.

3 Furnish and install all concrete reinforcing steel as shown. This price includes approximately 404 tons of concrete reinforcing steel. Masonry related rebar in not included in this portion of the work.

4. Furnish and install all 6x6x10/10 welded wire mesh for the porch and basement stair landings and slabs on grade.



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

**CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS**
9/15/06

5. Includes furnish and install of expansion joints, perimeter insulation, 6 mil polyethylene vapor barrier, diamond isolation joints, slab cure and saw cut control joints in the slab on grade.

6. No water stopping has been included in the concrete portion of the work except for that other than the elevator pits.

7. Concrete compressive strength and ad-mixtures in compliance with notes on sheet S.1.

8. Gypcrete price is based on Rapid Floor Plus gypsum concrete floor underlayment over Acousti Mat II by Maxxon Corporation. Rapid Floor Plus will be installed at a one (1) inch thickness over ¼ inch mat to provide a smooth, FLAT surface. Compressive strength will be 2500-3000 PSI. Second, third and fourth floors will be done in their entirety in three buildings.

### Div. 4 – Masonry:

1. Furnish and install normal weight CMU.

2. Furnish and install rebar (straight stick only) in reinforced CMU cores at elevator shafts and stairwells as shown.

3. Hot-dipped, standard gage, horizontal wire reinforcing in CMU.

4. Grout for reinforced cells.

5. CMU included in this price is an 8" CMU which has a two (2) hour rating supplied by an independent laboratory. It is not UL rated.

6. CMU pricing does not include any glass block that may have been implied in bathrooms by note "42" h wall w/ glass". These walls are included as a stickframe and drywall construction wall.

7. Planter boxes at plaza locations which are shown to be CMU construction with brick veneer have been excluded from this price completely. They are being treated as a separate entity from the plaza so as to minimize penetrations into the deck. We have included pricing for these planters elsewhere and included them as large pots which will be placed on top of the finished grade.



# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

**CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS**
9/15/06

8. Stone veneer pricing includes stone lintels, 15 lb felt, 2.5 lb wire lath, scratch coat, stop bead at windows and doors and bituthane tape over nailing flange at windows and doors.

9. Corners are to receive corner stones. Windows and knee walls to receive sill stones.

10. Stone veneer to be manufactured and installed by selected subcontractor. Final selection to be made by owner.

11. Stone color to be standard, stone style to be standard and mortar color is to be standard gray or off-white.

12. Drip edge between stone and stucco is to be .019 aluminum.

13. Stone veneer is to continue into all returns, including deck returns.

### Div. 5 – Metals:

1. Steel pan stairwells to be complete with accessories as necessary, with handrails and cane detection rail. All handrail turns to be smooth and at a consistent curve. All handrail returns to run flush to wall.

2. The following columns and beams to be provided:
   a. 3"x3"x5/16" tube steel columns & bases, labeled TS-3
   b. 3" steel pipe columns & bases, labeled SC-3
   c. 5"x3"x5/16" tube steel columns & bases, labeled TS-5
   d. W8x18 hoist beam
   e. W18x50 beam

3. Elevator angles at door openings are to 3-1/2"x3-1/2"x1/4"; Elevator sills are to be 4"x4"x3/8" angles w/ 3/4" dia bolts; Elevator hoist beam to have be 4"x4"x1/2" angles w/ 1/2" dia x 6" long headed stud. A 12"x12" sump pit cover and associated angles to also be supplied.

4. Garage perimeter to have 6'-0" vertical aluminum fence/grate.

5. All metals to be painted.



# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

## CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
### 9/15/06

6. Balcony railings are aluminum powder coated, installed at 42" in height, complete with accessories as necessary to produce a complete job.

### Div. 6 – Carpentry:

1. Our rough carpentry material pricing is based on a weighted composite of lumber components published weekly in Random Lengths. The rough carpentry material quantity is based on historical square foot data. We are currently carrying an allowance of $1,328,332. This allowance is subject to change upon final pricing.

2. Price is based on using Borate pressure treated decking material at balconies.

3. Furnish and install all necessary rough framing for a complete structure per contract documents

4. All floor framing shall be 20" deep pre-engineered open web wood trusses designed and spaced by truss manufacturer. All roof framing (consisting of flat and sloped members) shall be pre-engineered roof trusses designed & spaced by truss manufacturer.

5. Finish Carpenter to install all unit and common area doors and related hardware, door casing and trim, window stool and apron, and base, shoe mold, chair rail, moulding and crown trim.

6. Millwork material in Units includes the following paint grade trim, to be furnished and installed:

    a. Base: 5-1/2" finger jointed O.G. Base
    b. Casing Doors/Windows: 3-1/4" Finger Jointed
    c. Shoe Molding: WM-127 7/16" x 1/4" round shoe
    d. Chair Rail and Crown Moulding in Dining Room
    e. Shoe Moulding at hard surface areas
    f. Fireplace trim as shown in details

7. Millwork material in Common Areas includes the following paint grade trim, to be furnished and installed:
    a. As shown in details



# EXHIBIT 'B'
# BOZZUTO CONSTRUCTION COMPANY
## Terrazza @ Newtown Square
## Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
9/15/06

8. Currently an allowance it being carried for Finish Carpentry Materials, as with Rough Carpentry Materials this allowance is subject to change upon final pricing. The current allowance is: $234,400.

## Div. 7 – Thermal and Moisture Protection:

1. Furnish and install Rub-R-Wall waterproofing membrane with Hydroduct 200 (or equal) onto 11'-0"poured concrete foundation/garage exterior walls and elevator pit walls below grade as follows:
    a. Install Rub-R-Wall membrane from finished grade to top of footing overlapping footing 0'-3" per manufacturer's specs. Install Hydrocut 200 (or equal) from approximately 0'-8" below finished grade to top of footing.

2. Furnish and install Rub-R-Wall waterproofing membrane with Hydrocut 660 (or equal) with 1" Styrofoam onto the horizontal plaza decks as follows:
    a. Install RPC S/Q sheet membrane along perimeter of framing 0'-9" up wall from plaza and 0'-9" from plate onto plaza surface.
    b. Install Rub-R-Wall waterproofing membrane onto entire plaza deck surface overlapping all S/A sheet membrane.
    c. Install WR Grace Hydrocut 660 (or equal) over entire plaza deck surface covering the Rub-R-Wall.
    d. Install 1" Styrofoam over Hydrocut on plaza deck surface.

3. Furnish and install stucco above stonework and on porch returns. Columns on tower to be different stucco color. Stucco includes stop bead around all windows and doors, bituthane tape around windows and doors and three coat stucco system with 15lb felt paper on 2.5lb wire lath. Finish coat can be an acrylic or non-acrylic as selected by owner. Stucco bands to be 1" deep and varying thicknesses, manufactured by Manning Materials.

4. Roof shingles to be GAF 25 year 3-tab over 30# felt paper. Ridge vent is to be shingled over.

5. Metal flashing has been included at eaves, rakes and top of roof deck as .024ga C-3 1/2 aluminum.

6. Ice and water shield has been included at eaves, valleys and roof/wall intersections. It has been included as:
    a. Eaves – 54" weather watch
    b. Valleys – 36" weather watch



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

7. Metal roofing has been included as Atas Techo Metal Tile 24ga steel over 30# felt paper.

8. At all deck locations as shown, waterproofing has been included on the top of the deck as Duradeck Surcoseal 60 mil Ultra. The soffit of the same decks have been included to receive T-2" vinyl beaded soffit solid soffit.

9. At the inside portion of the roof deck there are conflicting notes as to what material is to be used to side this location. It has been included as Heartland Autumnwood D4" or D5" over Tyvek at line of siding.

10. At condo buildings, 8" aluminum wrap has been included at fascia and rakeboard as shown. 11" aluminum wrap frieze board has been included at eaves as shown. At the clubhouse fascia has been includes as Azek 5/4" x 8" typical and 5/4" x 10" at spires.

11. At condo buildings, Vinyl vented soffit has been included as 24" at eaves and rakes and as 30" at eaves at spires. At the clubhouse vinyl vented soffit has been included as 12" at eaves and rakes typical and 30" at eaves at spires.

12. Gutters and downspouts have been included as:
    a. Gutters to be 6K (.027ga) aluminum
    b. Downspouts to be 3" x 4" (.019ga) aluminum
    c. Concrete splash blocks have been provided as shown and necessary

13. Insulation has been include as:
    a. Garage ceiling – 3.5" R-13 kraft faced fiberglass batt
    b. Exterior walls 1st, 2nd, 3rd & 4th – 3.5" R-13 kraft faced fiberglass batt
    c. Party/Separation wall – 3.5" R-13 unfaced batt insulation (both sides of wall)
    d. Exposed ceilings which cant be blown – 10" R-30 kraft faced fiberglass batt
    e. Main flat ceiling – R-30 12.5" blown fiberglass insulation
    f. Ceilings between units 1st, 2nd & 3rd – 3.5" R-11 unfaced fiberglass batt
    g. Baffles – 16" Styrofoam ventilation baffles as needed

14. We have not included any sprayed fire proofing.

### Div. 8 – Doors, Windows and Hardware:

1. Hardware to be Schlage Accent 619 model line or approved equal.



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

2. All windows to be double hung vinyl windows unless noted to be fixed.

3. Tempered Glass is included where required by code.

4. Entry and patio doors are fiberglass.

5. Window F is fixed according to the schedule.

6. Patios on floors 1 through 3 have 8' doors (type D2) and 6' windows (type C per "Window Schedule" and type C1 per "Window Types" on A9.10) with no transoms.

7. Patios on the 4th floor have 8' doors (type D2A) and 6' windows (type C1 per "Window Schedule" and type C2 per "Window Types" on A9.10) with transoms.

8. Overhead garage doors are 22' long, not 24' long. The garage door type shown is not available in 24' lengths due to lack of structural integrity of the door material at that length.

9. Window type E1 in Unit D is now window type E per "Window Schedule" and "Window Types" on A9.10.

10. Per detail 6 on A5.31 and discussions with the Architect, the middles window shown will be window type G and the side windows will be window type J both at the second and third floor. At this same location on the fourth floor, the middle window will be window type F and the side windows will be window type H.

11. Window type L includes a transom and will be provided at the elevation shown in detail 4 on A5.31. Window type M does not include a transom and will be included at the detail shown on detail 6 on A5.31. Both of these windows as shown on the schedule, whether with or without a transom will have a total height of 7'-4".

12. Door type D2E is on the fourth floor patio locations only.

### Div. 9 – Finishes:

1. Due to the discrepancies within the drawings as to which types of partitions were to be used and where they were to be applied, below is a clarification of what has been included and where.



Page 9 of 20

# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

## CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
### 9/15/06

a.  **Corridor Wall Assembly**: Single layer of 5/8" Type 'C' on RC-2 channel 24" O.C. at corridor side of walls, with an additional layer of 5/8" Type 'X' to corridor walls for sound. Single layer of 5/8" Type 'C' on unit side of walls. Based on UL Rated Assembly U-311. Includes pre-rock behind tubs, medicine cabinets, electrical boxes, washer boxes and ice maker line boxes.

b.  **Floor/Ceiling Assembly**: Single layer of 5/8" Type 'C' on RC-2 channel 16" O.C. at first, second and third floor unit and corridor ceilings, with an additional layer of 5/8" Type 'X' at all locations for sound and ratings. Based on UL Rated Assembly L-521.

c.  **Roof/Ceiling Assembly**: Single Layer of 5/8" Type 'C' on RC-s channel 12" O.C. at fourth floor unit and corridor ceilings. Based on UL Rated Assembly P-522.

d.  **Exterior Walls**: Single layer of 5/8" Type 'X' at exterior walls of units based on UL Rated Assembly U-356. Includes pre-rock behind tubs, medicine cabinets, electrical panel, washer boxes and ice maker line boxes.

e.  **Unit Separation/Party Walls**: Single layer of 5/8" Type 'X' at each side of walls. Based on UL Rated Assembly U-341. Includes pre-rock behind tubs, medicine cabinets, electrical panel, washer boxes and ice maker line boxes.

f.  **Rated and Non-Rated Partition Walls**: Single layer of 5/8" Type 'X' at walls based on UL Rated Assembly U-305. Denshield tile backer at tub and shower walls (added as an additional layer when tub and shower walls call on rated walls).

g.  **Garage Level Partitions**: Single layer of 5/8" Type 'X' at lobby and elevator mechanical room walls only. Based on UL Rated Assembly U-905.

h.  **Fourth Floor Balcony Ceilings**: Single layer of 5/8" Type 'C' with an additional layer of 5/8" exterior soffit board. Based on a UL Rated Assembly P-522.

i.  **Stair Towers, Elevator and Trash Chute Ceilings**: 1" liner panel on CH studs with two layers of ½" Type 'C' based on 2-hour rated ceiling assembly NER-258. Interior wall of stair towers and elevators do not get sheetrock. First floor interior walls of stair towers shall have a single layer of 5/8" Type 'X' on framing. No sheetrock at underside of stair landings and stringers. No sheetrock has been included in stair towers with the exception of the entry level walls to maintain continuity with the corridors within the core of the building.

j.  **Trash and Elevator Mechanical Room**: Two hour suspended ceiling on kinetic springs. Based on custom assembly by architect.

k.  **Garage Ceiling**: USG Donn DX 15/16 Grid and "Vinyl Roc" ceiling board.

l.  **Clubhouse**: Single layer of 5/8" Type 'X' at all walls and ceilings. Pool room shall have a single layer of 5/8" DensArmor due to the moisture content of the air at this location. Elevator shaft ceiling to be the same as the condo buildings with an NER-258 assembly.



# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

## CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
### 9/15/06

2. Finish applied to drywall will be a level 4 smooth finish in accordance with industry standards and commonly accepted trade practice.

3. All soffits within units are wood framed with drywall covering.

4. Due to the lack of a flooring specification, assumptions have been made for each flooring product used. They are as follows:
   a. **Units**
      i. **Carpet**: 25 oz. nylon – continuous filament over ½" FHA foam pad – 2.2 pd.
      ii. **VCT**: 12" x 12" dry back VCT.
      iii. **Hardwood**: 3 strip snap in place wood over foam underlayment (2 ¼" wide visual).
      iv. **Tile Hall and Master Bath Walls**: 6" x 6" white/almond semi-gloss.
      v. **Tile Powder Room, Hall & Master Bath Floors**: 6" x 6" white/almond matte.
      vi. **Tile Foyer Floors**: 8" x 8" white/almond matte.
   b. **Common Areas**
      i. **Carpet**: Based on $40 per square yard allowance installed. We have included corridor bands at intersections and projections to facilitate carpet repair.
      ii. **Tile Floors** – 18" x 18" Dal Tile Villa Valetta.
      iii. **VCT** – 12" x 12" dry back VCT.
   c. **Clubhouse**
      i. **Carpet**: TBD – Based on $30 per square yard allowance installed. Glue down installation.
      ii. **Tile Bar, Kitchen, Resistance Pool**: 8" x 8" white/almond matte.
      iii. **Tile Powder Room, Men's and Women's Toilet Floors**: 6" x 6" white/almond matte.
      iv. **Tile Men's and Women's Toilet Wet Walls and Shower Walls**: 6" x 6" white/almond semi-gloss.
      v. **Vestibule**: 12" x 12" Cream Marfil Classic Dal Tile M722 marble.

5. Ceramic tile has been included in the coat closets and coat closets. This is contrary to the plans however it allows the same material to be carried from the adjacent areas into the closets rather than switching.

6. Ceramic tile has been included at the face of Jacuzzi tubs.

7. Carpet does not include any pattern repeats.



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

## CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
### 9/15/06

8. Wet walls in Men's and Women's Toilet areas to be 4' high.

9. Height of tile on Shower walls is 6'-8" AFF.

10. Walls and ceilings will not receive a light orange peel finish. This is contrary to the note found on drawing A9.10.

11. Walls and ceilings are priced to receive one prime coat and two finish coats. They are to be Finneran and Haley paint.

12. Semi-gloss paint is priced as Finneran and Haley Ultra White or White White as specified.

13. All trim on assumed to be paint grade and shall be painted as such.

14. All interior stairs and railings are to be painted. Exterior Railings are to be powder coat finished and thus will not be painted.

## Div. 10- Specialties/ Bath Accessories:

1. Bath Accessories (units):
   a. Accessories include the following:
      i. Medicine cabinets – 16" x 22" recessed box with a beveled edge glass door.
      ii. Towel bars – Mason – Brushed Nickel Finish
      iii. Toilet paper holders – Mason – Brushed Nickel Finish
      iv. Robe hooks - Brushed Nickel Finish
      v. Shower rods – Moen – Chrome finish
   b. Mirrors – At all vanities, 3/16" mirrors in sizes according to plans and vanity sizes. All mirrors to be supported with J-hooks and clips
   c. Toilet grab bars – Stainless Steel with peened finish.
   d. Shower doors
      i. Double-sliding swing doors

2. Bath Accessories (clubhouse):
   a. Accessories include the following:
      i. Towel bars – Stainless Steel Commercial Grade – Brushed Nickel Finish
      ii. Toilet paper holders – Stainless Steel Commercial Grade – Brushed Nickel Finish



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

    iii.    Robe hooks - Stainless Steel Commercial Grade – Brushed Nickel Finish
    iv.    Shower rods – Bobrick model B6107 x 36, or equal

b. 3/16" vanity-width plate mirrors with polished edges
c. Shower grab bars – two 18" and two 18"x36"
d. Toilet grab bars – three 36" and three 42"
e. Shower curtains
f. Handicap accessible shower benches
g. Commercial towel dispensers

3. Wire Shelving (units):
   a. Vinyl coated ventilated shelving and rods
   b. Coat, den, and bedroom closets may consist of one shelf/rod, two shelves/one rod, one shelf/ two rods, and two shelves/ two rods
   c. One shelf is included in computer niches and wet bars
   d. Five shelves are included in pantries and linen closets
   e. Free Slide (continuous slide) type in W.I.C., Tightmesh type shelving in all linens and pantry closets. Products manufactured by Rubbermaid.

4. Wire Shelving (clubhouse):
   a. Vinyl coated ventilated shelving and rods
   b. One shelf/ rod is included in coat closets

5. Fire Extinguisher:
   a. Cabinets are fire-rated, where required, to maintain the wall rating.
   b. Extinguishers are 10lb ABC.
   c. Fifteen extinguishers and cabinets are included in the residential buildings.
   d. Twelve extinguishers and brackets are included in the garages
   e. Two extinguishers and cabinets are included in the clubhouse

6. Mailboxes:
   a. Manufactured by Auth Florence
   b. Two 4C USPS (4CAT8-19) compliant, front loading
   c. Each building will have 36 usable units with an outgoing mail receptacle and two parcel lockers (Auth Florence 4CAT10).

7. Fireplaces (units):
   a. Single-side gas venting fireplaces



EXHIBIT 'B'

## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
9/15/06

8.  Fireplace (clubhouse):
    a.  Double–sided gas venting fireplace

9.  Interior Signage:
    a.  We have included an allowance of $22,050 building and unit numbers.

10. Louvers and Access Doors (units):
    a.  Semi-round 24"x48" Nystrom model LSA4D38 louvers
    b.  18"x60" Nystrom model LSA4D38 elevator louvers
    c.  24"x36" access door is provided in each 4th floor unit
    d.  Three metal access doors per apartment building

11. Louvers and Access Doors (clubhouse):
    a.  Semi-round 24"x48" Nystrom model LSA4D38 louvers
    b.  22"x30" (1HR) access panel

12. Bike Racks
    a.  One 26 space bike rack per garage

13. Knox Boxes
    a.  One Knox box per apartment building
    b.  One Knox box for the clubhouse

14. Storage Units:
    a.  Eighteen double-stacked 48" high metal cage storage units with 36" door per apartment building

### Div. 11 – Appliances / Equipment:

1.  Each unit will have white GE model appliances. No ADA pedestals are included as none were located on the drawings:
    a.  Refrigerator – GE GSS22JETWW
    b.  Dishwasher – GE GLD5500LWW
    c.  Gas Range – GE JGBP28WEHWW
    d.  OTR Microwave – GE JVM1640W
    e.  Disposer – GE GFC325F
    f.  Washer – GE WCSR2090DWW
    g.  Dryer – GE DBXR463DWW



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

**CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS**
. 9/15/06

    h.  Stacked Washer/Dryer – GE WSM2700DWW

2.  In the clubhouse each unit will have stainless steel GE model appliances. No ADA pedestals are included as none were located on the drawings:
    a.  Dishwasher – GE GLD5500LSS
    b.  UCM Microwave – GE JVM1640S
    c.  Disposer – GE GFC325F
    d.  Refrigerator – GE GSC23KS
    e.  Ice Maker – GE ZDIS15
    f.  Sealed Drain Pump Kit @ Ice maker – GE ZPK1

## Div. 12 – Cabinets:

1.  Three approved cabinet suppliers have provided programs that fit within the current budget which is being carried in the schedule of values. This value is being carried as an allowance.

## Div. 14 – Conveying Systems:

1.  Furnish and install three (3) trash chutes manufactured by Wilkinson Hi-rise, LLC, Stow, Ohio. Each chute is to be 24" in diameter and fabricated of 16 gauge-aluminized steel. Approximate overall length is 60'0" per chute.
    a.  4 intake doors and frames made 15" x 18" of stainless steel and bearing the UL 1 ½ hour 'B' label. Doors are to be bottom hinged, hand operated, silent, self closing and positive latching (level 1 through 4 only).
    b.  Each intake equipped with rubber gaskets seals.
    c.  No piano type hinges are used. Intake doors have a cold rolled steel shaft passing through anti-friction bearings.
    d.  Closer mechanism is located so that it is not exposed to rubbish and does not restrict the intake opening.
    e.  Stainless steel trim with embossed letter (RUBBISH).
    f.  Type 'A' DISHCARGE DOOR of 'B' label construction with 1" thick insulation enclosed in an aluminized steel cover. This door is normally open, fireproof, self-latching and equipped with a heat sensitive fusable link.
    g.  Vent: Manufacturer's standard vent (to meet NFPA requirements); non-enclosed, to extend 4'-0" above roof and be provided with round-bodied, flat topped, metal explosion vent, with bird/insect screen and pitched roof flashing or curb type cap flashing (curb and counter flashing by others).
    h.  ¾" IPS flushing spray head above top intake (hook-up by plumber).



# EXHIBIT 'B'
# BOZZUTO CONSTRUCTION COMPANY
## Terrazza @ Newtown Square
## Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

i. ½" IPS sprinkler head about the top and alternate intake (hook-up by fire protection),
j. Disinfecting and sanitizing unit.
k. Access door and frame made 15" x 15" of stainless steel and bearing the UL 1 ½ hour 'B' label.
l. Rubber grommets and Korfund Elastorib Isolator Pads for the chute support frames to prevent sound transmission to the floor slab.
m. Chute to have factory applied sound dampening material to the exterior of the chute.
n. No offsets included in chute.

2. Furnish and install three (3) model Auto-Pak 1830-3005 short trash compactors manufactured by Precision Machinery Systems, York, Pennsylvania.
   a. 5 HP motor.
   b. Chute fed hopper.
   c. Ten gallon hydraulic tank.
   d. Photelectric eye for automatic chute fed operation.
   e. Access door with safety interlock switch.
   f. Automatic shut down in even of jam.
   g. Manual hopper shut off gate.
   h. Automatic shut down and indicator light when container is full.
   i. Maintained emergency stop switch.
   j. One-sided container binder to meet site conditions.
   k. Six (6) steel 2 cubic yard compaction containers. 2 per compactor.

3. Furnish and install four (3) 330A, Holeless Dual Jack Hydraulic Elevators at the condo buildings and one (1) of the same at the clubhouse, with 2 stops instead of 5, with the following features:
   a. Total rise: 40'- 7-1/2" at condos and 11' – 9-1/2" at the Clubhouse.
   b. Rated capacity: 3,500 lbs at Condo Buildings and 2,500 lbs at the Clubhouse.
   c. Cab height: 9'-0".
   d. Entrance width: 3'-6" w/single side opening.
   e. Power supply: 208V (AC), 3 phase, 60Hz.
   f. Operation: Microprocessor Single Car.
   g. Soft start.
   h. Remote machine room.
   i. Hall fixtures: L.E.D. car position indicator, #4 stainless steel pad with Lexan push buttons.
   j. Car lantern & chime: Car lantern with audible gong.
   k. Cab ceiling: SC02 Removable flat.



# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

l.   Cab walls: Baked enamel E999.
m.   Cab panels: Plastic laminate M999.
n.   Cab Canopy: Baked enamel E050.
o.   Cab doors: SS #4 @ interior.
p.   Cab handrail: Flat ½" x 2". Aluminum finish, at sides and rear.
q.   Cab threshold: grooved, extruded aluminum.
r.   ADA phone: hands free telephone in-car operating system.
s.   Cab Finish: Black Lexan with #4 Stainless Steel.
t.   Ventilation: one (1) speed fan per elevator.

## Div. 15 – HVAC:

1.  Mechanical equipment and accessories have been provided as shown and detailed within drawings and schedules on M0.01.

2.  Ceiling radiation dampers per drawings.

3.  Bath exhaust ducts included as 3" round hard pipe with flex connector at fan.

4.  Dryer exhaust ducts included as 4" round hard pipe with wall box for dryer connection.

5.  Kitchen range hood exhaust ducts to outside (6").

6.  White plastic outside wall caps.

7.  Sheet metal duct work as per drawings for each unit and at corridors.

8.  Sheet metal exhaust and outside air ductwork as shown in drawings.

9.  Duct insulation is included where required and shown.

10. Heat/cool thermostat for each unit – Honeywell #T8400.

11. PVC flue piping to outside with concentric terminations.

12. Plastic A/C pads for split outdoor units on roof.



## EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

**CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS**
9/15/06

13. We have included one filter change per air filter in this price.

14. All testing, air balancing and inspections have been included.

15. A one (1) year warranty on all parts and labor has been included.

16. Identification, per code minimum requirements, has been included in this price. This includes: pipe, duct, access panels, fire and smoke dampers and other types of identification as needed by code.

### Div. 15 – Plumbing:

1. Price includes plumbing piping, fixtures and equipment as shown on drawings and schedules.

2. Fixtures included in price are a base fixture schedule.

3. All underground drainage to be in PVC.

4. Small drains are to be in PVC.

5. Domestic water piping and fittings to be CPVC.

6. Air test all water, sewer, storm and gas lines.

7. All gas piping has been included as shown.

8. Pipe insulation has been included in the walls and ceilings as specified.

9. Drain pans have been included as all 2nd, 3rd & 4th floor washers and at all hot water heaters.

10. We have generally assumed that a 'code minimum' design will be utilized unless otherwise provided for herein. We have assumed that modifying the piping layout as necessary to achieve a more efficient design and to coordinate with other trades will be allowed.

### Div. 15 – Fire Protection:

1. We have included an NFPA 13 fire protection system within the condominiums units and condominium common areas.



EXHIBIT 'B'

# BOZZUTO CONSTRUCTION COMPANY

## Terrazza @ Newtown Square
## Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
### 9/15/06

2. Fire protection system is based on adequate water supply being available to achieve the necessary code minimums.

3. Furnish and install a standpipe system in both stair towers.

4. Furnish and install a dry pipe valve with an air compressor for the garage area.

5. Furnish and install a wet system throughout the building.

6. Furnish and install sectional valves, 1 per floor, for the sprinkler system.

7. No hose reel equipment is included in this proposal.

8. All piping in the residential units will be CPVC.

9. Furnish and install a double check backflow preventer, a riser check valve and an approved fire department connection at the riser assembly.

10. Sprinklers in suspended ceiling will be semi-recessed pendant type with matching escutcheon plates. Sprinklers will not be located in the center of the ceiling tiles modules. Finish will be chrome with matching escutcheon plate.

11. Exposed sprinklers will be standard upright. Finish will be brass.


### Div. 16 – Electrical:

1. We have included GFCI protected circuits as required per 1999 NEC.

2. We have included wiring for HVAC units with non-fused (pull-out) disconnects as required per 1999 NEC. Exterior wiring is protected with flexible PVC conduit.

3. We have provided a life safety/fire alarm system with central monitoring capability. Monitoring is not included in this price. A single fire alarm system meeting code standards will be provided to support the entire project. Equipment provided by FCI (Honeywell) will be provided.



# EXHIBIT 'B'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

### CONTRACTORS QUALIFICATIONS AND ASSUMPTIONS
#### 9/15/06

4. Furnish and install single station smoke detectors to be equipped with flashing strobes.

5. Fixtures have been included as an allowance of $75,000 based on the fixture schedule.

6. All power metering will be furnished and installed by the local power company unless noted otherwise in this proposal.

7. All wiring in Romex cable to unit panels.

8. All electronic water metering is to be furnished and installed by others.

9. Secondary feeders are included at 50 feet per building in aluminum. No concrete encasement.

10. Primary conduit and wiring is specifically excluded in this proposal.

11. We have included a telephone home run wire, per unit, to the junction box.

12. We have excluded any utility or power company fees from this price.

13. We have excluded any hook ups of power company conductors.

14. We have included all electrical work associated with trash chutes, compactors and elevators.

15. All unit devices are white standard residential grade with plastic semi-jumbo plates.

16. We have excluded cable TV wiring.



# EXHIBIT 'C'
## BOZZUTO CONSTRUCTION COMPANY
### Terrazza @ Newtown Square
### Newtown Square, PA

## LIST OF ALLOWANCES

**ALLOWANCE**                                                    **AMOUNT**

Landscaping & Hardscaping                                        $762,000
(Includes all labor & material, equipment and other costs associated with, or related to, the installation of all landscape and hardscape)

Fountains                                                       $50,000
(Includes all labor & equipment and other costs associated with, or related to, the installation of the fountain.)

Monumental & Decorative Signage                                 $75,000
(Includes all labor & material, equipment and other costs associated with, or related to, the installation of the Monumental/Entrance Signage.)

Secondary Power Wiring                                          Included
(Includes all labor & equipment and other costs associated with, or related to, the installation of 50 LF of aluminum secondary wiring, not concrete encased.)

Rough Carpentry Material                                        $1,328,322
(Includes all material and other costs associated with, or related to, the furnishing of rough carpentry materials.)

Finish Carpentry Material                                       $234,400
(Includes all material and other costs associated with, or related to, the furnishing of finish carpentry materials.)

Waterproofing Consultant                                        $50,000
(Includes all costs associated with, or related to, the procurement of a waterproofing consultant for the inspection and approval of installation details with respect to potential waterproofing issues.)

Mold Remediation                                                $131,250
(Includes all labor & material, equipment and other costs associated with, or related to the installation of Mold Remediation.)



# EXHIBIT 'C'
# BOZZUTO CONSTRUCTION COMPANY
## Terrazza @ Newtown Square
## Newtown Square, PA

## LIST OF ALLOWANCES

Common Area Carpet                                    $40/SY – main carpet
                                                      $40/SY – banding
(Includes all labor & material, equipment and other costs associated with, or related to, the installation of corridor and clubhouse carpet. The banding has been included as both a preventative and aesthetic measure as well to ease maintenance in the event of replacement.)

Glass Shower Door Enclosures                          $86,700
(Includes all labor & equipment and other costs associated with, or related to, the installation of the glass shower door enclosures. This amount has been determined from bids that ensure that it is accurate and provides high quality doors. We are still working on a final selection with this item.)

Interior Signage                                      $22,050
(Includes all labor & material, equipment and other costs associated with, or related to, the installation of building and unit numbers.)

Kitchen Cabinets                                      $1,333,615
(Includes all labor & equipment and other costs associated with, or related to, the installation of the unit kitchens. Three competent contractors are currently being worked with to design a program which is acceptable. Currently the allowance that is being carried is believed to be enough to provide the desired finished product with regards to the kitchens.)

Elevator Upgrades                                     $10,000
(Includes all labor & equipment and other costs associated with, or related to, the upgrading of the elevator finishes.)

Endless Pool                                          $20,000
(Includes all labor & equipment and other costs associated with, or related to, the installation of the Endless Pool.)

Desertaire Dehumidification System                    $10,000
(Includes all labor & equipment and other costs associated with, or related to, the installation of the Desertaire Dehumidification System. Currently The HVAC sub that has priced the job is still waiting on pricing from the factory in order to back this up. Therefore, it is still being carried as an allowance with subcontractor input.)



# EXHIBIT 'C'
# BOZZUTO CONSTRUCTION COMPANY
## Terrazza @ Newtown Square
## Newtown Square, PA

## LIST OF ALLOWANCES

Light Fixtures                                                    $75,000
(Includes all labor & equipment and other costs associated with, or related to, the installation of the light fixtures per the fixture schedule.)

Entry and Access Control Systems                                 $75,000
(Includes all labor & material, equipment and other costs associated with, or related to, the installation of entry and access control systems.)

Handicap Accessible Unit                                         $15,000
(Included all labor & material, equipment and other costs associated with making three units, one in each building, handicap accessible)

Interior Designer Upgrades                                       $75,000
(Allowance put in place designed to cover and allow any upgrades to the clubhouse above and beyond what is already provided by the interior designer.)

The above allowances include all labor, material, equipment and other costs associated with, or related to the specified work.



# Exhibit D

# Contractor's Insurance Certificate

*(to be inserted)*

## BOZZUTO CONSTRUCTION COMPANY

| Description | Rem Dur | 2006 N D J F M A M J J A S O N D J F M A M J J A S (2007 / 2008) |
|---|---|---|
| **Terrazza at Newtown Square** | | |
| Total Duration | 577 | |
| **Sitework** | | |
| Sitework | 577 * | |
| Sitework | 577 | |
| **Clubhouse** | | |
| Clubhouse | 310 * | |
| Clubhouse | 310 | |
| **Building #1** | | |
| Building #1 | 365 * | |
| Building #1 | 365 | |
| **Building #2** | | |
| Building #2 | 365 * | |
| Building #2 | 365 | |
| **Building #3** | | |
| Building #3 | 365 * | |
| Building #3 | 365 | |

© Primavera Systems, Inc.

**Exhibit 'E'**
**Preliminary Construction Schedule**

Early bar
Progress bar
Critical bar
Summary bar
▲ Progress point
▽ Critical point
▽ Summary point
◇ Start milestone point
◇ Finish milestone point

Case 2:23-cv-00257-CMR    Document 1-3    Filed 01/23/23    Page 126 of 160

BOZZUTO CONSTRUCTION COMPANY

| | 2008 | | | 2009 | | | | | | | | | | | 2010 | | | | | | | | | | | 2011 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J |

**Exhibit 'E'**
**Preliminary Construction Schedule**

☐ Early bar
▰ Progress bar
▨ Critical bar
— Summary bar
▲ Progress point
▽ Critical point
▽ Summary point
◇ Start milestone point
◇ Finish milestone point

© Primavera Systems, Inc.

BOND REQUIRED _____ YES _____ NO

**EXHIBIT 'F'**

**SUBCONTRACT AGREEMENT**

THIS AGREEMENT, made and entered into this _____ day of _____ **2006**, by and between

**BCC NEWTOWN SQUARE, LLC**
**7850 Walker, Suite 400**
**Greenbelt, Maryland  20770**
**301/220-0100**
Attn:        _____, Project Manager

(hereinafter called the "Contractor") and

**SUBCONTRACTOR NAME**
**ADDRESS**
**PHONE NUMBER**
**Attn:    CONTACT NAME**

(hereinafter called "Subcontractor") for work to be performed at

**TERRAZZA AT NEW TOWN SQUARE**
**Route 252**
**Newtown Township, Delaware County, PA**
**SITE PHONE NUMBER**
**Attn: SUPERINTENDENT'S NAME**

(hereinafter referred to as the "Project").

Contractor and Subcontractor covenant and agree as follows:

## ARTICLE 1.  SCOPE OF WORK

a.  Subcontractor agrees to perform and furnish all the work, labor, materials, as herein specified, and plant, equipment, tools, scaffolds, hoists, and everything of sort for accomplishing the work (hereinafter called the "Work") as described in the attached Exhibit 2, "Scope of Work".

b.  Subcontractor represents that it is fully qualified to perform this Agreement. Subcontractor hereby agrees that the Work will be performed in strict accordance with the Contract Documents as hereinafter defined in Article 2 and any Work not conforming to this Agreement's requirements, including substitutions not properly approved, may be considered defective. Subcontractor agrees to perform the Work to the full satisfaction of Contractor, the Inspecting Architect, and the Owner. Subcontractor shall commence the Work immediately when notified by Contractor and shall prosecute said Work in a good and workmanlike manner with due diligence and without delay. The Subcontractor shall immediately repair or replace all defective Work upon discovery or notification by the Contractor. The Contractor reserves the right to have any portion of the Work, which the Subcontractor has not been directed to proceed with or has not begun, accomplished by his own forces or by others.

c.  Subcontractor shall assume all obligations, risks and responsibilities, which the Contractor has assumed with respect to the Owner in accordance with the Contract Documents. Subcontractor shall have the right to enforce its rights and remedies and to defend against claims against it by the Owner as provided herein.

d.  This agreement is fully inclusive and shall not be affected by any changes in labor rates, transportation charges, costs of materials, etc., and the Subcontractor agrees that the price includes all taxes that he shall incur as a result of his prosecuting the Work.

# 277261 V2 MWS  BCC FORM
006103-0000: 9/29/2006 2:22 PM

1

## ARTICLE 2.  CONTRACT DOCUMENTS

a.   The Contract Documents for this Subcontract shall consist of this AGREEMENT and the EXHIBITS:

      Exhibit 1 – List of Contract Documents included in this Agreement
      Exhibit 2 – Scope of Work
      Exhibit 3 – General Requirements for Subcontractors/Vendors
      Exhibit 4 – Payment Schedule
      Exhibit 5 – Insurance Requirements
      Exhibit 6 – TaxPayer Identification Number
      Exhibit 7 – Partial Lien Waiver
      Exhibit 8 - Payment & Performance Bond (if applicable)
      Exhibit 9 - Waiver of Liens

      The Contract Documents also include the contract between Contractor and Owner which contract is incorporated by reference, as set forth in Article 5 herein, and any subsequent amendment to any Contract Document.

b.   Subcontractor represents and agrees that prior to the execution of this Agreement, it has (a) by its own independent investigation ascertained (i) the work required by this Agreement and the Contract Documents, (ii) the conditions involved in performing the work, and (iii) the obligations of this Agreement and the Contract Documents; and (b) verified all information furnished by the Contractor or others satisfying itself as to the correctness and accuracy of that information, No allowance in the form of additional compensation is to be made by reason of any error on the part of Subcontractor with respect to such matters, nor will Subcontractor be relieved from its responsibilities hereunder by its failure to properly investigate.  This Subcontractor Agreement and Exhibits attached hereto shall constitute the complete contract and all prior negotiations, prior commitments and prior agreements whether oral or written are superceded hereby.  This Agreement may only be amended by a writing, including a change order issued by the Contractor and signed by both parties.

## ARTICLE 3.  CONTRACT SUM AND PAYMENT PROCEDURES

a.   The Contractor agrees to pay to the Subcontractor for the satisfactory performance and completion of the Work and of all the duties, obligations and responsibilities of Subcontractor under this Agreement the Sum of _____
_____**DOLLARS ($**_____**)**, hereinafter, the Subcontract Amount.

b.   Partial payments will be made monthly on approximately the 30th day of each month for work completed the previous month, provided the Subcontractor shall have submitted its request for payment on or before the 30th day of such previous month.  Partial payments shall be due to the Subcontractor in the amount of ninety percent (90%) of the work in place which has been approved by the Contractor, Owner, the Owner's Lender and Inspecting Architect and for which payment has been made to the Contractor by the Owner.  All payments will be made per the Payment Schedule attached hereto as Exhibit #4 and made a part hereof. A request for payment for an item noted in the Payment Schedule may only be made by the Subcontractor upon completion of that item to the satisfaction of the Contractor, Inspecting Architect and Owner.

c.   If the Project is located in the State of Maryland and the Subcontractor is or may be deemed to be a non-resident contractor for whom withholding applies pursuant to Maryland tax law, the Contractor will withhold three percent (3%) from each payment made to Subcontractor as security for the payment of taxes due to the State of Maryland. This withholding of three percent (3%) shall not be in addition to the ten percent (10%) retainage that will be withheld from the Subcontractor's payments but instead, shall be part of that retainage.  Upon completion of its Work, any non-resident Subcontractor must submit a written request to the Comptroller of Maryland to issue a tax clearance certificate and provide Contractor with a receipted copy of that request.  The three percent (3%) withholding will not be paid to Subcontractor until at least thirty (30) days after the written request was filed with the Comptroller.  If the Comptroller provides notice that the Subcontractor owes any taxes, the Contractor may at its sole discretion pay the three percent (3%) tax retainage to the Comptroller of Maryland.

d.   All invoices shall be supported to the extent required by the Contractor by affidavits, or other evidence satisfactory to Contractor, showing that all labor and material bills, taxes and all other indebtedness incurred by the Subcontractor for the Project up to and including the date of invoicing have been paid in full.  The Contractor may at its sole discretion withhold payments due the Subcontractor until satisfactory evidence of payment of all the Subcontractor's obligations has been accomplished.  A Partial Waiver of Lien and Subcontractor's Affidavit shall be provided with each request for payment, including the current request for payment, and a Final Waiver of Lien and Subcontractor's Affidavit shall be submitted with request for final payment.  All Waivers of Lien and Subcontractor's Affidavits shall be in a format acceptable to the Contractor.

e.   No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials nor shall it release Subcontractor from any of its obligations under this Agreement; nor shall entrance and use by the Owner constitute acceptance of the Work or any part thereof.

f.   Anything herein contained to the contrary notwithstanding, the Contractor reserves the right, at its sole discretion and without any fault or breach by Subcontractor, to make any payments directly to laborers, materialmen, subcontractors, sub-subcontractors, or any subcontractors or materialmen of any of them, for or on account of work performed or materials furnished under this Agreement. If such payments are made in good faith and upon reasonable evidence of their validity, the Contractor shall have no liability to Subcontractor in connection therewith and shall deduct such payments from any balance owed to the Subcontractor.

g.   Subcontractor shall, prior to the submission of the first request for payment, supply Contractor with the names, addresses and telephone numbers of all suppliers furnishing or to furnish materials for the Work covered hereby. No payment shall be made to Subcontractor until such information is furnished. Contractor reserves the right and is hereby authorized by Subcontractor to make all payment checks jointly payable to Subcontractor and material suppliers of Subcontractor.

h.   All material and work incorporated into the Project or for which partial payment has been made shall become the property of the Contractor or, if the Contract Documents so provide, the property of the Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by the Owner.

i.   The Contractor may withhold amounts otherwise due under this Agreement or any other agreement between the parties to cover the Contractor's reasonable estimate of any costs or liability the Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement or any other agreement between the parties. For purposes of this paragraph, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and the Contractor or any joint venture or other entity in which the Contractor has an ownership interest. Appropriate adjustments to the withheld sums shall be made when the exact amounts owed are determined.

j.   Final payment, subject to withholdings permitted hereunder, shall not be due until after the last of the following to occur: (a) Subcontractor's work has been completed and approved by the Owner and the Inspecting Architect, (b) the entire Project is complete, (c) all final payment prerequisites under the Contract Documents have been satisfied, (d) satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Agreement has been provided, and (e) the Contractor has been paid in full for the entire Project.

## ARTICLE 4. LIEN RIGHT

a.   Subcontractor acknowledges that no lien shall attach to the Project real estate by virtue of any work done hereunder by the Subcontractor or by any suppliers, employees, materialmen, or others subcontractors employed by him if the Subcontractor is paid to date in accordance with this Agreement for work accepted and approved; and the Subcontractor warrants that all such parties shall be advised of the same and shall certify to the Contractor that they are aware thereof and bound thereby.

b.   Subcontractor will immediately discharge or cause to be discharged all liens, claims or attachments which may be filed in connection with the Work and will hold Contractor harmless therefrom if Subcontractor is paid to date for work accepted and approved. Failure to comply with the requirements of this Article within a period of seven (7) days after receipt of written notice from the Contractor of any lien, claim or attachment that may have been filed in connection with the Work shall place the Subcontractor in default and entitle the Contractor to exercise any of its remedies, including the right to terminate this Agreement in accordance with the provisions of Article 13.

c.   In the event that the Subcontractor fails to pay and discharge when due, any bills or obligations of any kind or nature whatsoever incurred by the said Subcontractor by reason of or in the fulfillment of this Agreement, whether or not a lien or notice of lien has been or may be filed with respect thereto, which bills or obligations in the opinion of Contractor are proper, the Contractor, at its sole option but without being obligated to do so, may pay all or any part of such bills or obligations. The Subcontractor hereby appoints the Contractor as agent and attorney-in-fact of the Subcontractor for the purpose of payment and discharging such bills and obligations, and the Contractor may deduct the amount of such bills as well as any expenses incurred in the payment of same, including interest, court costs and attorney's fees, from any sums due or to become due to the Subcontractor. The Subcontractor hereby expressly waives any right of redress or recovery against the Contractor by reason of any act or omission of the Contractor while acting as such agent and attorney-in-fact of the Subcontractor.

## ARTICLE 5. SUBCONTRACTOR BOUND BY OWNER/CONTRACTOR AGREEMENT

a.  In respect to the Work covered by this Agreement, the Subcontractor shall be bound to the Contractor by the terms of this Agreement and the contract between the Owner and Contractor, and shall assume toward the Contractor all the obligations, risk and responsibilities which the Contractor, by that contract, assumes toward the Owner, provided that where any provision of those contract documents between the Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern.

b.  In event of a dispute between Contractor and Owner involving in any way the work of Subcontractor and if such dispute results in a proceeding, to which Subcontractor may become a party, then Subcontractor will join in such proceeding and will be bound by the result thereof.

## ARTICLE 6. TIME IS OF THE ESSENCE

a.  Time is of the essence in the performance of the Work referred to in the Contract Documents, inasmuch as failure of the Subcontractor to commence and complete its Work as and when required by the Contractor may cause grave injury and damage to the Contractor by virtue of increased costs for construction financing, loss of interest on invested funds, loss of sales and good will, delayed receipt of income from rental units, extension of overhead costs and otherwise. Accordingly, the Subcontractor shall be prepared to commence Work within seven (7) days after receipt of notice from the Contractor to do so and will thereafter actually commence Work when and as required to do so by the Contractor. Such notice shall be given as the Project reaches the stage of construction, in accordance with the plans and specifications, where the Subcontractor's services are to be used, or at such earlier date as set forth in any supplement hereto. The Subcontractor further agrees to prosecute the Work with due diligence and will not in any manner delay or otherwise interfere with the work of the Contractor or other subcontractors.

b.  Subcontractor agrees to conform with the progress schedule, which the Contractor shall issue. This schedule shall allow the Subcontractor adequate time to complete his Work and, unless the Contractor is notified otherwise by the Subcontractor in writing within five (5) days of the receipt of the schedule, it shall be binding on the Subcontractor. The Contractor reserves the right to amend the progress schedule from time to time as the overall progress of the Project dictates, and the Subcontractor hereby discharges the Contractor from any liability incurred on account of such changes.

c.  If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor and at its own cost and expense, work such overtime as may be necessary, in the opinion of the Contractor, to make up for all time lost and take all necessary measures to avoid delay in the completion of the Work and of the Project, and, in any case, Subcontractor shall be responsible for all loss, costs and damages incurred by the Contractor as a result of such delay, including but not limited to all delay damages assessed against the Contractor by the Owner.

d.  Subcontractor will coordinate its work with the work of the Contractor, other subcontractors, and the Owner's other contractors, if any, so no delays or interference will occur in completion of any part or all of the Project.

e.  Subcontractor may be entitled to additional compensation for compliance with schedule amendments or to damages for delay but only to the extent that the contract documents between the Owner and Contractor entitle the Contractor to damages or to a contract adjustment increasing the price or Guaranteed Maximum Cost of the contract between the Contractor and Owner.

f.  The extent to which the Contractor provides temporary heat and temporary enclosures shall be at the sole discretion of the Contractor and shall be based upon general overall job progress, and the Subcontractor understands that the Project and Subcontract Amount are based upon this condition.

## ARTICLE 7. CHANGE ORDERS AND FIELD WORK ORDERS

a.  The Contractor may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the Work covered by the Contract Documents. Any unilateral order or agreement under this Article 7 shall be in writing. Subcontractor shall perform the work as changed without delay.

b.  Subcontractor shall submit to the Contractor any requests or claims for adjustment in the price, schedule or other provisions of the Agreement for changes directed by the Owner or the Contractor, as a result of deficiencies or discrepancies in the

Contract Documents, or for circumstances otherwise permitted by the Contract Documents. Said requests or claims shall be submitted in writing by Subcontractor within seven (7) days of the date that Subcontractor knew or should have known that it had a claim for an adjustment or within such shorter time as may be necessary to allow the Contractor to comply with the applicable provisions of the Owner-Contractor agreement. If the claim is not made within seven (7) days or the appropriate shorter period, the claim is waived. The Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including the Contractor. Agreement adjustments shall be made only to the extent that the Contractor is entitled to relief from or must grant relief to the Owner and the Subcontractor has complied with this Article. Further, each Agreement adjustment shall be equal only to Subcontractor's allocable share of any adjustment in the Contractor's contract with the Owner. Subcontractor's allocable share shall be determined by the Contractor, after allowance of the Contractor's normal overhead and profit on any recovery and the Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, the Contractor and other subcontractors or persons with interests in the adjustment. This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

c.   Payment on account of pending changes made by the Owner shall be made only if the Contractor receives such payment from the Owner for Subcontractor's changed work and the Subcontractor has complied with this Article. Each payment to Subcontractor on account of pending change orders shall be equal to Subcontractor's allocable share of the Contractor's payment from the Owner for the pending change as determined by the Contractor. Amounts paid on account of pending changes are provisional and not an admission of liability and shall be repaid to the Contractor on demand whenever the Contractor determines there has been an overpayment.

d.   For changes ordered by the Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Amount. If Subcontractor considers any action or inaction by the Contractor other than a formal change order to be a change, it shall so notify the Contractor within three (3) days of said action or inaction and seek a confirmation from the Contractor. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

e.   For all changes in the work, the Subcontractor shall charge no more than the actual labor cost, including burden, of those individuals actually performing the changed work plus the actual cost of materials, including the cost of delivery, plus the actual direct cost of equipment utilized in the performance of the changed work, which in no event shall be greater than Industry Standards. The Subcontractor's markup for overhead and profit on the actual direct labor and material cost shall not be greater than that allowed by the Contract Documents and in no event shall be greater than 15%. Overhead and profit shall not be charged on change orders, which are the result of another subcontractor's performance (i.e., a backcharge to another subcontractor). Subcontractor shall, at the Contractor's request, provide copies of payroll invoices, cancelled checks, invoices, receipts for all labor and material, and/or other documents which relate to a change.

f.   Subcontractor shall, within seven (7) days of a Contractor request, submit a reasonable price quotation for proposed changes. If Subcontractor does not and the Contractor is required to submit a price quotation to the Owner which includes a proposed change to Subcontractor's work, the Contractor shall use its best estimate of the proposed change as it affects the Agreement in its quotation to the Owner, which estimate shall be the maximum equitable adjustment due to Subcontractor.

g.   In no event shall the Subcontractor perform any additional work without first receiving written authorization to do so from the Project Manager for the Contractor. Field staff, including Contractor's superintendents, are not allowed to give such authorization. Any claim for an adjustment that did not receive prior written approval from the Project Manager is void.

## ARTICLE 8.  COMPLIANCE WITH LAWS, ORDINANCES, ETC.

a.   The Subcontractor shall obtain all permits, licenses, and other governmental fees of any kind that may be necessary for the proper performance of its Work. Subcontractor shall cooperate fully with and obtain such additional permits, if any, which may be required so that Contractor may at Contractor's cost and expense, connect with, attach to or add to Subcontractor's Work. All fees for such additional permits shall be paid by Contractor. The Subcontractor, its employees and all others acting under its direction or control, shall at all times comply with and abide by all Local, State and Federal statutes, ordinances, rules and regulations as well as those of any other public body having authority concerning the Work, including but not limited to the Occupational Safety and Health Act and the Immigration Reform and Control Act of 1986. The Subcontractor shall assume all liability and responsibility for all royalties, licenses, patent fees, and any other charges made in connection with the use of patented processes upon the Work or in connection therewith. Subcontractor shall be responsible for the payment of all taxes of any nature related to the performance of its Work and shall pay all contributions and taxes for unemployment insurance or old age retirement benefits, annuities or pensions now or hereafter imposed by the United States or any state or governmental subdivision thereof, or labor organization measured by the wages, salaries or other remuneration paid persons employed by the Subcontractor engaged in the performance of the Work. The Subcontractor shall comply with all rules and regulations applicable thereto. In the event that the Contractor is held liable

# 277261 V2 MWS BCC FORM                      5
006103-0000 9/29/2006 2:15 PM

for payment of any taxes, penalties, fines or contributions as a result of the Subcontractor's noncompliance with the provisions of this Article, the Subcontractor shall supply the Contractor with all records necessary to compute such taxes or contributions and shall fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest). The Subcontractor shall hold and save the Contractor harmless and indemnified against all claims including attorney's fees, arising out of any violation or noncompliance with the provisions of this Article.

b.   If hazardous substances are being used or located on site by the Subcontractor or the Subcontractor's subcontractors, the Subcontractor shall immediately give written notice to the Contractor of its chemical composition and dangers. If the Subcontractor encounters asbestos, PCB, or other hazardous substances while completing its Work, Subcontractor shall immediately stop work and notify the Contractor's representative at the Project site.

## ARTICLE 9.  INSURANCE

a.   This Subcontractor shall provide insurance in accordance with the requirements of Exhibit #5 attached hereto and the Subcontract Amount includes the cost of said insurance. The Subcontractor shall provide certificates of insurance naming the Contractor, the Owner, and such other parties designated in Exhibit #5 as named insureds, on all insurance coverages set forth in Exhibit #5.

b.   Evidence of insurance coverages noted in Exhibit #5 shall be provided to the Contractor at least seven (7) days prior to the start of any work by the Subcontractor in the field. Any failure to so provide such insurance coverage on behalf of the Contractor, the Owner or other parties shall not relieve this Subcontractor in any way of his responsibilities, obligations and indemnification of the Contractor and the Owner from any acts, damages, accidents, injuries, claims and the like, that occur at the Project site as a result of the operations and activities of this Subcontractor. This Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless the Contractor and Owner in all respects thereto. Insurance shall be carried by this Subcontractor for the duration of the entire construction of the Project including The Guarantee Period. All insurance provided by the Subcontractor on the Project is non-cancelable without first providing the Contractor with thirty (30) days advance notice by registered mail of said cancellation. Failure to maintain insurance coverage as described hereto and further set forth in Exhibit #5 shall be a breach of this Agreement by the Subcontractor.

c.   Subcontractor waives all rights of recovery against the Contractor, the Owner, and such other parties as are required by the Contractor and/or the Contract Documents for losses within the scope of Subcontractor's insurance. Subcontractor will ensure that its subcontractors also waive such claims against the Contractor and Owner.

d.   If the Subcontractor fails to secure and maintain the required insurance, the Contractor shall have the right (without any obligation to do so, however) to secure the insurance in the name of and for the account of the Subcontractor, in which event, the Subcontractor shall pay the cost thereof and shall furnish, upon demand, all information that may be required in connection therewith.

e.   The obligations of Subcontractor in this Article shall survive termination of this Agreement.

## ARTICLE 10.  ASSIGNMENTS

a.   Subcontractor shall neither assign this Agreement nor employ other subcontractors for the execution of any part or all thereof without the express written approval of the Contractor and the Subcontractor's surety. Such consent, if given, shall not release the Subcontractor from its obligations hereunder. The Subcontractor agrees that it will be responsible for the acts and omissions of its subcontractors, sub-subcontractors and their employees to the same extent that it is responsible for acts and omissions of persons directly employed by it. The Subcontractor agrees to bind every subcontractor and sub-subcontractor, and every subcontractor and sub-subcontractor agrees to be bound, by the terms of the Contract Documents so far as they are applicable to its Work.

b.   Subcontractor, by execution of this Agreement, contingently assigns to the Contractor all Subcontractor's subcontracts. The assignment of each of Subcontractor's subcontracts shall take effect only upon Subcontractor's termination for default under Article 13 and the Contractor's affirmative acceptance of the assignment of the specific subcontract by written notice to Subcontractor and Subcontractor's subcontractor. The Contractor shall have no liability to any of Subcontractor's subcontractors unless and until the Contractor affirmatively accepts the assignment as provided above.

c.   In the event of a termination by the Owner of the Contractor for default under the Owner/Contractor contract, the Owner may take assignment of this Agreement.

d.   This Agreement shall inure to the benefit of Contractor and its successors, and assigns, heirs and legal representatives, and shall be binding upon Subcontractor, its successors and permitted assigns, if any, pursuant to the terms hereof.

## ARTICLE 11. LOSS OR DAMAGE TO WORK

a.   The Contractor shall not be responsible for loss or damage to equipment or materials belonging to the Subcontractor, except where incorporated or installed into the Project in a satisfactory manner in accordance with the provisions of this Agreement. The Contractor shall not be responsible for loss or damage to materials, tools, equipment, or other personal property owned, rented, or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused.

b.   Subcontractor shall pay for any damage to the work of another caused by Subcontractor, its employees, subcontractors, sub-subcontractors or agents. Subcontractor shall not claim or be entitled to receive any compensation or damages because of failure of Owner, Architect or Contractor or other subcontractors to have related portions of the Project completed in time for the Subcontractor's Work.

c.   Subcontractor shall protect its work, materials, tools and equipment against any loss or damage by fire, theft, accident or other cause. In the event of any injury, loss or damage to Subcontractor, its agents or employees or to its work, materials, or equipment, Subcontractor shall make no claim against Contractor by reason thereof.

## ARTICLE 12. CLEANUP

a.   All debris resulting from the Work shall be removed from the Work areas by the Subcontractor to locations on the Project Site designated by the Contractor as and when instructed by the Contractor's Superintendent. The Contractor shall have the right, where the Subcontractor fails to comply with its obligations under this Article, after 24 hours prior written notice, to accomplish the Subcontractor's cleanup with its own forces and equipment, and withhold the amount of all costs incurred in so doing from any amounts due the Subcontractor.

## ARTICLE 13. SUBCONTRACT'S FAILURE TO PERFORM OR DEFAULT

a.   If, in the sole opinion of the Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the Work according to the Contractor's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of the Contractor or of any other contractor or subcontractor, (4) fail to comply with any provision of this Agreement or other Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days' written notice and the Subcontractor fails to eliminate the condition specified in that notice within the time allowed, the Contractor, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to the Contractor for all cost, expenses, and damages resulting therefrom, (ii) terminate this Agreement, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to the Contractor and/or the Owner. In the event of termination by the Contractor, the Contractor may, at its option, (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method the Contractor may deem expedient. In case of termination by the Contractor, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full is made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the amount of all costs, expenses, and damages incurred by the Contractor including its reasonable overhead and profit, such excess shall be paid by the Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay the Contractor the difference immediately upon demand.

b.   If the Contractor wrongfully exercises its option under Article 13, that action shall be treated as a deductive change. If the Contractor wrongfully exercises its option under Article 13, that termination for default shall be considered a termination for the Contractor's convenience and Subcontractor shall be entitled to the applicable compensation provided in Article 18. Subcontractor's remedies under this Article 10.b. shall be exclusive. Nothing herein shall bar withholdings by the Contractor permitted by other provisions of this Agreement.

c.   Any claim arising out of or related to this Agreement shall not be subject to any requirement to mediate or arbitrate unless the parties mutually agree to such a proceeding. Any mutual agreement to mediate or arbitrate any one claim shall be strictly limited to the one claim and no other.

## ARTICLE 14.  GUARANTEES

a.   Subcontractor warrants and guarantees that all the Work shall be free from defects in workmanship and materials at the time that it is completed and for a minimum period of one (1) year from date Owner accepts the Project (hereinafter the "Guarantee Period") and promptly upon Contractor's request, will correct by repair or replacements, without charge, any such defects (and any damage to other property, including without limitation the work of other subcontractors resulting therefrom or from the correction thereof) which may appear in the Work. Where the contract documents between the Owner and Contractor, or governmental bodies or agencies require guarantees extending beyond one year, or any additional warranties or guarantees are included in this Agreement, the Subcontractor's obligation shall remain in effect for such extended period of time.

b.   If the Subcontractor fails to commence and to complete the repair or replacement of improper or defective work, as specified, within a reasonable period of time as determined by the Contractor in its sole discretion, the Contractor may proceed to arrange to have such work completed and do so by whatever method it may deem expedient and may charge the cost thereof against any monies due to the Subcontractor. If the unpaid balance of the Subcontract Amount shall exceed the expense of finishing the Work, including proper allowance for additional managerial and administrative expenses, such excess shall be paid to the Subcontractor. If such expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor immediately upon demand.

c.   If the Subcontractor shall cover any portion of the Work prior to the Inspecting Architect having a reasonable time and opportunity to inspect, the Subcontractor, upon the request of the Architect, shall uncover that portion of the Work, and the costs of uncovering and replacing the Work shall be at the Subcontractor's sole expense.

d.   The obligations of Subcontractor in this Article shall survive termination of this Agreement.

## ARTICLE 15.  LABOR TO BE EMPLOYED/SUBCONTRACTOR REPRESENTATIVE

a.   The Subcontractor shall not employ men, means, material or equipment which may cause strikes, work stoppages or any disturbances by workmen employed by the Subcontractor, Contractor, or other subcontractors on or in connection with the Work or the Project or the location thereof.

b.   Subcontractor understands that the Contractor, other subcontractors and/or other contractors of the Owner may employ both Union and Non-Union workers on the Project.  If required by the Contract Documents or specified in an Exhibit to this Agreement, Subcontractor agrees to employ Union labor.

c.   The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work any person unfit for or not skilled in the work assigned to him.  Subject to the foregoing and to preserving good relations with the public and requiring the discharge of any employees causing a breach of peace or other disturbance of said relations, the Contractor shall not in any way interfere with the Subcontractor's right to hire and fire its employees, assign duties to them, and fix their working hours, wages or terms and conditions of employment, which right shall be absolute. Exceptions to this provision shall apply in those instances where Federal, State or Local Agencies having jurisdiction over the Project dictate a level of prevailing wage or oversee and establish minimum working standards or establish non-working hours for the Project.

d.   Subcontractor shall maintain a foreman on the job at all times with full authority and expertise to execute and direct the Subcontractor's Work in accordance with the Contract Documents and as directed by the Contractor's Superintendent.  The Subcontractor shall notify the Contractor's Superintendent upon arrival and departure of the Subcontractor's men from the job site.  The Contractor shall from time to time schedule job meetings, which shall be attended by an authorized representative of the Subcontractor with authority to make commitments, which shall be binding, on the Subcontractor.

e.   Should the Subcontractor fail to carry out or comply with the provisions of this Article, it shall be in default and the Contractor shall have the right to terminate this Agreement in accordance with Article 13 hereof.

## ARTICLE 16.  SEPARABILITY

In the event that any provision of this Agreement or any part of any Article thereof shall be declared invalid by a court of competent jurisdiction, it shall not affect the validity of any other parts of this Agreement or any other provisions of an Article containing an invalid provision, which shall remain in full force and effect.

## ARTICLE 17. LIABILITY FOR DAMAGES AND INJURY

a. The Subcontractor hereby assumes entire responsibility and liability for any and all damages or injury of any kind or nature whatever to all persons, whether employees of the Subcontractor or otherwise, and to all property caused by, resulting from, or occurring in connection with the execution of the Work. If any claims are not based upon the Contractor's sole active or passive negligence, the Subcontractor agrees to the fullest extent permitted by law to indemnify, defend (with counsel chosen by Contractor), and save harmless the Owner and Contractor, and their agents and employees, from and against any and all such claims or suits. The Subcontractor shall promptly reimburse the Contractor therefore, and if any such claims or suits remain outstanding at the time the Work is completed, final payment shall be deferred until they are adjusted. The Subcontractor shall ensure that all of its subcontractors agree to bring any claims for damages or injuries against Subcontractor and not to bring such claims against the Contractor or Owner to the fullest extent permitted by law.

b. Subcontractor shall be liable to the Contractor for all costs the Contractor incurs as a result of Subcontractor's failure to perform this Agreement in accordance with its terms. Subcontractor's failure to perform shall include the failure of its lower-tier subcontractors or materialmen to perform. Subcontractor's liability shall include but is not be limited to (1) damages and other delay costs payable by the Contractor to the Owner; (2) the Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; (5) excess reprocurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs.

c. If any person (including employees of Subcontractor) suffers injury or death or any property is damaged, lost or destroyed, as a result, in whole or in part, of Subcontractor's acts or omissions, whether or not involving negligence of Subcontractor, its employees, agents or lower-tier subcontractors, Subcontractor assumes the liability therefor and shall to the fullest extent permitted by law indemnify, defend (with counsel chosen by Contractor), and hold harmless therefrom the Owner and the Contractor and their agents, servants, employees and sureties. With respect to any action involving Subcontractor's acts or omissions, (i) Subcontractor shall at its own expense defend the Contractor with an attorney selected by the Contractor, and all other indemnified parties, and (ii) Subcontractor shall pay all costs and expenses, including attorneys' fees, related thereto, and shall satisfy all judgments entered against the Contractor and all other indemnified parties. Nothing herein shall preclude the Contractor from participating in any such defense. Subcontractor's assumption of liability herein includes but is not limited to assumption of all liabilities on account of or in any way related to Subcontractor's Work, which the Contractor has assumed under the Contract Documents or under agreements with third parties who may be affected by construction of the Project.

d. Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 9, or otherwise. All amounts owed by Subcontractor to the Contractor as a result of the liability provisions of this Agreement shall be paid upon demand.

e. The Subcontract Amount includes one hundred dollars ($100.00) as specific consideration for indemnification under this Agreement.

## ARTICLE 18. TERMINATION FOR CONVENIENCE

a. The Contractor, at its sole discretion, may terminate this Agreement without cause at any time by giving at least ten (10) days' prior written notice of such termination to the Subcontractor. Upon any termination of this Agreement pursuant to this Article, and subject to all of the terms and provisions herein contained, the Subcontractor shall be entitled to payment up to the Contract Amount for all accepted work furnished or installed by it. However, the Contractor may retain from any monies due the Subcontractor, an amount sufficient to cover the Subcontractor's obligations under the Article 14. Guarantee. Upon the expiration of such obligations, the balance of such amount, if any, shall be paid to the Subcontractor. The Subcontractor, upon termination of this Agreement, shall forthwith peaceably and quietly surrender to the Contractor all premises, facilities, machinery, and equipment furnished by or belonging to the Contractor and shall cooperate with the Contractor in facilitating the transition of work to a new party.

b. Subcontractor shall not be entitled to anticipate profits on work unperformed or on material or equipment unfurnished.

## ARTICLE 19. DISCONTINUANCE OR SUSPENSION OF WORK

If, as a result of fire, earthquake, Act of God, war, strike, picketing, boycott, lockout or other cause beyond the control of Owner or Contractor, Owner or Contractor decide, in their sole discretion, that it is inadvisable to proceed with the Work hereunder then Subcontractor shall, upon receiving written notice thereof from Owner or Contractor, immediately

discontinue any further work hereunder until such time as Owner or Contractor may deem it advisable to resume said Work. Subcontractor will resume the Work promptly upon receiving notice from Contractor to do so and Subcontractor shall not be entitled to any damages or compensation on account of any such cessation of work as a result of any of the causes set forth herein.

## ARTICLE 20. SUBCONTRACTOR'S BOND

a.   If required of the Contractor, the Contractor shall have the option to require the Subcontractor to furnish a bond or bonds in the form and amounts satisfactory to the Contractor at the time of execution of this Agreement. In such case, the Subcontractor will be paid additional reasonable compensation for the cost of such bond or bonds.

b.   Any Subcontractor's bonds shall cover the faithful performance of this Agreement, the payment of all obligations arising therefrom and the maintenance of the completed improvements for one (1) year from the date of final approval and acceptance (and also where any governmental bodies or agencies or the Contract Documents including the contract between the Owner and Contractor require guarantees extending beyond one (1) year, for such extended period) against defective workmanship and materials (even where furnished by Contractor or its suppliers) and liability for damages resulting therefrom. The bond(s) will be an AIA form of bond, will be from a surety acceptable to the Contractor, and will be in the form attached hereto as Exhibit #8.

## ARTICLE 21. USE OF CONTRACTOR'S EQUIPMENT

Contractor's equipment will be available for use by Subcontractor only at Contractor's discretion and upon mutually satisfactory terms. In using such equipment or facilities (including but not limited to rigging, blocking, hoisting equipment and scaffolding), Subcontractor shall be responsible for and shall indemnify, defend (with counsel chosen by Contractor), and hold Contractor harmless from and against any and all claims, actions, demands, damages, liabilities or expenses, including attorney's fees, which may arise from such use. Subcontractor has examined and will examine all such equipment and understands that Contractor makes no warranty regarding the same, such use being at Subcontractor's own risk.

## ARTICLE 22. SAFETY .

This Subcontractor is to provide adequate and proper safety protection for its men and equipment and shall strictly comply with all the rules and regulations of the federal and state Occupational Safety and Health Acts. Hard hats will be worn by all personnel employed on the job by this Subcontractor at all times. Payments may be withheld for any failure by Subcontractor to comply with the requirements of this Article. Accidents to employees or sub-subcontractors of this Subcontractor will be promptly reported in detail to the Job Superintendent. Fines resulting from acts of this Subcontractor for failure to comply with the safety regulations and the requirements of OSHA or a state or local agency will be promptly paid by this Subcontractor or deducted from its Subcontract Amount.

## ARTICLE 23. EQUAL EMPLOYMENT OPPORTUNITY

Subcontractor agrees to indemnify, defend (with counsel chosen by Contractors), and hold Contractor harmless of, from and against any and all loss, cost, damage, charge or expense, caused or contributed to by the violation or claimed violation by the Subcontractor of the Labor Management Relations Act of 1947, as amended, or any applicable and valid order, rule or regulation issued by any appropriate governmental agency in accordance with said Act. Subcontractor agrees to abide by and comply with all federal, state and local nondiscrimination laws and all procedures, rules and regulations with regard to nondiscrimination issued or to be issued by the Equal Employment Opportunities Commission or Executive Order of the President of the United States insofar as they may apply to the Work.

## ARTICLE 24. ATTORNEYS' FEES

Should any litigation or arbitration be commenced between the parties hereto concerning the Work, any provision of this Agreement or the rights or obligations of either party in relation hereto, the party, Subcontractor or Contractor, prevailing in such litigation or arbitration shall be entitled to a reasonable sum for attorneys' fees in such proceedings, unless this litigation or arbitration is related to an Article 13 default.

## ARTICLE 25.  DEMANDS AND NOTICES

All notices, demands, requests and other communications required or permitted to be given hereunder or by law to either party hereto shall be in writing and shall be deemed duly served or delivered when personally delivered to the party to whom it is addressed or when personally delivered to a supervisorial employee of said party or, when in lieu of said personal service, deposited in the United States Mail, first class postage prepaid, addressed to the Contractor or Subcontractor at the address that appears for each of them in this Subcontract. Either party hereto may change its address for the purposes of this Article by giving written notice of such change to the other party in the manner provided in this Article.

## ARTICLE 26.  CAPTIONS

The captions used for the sections in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of the intent of this Agreement, or any section thereof.

## ARTICLE 27.  SINGULAR NUMBER

Whenever used in this Agreement, the singular number shall include, the plural, and the use of any gender shall be applicable to all genders.

## ARTICLE 28.  AUTHORITY

If Subcontractor is a corporation, the person signing this Agreement on behalf of such corporation hereby warrants that he or she has full authority from such corporation to sign this Agreement and obligate the corporation.

## ARTICLE 29.  FAILURE TO NEGOTIATE PAYMENTS

Any payment hereunder that remains unclaimed or un-cashed or otherwise unconverted by the Subcontractor shall after a five (5) year period, automatically, without any further action of any party, become the sole property of Contractor.

## ARTICLE 30.  CONFLICT IN INTEREST

Until Subcontractor's obligations under this Agreement are completely fulfilled and the Project is complete, Subcontractor agrees not to perform any work related to the Project directly for the Owner, other contractors or any other entity or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by Contractor. All work for this Project performed by Subcontractor shall be processed and handled exclusively through Contractor.

## ARTICLE 31.  SUBCONTRACTOR'S OBLIGATION TO THE OWNER

a.   In addition to its contractual obligations pursuant to the terms of this Agreement, Subcontractor is obligated directly to the Owner for the quality of work.

b.   The services to be provided by Subcontractor hereunder are for the benefit of one or more partnerships, corporations, limited liability companies or joint ventures formed or to be formed to own and/or develop the project involved (together, the "Owner"). The Owner possesses some identity of interest with the Contractor and it is agreed that the Owner can enforce directly against Subcontractor all warranties or common law or statutory remedies, or contractual obligations with respect to the quality of the Work by a lawsuit for damages without the necessity of including the Contractor as a party to the litigation or arbitration. In this respect, Subcontractor expressly waives any requirement of privity between it and the Owner for the purposes of the Owner's making claims for defective work under this Agreement on any of the abovesaid grounds.

c.   If for any reason the abovesaid waiver is not enforceable, Subcontractor agrees that Contractor may assign to Owner at any time all of the benefits of this Agreement with respect to the Subcontractor's obligation to provide a work product free from defects and that Owner may then enforce those obligations directly as if it had contracted with Subcontractor directly.

# 277261 V2 MWS BCC FORM
006103-0000 9/29/2006 2:15 PM

11

d.  If claim is made against Owner in any way arising out of the quality of Subcontractor's work, Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless Owner against any and all monetary damages sustained by Owner including attorney fees, incurred as a result of such claim. It is agreed that the statute of limitations controlling such claim by the Owner shall begin to run at the earliest from the date of any judgment against the Owner arising out of Subcontractor's defective work. This obligation shall survive termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SUBCONTRACTOR:                                CONTRACTOR:

                                              **BCC NEWTOWN SQUARE, LLC**

BY:_____           BY:_____

TITLE:_____           TITLE:_____

WITNESS:_____           WITNESS:_____

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

**EXHIBIT 'G'**
**PRELIMINARY CONSTRUCTION ESTIMATE**

| CODE | DESCRIPTION | Original Budget 18-Jul-08 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | CURRENT BUDGET Bidders (Sub used is first) | Current Budget 23-Aug-08 | 248,768 $/GSF | 184,451 $/R SF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| | **GENERAL REQUIREMENTS-SECTION 01** | | | | | | | | | |
| 0123 | Progress Photos | $0 | $0 | | | | | | | |
| 0147 -01 | Security (systems & monitoring) | $0 | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| 0147 -02 | Security (personnel) ALLOWANCE | $0 | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| 0149 | Project Executive | $170,138 | $170,138 | | | | $0 | $0.00 | $0.00 | $0 |
| 0150 -01 | Project Manager | $0 | $0 | | | | $170,138 | $0.68 | $0.87 | $1,620 |
| 0150 -02 | Assistant Project Manager | $206,353 | $206,353 | | | | $0 | $0.00 | $0.00 | $0 |
| 0150 -03 | Purchasing & Planning | $0 | $0 | | | | $206,353 | $0.84 | $1.06 | $1,985 |
| 0151 -01 | Superintendent | $283,071 | $283,071 | | | | $0 | $0.00 | $0.00 | $0 |
| 0151 -02 | LSDBE Program Compliance Officer | $0 | $0 | | | | $283,071 | $1.07 | $1.35 | $2,505 |
| 0151 -03 | Assistant Superintendent #1 | $170,300 | $170,300 | | | | $0 | $0.00 | $0.00 | $0 |
| 0151 -04 | Assistant Superintendent #2 | $0 | $0 | | | | $170,300 | $0.68 | $0.86 | $1,622 |
| 0151 -05 | Turnover Coordinator | $102,180 | $102,180 | | | | $0 | $0.00 | $0.00 | $0 |
| 0151 -06 | Field Accountant | $65,043 | $85,043 | | | | $102,180 | $0.41 | $0.53 | $973 |
| 0151 -07 | Field Administration | $65,043 | $65,043 | | | | $85,043 | $0.28 | $0.33 | $619 |
| 0153 | Construction Travel | $7,500 | $7,500 | | | | $85,043 | $0.26 | $0.33 | $619 |
| 0154 | General Labor (in house) | $56,333 | $56,333 | | | | $7,500 | $0.03 | $0.04 | $71 |
| 0155 | Rental Labor | $74,880 | $74,880 | | | | $56,333 | $0.23 | $0.29 | $537 |
| 0161 | Field Office Supplies | $5,850 | $5,850 | | | | $74,880 | $0.30 | $0.39 | $713 |
| 0162 | Public Relations/Project Signage | $8,100 | $8,100 | | | | $5,850 | $0.02 | $0.03 | $56 |
| 0163 | Warranty | $0 | $0 | | | | $8,100 | $0.03 | $0.04 | $77 |
| 0164 -01 | Field Office Set Up, Furniture & Equipment Rental | $9,000 | $9,000 | | | | $0 | $0.00 | $0.00 | $0 |
| 0164 -02 | Field Office Rental | $9,500 | $9,500 | | | | $9,000 | $0.04 | $0.05 | $86 |
| 0165 | Mail and Messenger Expense | $5,700 | $5,700 | | | | $9,500 | $0.04 | $0.05 | $90 |
| 0166 | Printing & Reprographics | $14,100 | $14,100 | | | | $5,700 | $0.02 | $0.03 | $54 |
| | 3rd Party Plan Review in 03 | $0 | $0 | | | | $14,100 | $0.06 | $0.07 | $134 |
| 0172 | Temporary Utilities & Generator | $7,700 | $7,700 | | | | $0 | $0.00 | $0.00 | $0 |
| 0173 | Temporary Roads | $0 | $0 | | | | $7,700 | $0.03 | $0.04 | $73 |
| 0174 | Winter Conditions & Snow Removal | $20,000 | $20,000 | | | | $0 | $0.00 | $0.00 | $0 |
| 0175 | Safety & First Aid | $2,400 | $2,400 | | | | $20,000 | $0.08 | $0.10 | $190 |
| 0176 | Temporary Heat | $136,500 | $136,500 | | | | $2,400 | $0.01 | $0.01 | $23 |
| 0181 -01 | Miscellaneous Equipment Rental | $9,500 | $9,500 | | | | $136,500 | $0.55 | $0.70 | $1,300 |
| 0183 | Miscellaneous Equipment & Small Tools | $9,500 | $9,500 | | | | $9,500 | $0.04 | $0.05 | $90 |
| 0184 | Vandalism | $0 | $0 | | | | $9,500 | $0.04 | $0.05 | $90 |
| 0186 | Trash Removal/Dumpsters | $120,600 | $120,600 | | | | $0 | $0.00 | $0.00 | $0 |
| 0185 | Portable Toilets | $8,600 | $8,600 | | | | $120,600 | $0.49 | $0.62 | $1,149 |
| 0196 | Fencing and Barricades | $0 | $0 | | | | $8,600 | $0.03 | $0.04 | $82 |
| 0197 | Phone Expenses | $8,100 | $8,100 | | | | $0 | $0.00 | $0.00 | $0 |
| 0198 | Storage Trailer Rental | $0 | $0 | | | | $8,100 | $0.03 | $0.04 | $77 |
| 0199 | Drinking Water & Coffee | $2,850 | $2,950 | | | | $0 | $0.00 | $0.00 | $0 |
| 0200 | Construction Scheduling | $4,000 | $4,000 | | | | $2,850 | $0.01 | $0.01 | $27 |
| 0201 -01 | Davis-Bacon on Labor | $0 | $0 | | | | $4,000 | $0.02 | $0.02 | $38 |
| 0201 -02 | Private Trade Inspections (IN 03) | $0 | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| 0205 | 14 Months GCs | $0 | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| | **TOTAL GENERAL REQUIREMENTS** | $1,562,842 | $1,562,842 | $0 | $0 | | $0 | $0.00 | $0.00 | $0 |
| | | | | | | | $1,562,842 | $6.33 | $8.04 | $14,884 |

Page 1 of 8

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

EXHIBIT 'G'
PRELIMINARY CONSTRUCTION ESTIMATE

9/29/2006

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | CURRENT BUDGET Bidders (Sub used is first) | Current Budget 23-Aug-06 | 248,768 S/GSF | 194,451 S/RSF | 105 S/DU |
|------|-------------|---------------------------|---------------|-----------------|-----------------|--------------------------------------------|--------------------------|----------------|----------------|----------|
| SITE IMPROVEMENTS-SECTION 02 | | | | | | | | | | |
| 0201 | Earthwork-Lump Sum | $0 | | $0 | | | | | | |
| 0212 | Demolition | $0 | | $0 | | | | | | |
| 0213 | Remove Contaminated Soil | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0220 | Erosion-Sediment Control | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0223 | Rock Blasting | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0224 | Maintenance & Finish Grading | $50,000 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0225 | Problem Soils Allowance | $0 | | $50,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0226 | Field Engineering & Survey | $20,000 | | $0 | | | $50,000 | $0.20 | $0.26 | $478 |
| 0227 | Geotechnical Testing and Inspections | $0 | | $20,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0228 | Piling/Caissons | $0 | | $0 | | | $20,000 | $0.08 | $0.10 | $190 |
| 0230 | Water Distribution System | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0240 | Sanitary Sewer System | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0250 | Storm Sewer System | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0255 | Utility Related Cost (Conduit) | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0257 | Site Lighting | $40,000 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0260 | Road & Parking Paving | $172,800 | | $40,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0261 | Special Paving and Grass Crete | $0 | | $172,800 | | | $40,000 | $0.16 | $0.21 | $381 |
| 0263 | Curb & Gutters | $0 | | $0 | | | $172,800 | $0.70 | $0.89 | $1,646 |
| 0264 | Sidewalks & Flat Work | $19,200 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0265 | Retaining Walls & Dams | $0 | | $19,200 | | | $0 | $0.00 | $0.00 | $0 |
| 0267 | Parking Lot Striping | $10,000 | | $0 | | | $19,200 | $0.08 | $0.10 | $183 |
| 0270 | Site Fencing | $0 | | $10,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0272 | Dumpster Enclosures | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0275 | Playground & Street Furniture | $50,000 | | $0 | | | $10,000 | $0.04 | $0.05 | $95 |
| 0276 | Fountains & Bridges | $75,000 | | $50,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0277 | Monument Signs | $0 | | $75,000 | | | $50,000 | $0.20 | $0.26 | $476 |
| 0278 | Street Signs | $50,000 | | $0 | | | $75,000 | $0.30 | $0.39 | $714 |
| 0279 | Irrigation Systems | $25,000 | | $50,000 | | | $0 | $0.00 | $0.00 | $0 |
| 0284 | Topsoil Respread & Lawns | $300,000 | | $25,000 | | | $50,000 | $0.20 | $0.26 | $476 |
| 0285 | Landscape Plantings | $0 | | $300,000 | | | $25,000 | $0.10 | $0.13 | $238 |
| 0290 | Unique Site Conditions | $0 | | $0 | | | $300,000 | $1.22 | $1.54 | $2,857 |
| 0291 | Off Site Work | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0294 | Trails | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0295 | Bond Release | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| 0300 | Open | $0 | | $0 | | | $0 | $0.00 | $0.00 | $0 |
| | | | | | | | $0 | $0.00 | $0.00 | $0 |
| TOTAL SITE IMPROVEMENTS (SECTION 2) | | $812,000 | $0 | $812,000 | $0 | | $812,000 | $3.26 | $4.18 | $7,733 |

Page 1 of 2

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

EXHIBIT 'G'
PRELIMINARY CONSTRUCTION ESTIMATE

9/29/2006

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | Bidders (Sub used is first) | Current Budget 23-Aug-06 | 248,768 $/GSF | 194,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| | STRUCTURES (APARTMENTS) - SECTION 03 | | | | | | | | | |
| 0148 | Final Cleaning | $105,000 | $105,000 | | | | $105,000 | $0.43 | $0.54 | $1,000 |
| 0293 | Soil Poisoning | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0301 | Concrete Foundations | $981,300 | | | $969,499 | Cavan | $969,499 | $3.93 | $4.99 | $9,233 |
| 0302 | Concrete Slab-on-Grade | IN 0301 | | | IN 03-0301 | | $0 | $0.00 | $0.00 | $0 |
| 0303 | Concrete/Gypsum Floor Fill w/Sound Mat | $472,500 | | | $339,750 | Floors & Fireproofing, American Floor @ 342,540 | $339,750 | $1.38 | $1.75 | $3,236 |
| 0304 | Concrete Stair Fill | IN 0301 | | | IN 03-0301 | | $0 | $0.00 | $0.00 | $0 |
| 0340 | Concrete - Precast | EXCLUDED | | | IN 03-0303 | | $0 | $0.00 | $0.00 | $0 |
| 0400 -01 | Masonry CMU | $262,055 | | | $489,000 | Corrado | $489,000 | $1.98 | $2.51 | $4,657 |
| 0400 -02 | Brick | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0403 -01 | Stonework | $542,634 | | | $805,172 | Quality Stone, Mid Atlantic @ 586,740, ESW @ 679,865 | $805,172 | $2.45 | $3.11 | $5,764 |
| 0403 -02 | Pavers at Plaza | $108,351 | $108,351 | | | | $108,351 | $0.44 | $0.56 | $1,032 |
| 0500 | Structural Steel, Joists & Decking | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0540 | Light Guage Metal Framing | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0550 | Miscellaneous Metals | $123,384 | | | $81,862 | Paramount Steel | $81,862 | $0.33 | $0.42 | $778 |
| 0552 -01 | Railings - Building | $125,580 | | | $90,825 | Paramount Steel | $90,825 | $0.37 | $0.47 | $865 |
| 0552 -02 | Railings - Site | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0553 | Wall Mounted Rails | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0554 | Metal Stairs & Railings | $117,000 | | | $123,961 | Paramount Steel | $123,961 | $0.50 | $0.64 | $1,181 |
| 0610 | Rough Carpentry Material | $1,295,532 | $1,295,532 | | | | $1,295,532 | $5.25 | $6.66 | $12,338 |
| 0611 | Rough Carpentry Labor | $1,110,456 | | | $1,050,875 | RPM | $1,050,875 | $4.26 | $5.40 | $10,008 |
| 0612 | Roof Trusses | $644,730 | | | $641,821 | HM Stauffer, Trussway @ 552,870; Chopp @ 575,686 | $641,821 | $2.60 | $3.30 | $6,113 |
| 0615 | Floor Trusses | IN 0612 | | | IN 03-0612 | | $0 | $0.00 | $0.00 | $0 |
| 0620 -01 | Millwork, Trim - Material - Units | $94,500 | | $94,500 | | | $84,500 | $0.36 | $0.49 | $900 |
| 0620 -02 | Millwork, Trim - Material - Common Area | $30,000 | | $30,000 | | | $30,000 | $0.12 | $0.15 | $286 |
| 0620 -03 | Millwork, Trim - Material - Column Wraps in Corridors | $57,000 | | $57,000 | | | $57,000 | $0.23 | $0.29 | $543 |
| 0620 -04 | Millwork, Trim - Material - Corridor Bump Outs | $42,000 | | $42,000 | | | $42,000 | $0.17 | $0.22 | $400 |
| 0621 -01 | Millwork, Trim - Labor - Units | $189,000 | | | $249,470 | Delaware Valley | $249,470 | $1.01 | $1.28 | $2,376 |
| 0621 -02 | Millwork, Trim - Labor - Common Area | $78,000 | | | IN 03-0821-01 | | $0 | $0.00 | $0.00 | $0 |
| 0650 | Exterior Siding | $0 | | | $144,715 | Archer | $144,715 | $0.59 | $0.74 | $1,378 |
| 0650 -01 | Exterior Stucco | $697,310 | | | $606,432 | Quality Stone, ESW @ 942,008, Eurospec @ 1.098M, Mid Atlantic @ 1.616M | $606,432 | $2.46 | $3.12 | $5,776 |
| 0650 -02 | Stucco Accessories | EXCLUDED | | | $326,697 | Quality Stone, ESW @ 942,008, Eurospec @ 1.098M; Mid Atlantic @ 1.616M | $326,697 | $1.32 | $1.68 | $3,111 |
| 0711 -01 | Waterproofing | $0 | | | IN 06-0711 | Dale Waterproofing | $0 | $0.00 | $0.00 | $0 |
| 0711 -02 | Waterproofing - Elevated Plaza Deck | $144,468 | | | $110,835 | Dale Waterproofing | $110,835 | $0.45 | $0.57 | $1,056 |
| 0711 -03 | Waterproofing Consultant | $0 | | $50,000 | | | $50,000 | $0.20 | $0.26 | $476 |
| 0712 | Caulking | IN TRADES | | | IN TRADES | | $0 | $0.00 | $0.00 | $0 |
| 0720 | Building Insulation | $271,445 | | | $199,668 | Westchester; United @ 213,185 | $199,668 | $0.81 | $1.03 | $1,902 |
| 0730 | Shingle Roofing | $158,707 | | | $618,559 | Archer | $618,559 | $2.51 | $3.16 | $5,891 |
| 0740 -01 | Flat Roofing | $131,670 | $131,670 | | | | $131,670 | $0.53 | $0.68 | $1,254 |
| 0740 -02 | Metal Roofing | $156,870 | | | IN 03-0730 | | $0 | $0.00 | $0.00 | $0 |
| 0750 | Gutters and Rainleaders | $44,695 | | | $42,000 | P&K, Archer @ 39,790 | $42,000 | $0.17 | $0.22 | $400 |
| 0819 | Doors, Frames & Hardware | $420,000 | | | $360,000 | Wickes | $360,000 | $1.46 | $1.85 | $3,429 |
| 0836 | Overhead Doors | $5,250 | | | IN 06-0836 | | $0 | $0.00 | $0.00 | $0 |
| 0840 | Miscellaneous Door Accessories | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0850 | Windows | $148,307 | | | $167,766 | Silverline | $167,766 | $0.68 | $0.86 | $1,598 |
| 0851 -01 | Balcony (4door/window openings) | $90,000 | | | IN 03-0850 & 03-0819 | | $0 | $0.00 | $0.00 | $0 |
| 0851 -02 | Balcony (3door/window openings) | $48,000 | | | IN 03-0850 & 03-0820 | | $0 | $0.00 | $0.00 | $0 |
| 0852 | Storefront Glass | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0852 | Glass Shower Enclosures in Units | $86,700 | | | $86,700 | Allowance w/ bid backup | $86,700 | $0.00 | $0.00 | $0 |
| 0920 | Mold Protection / Remediation | $131,250 | | $131,250 | | | $131,250 | $0.35 | $0.45 | $826 |
| 0925 | Drywall, Metal Studs | $1,502,631 | | | $1,189,520 | Machine Drywall | $1,189,520 | $0.53 | $0.67 | $1,250 |
| 0930 -01 | Ceramic & Quarry Tile - Units | $352,869 | | | $243,216 | CTI | $1,189,520 | $4.82 | $6.12 | $11,329 |
| 0930 -02 | Ceramic & Quarry Tile - Common Areas | | | | $59,803 | CTI | $243,216 | $0.99 | $1.25 | $2,316 |
| 0940 | Acoustical Ceilings | $0 | | | IN 06-0940 | | $59,803 | $0.24 | $0.31 | $571 |
| 0955 -01 | Resilient Flooring & VCT - Units | $52,305 | | | $14,703 | CTI | $0 | $0.00 | $0.00 | $0 |
| 0955 -02 | Resilient Flooring & VCT - Common Areas | $59,576 | | | $4,225 | CTI | $14,703 | $0.06 | $0.08 | $140 |
| 0955 -03 | Hardwood - Units | $0 | | | $238,221 | CTI | $4,225 | $0.02 | $0.02 | $40 |
| 0965 | Carpeting - Units | $315,610 | | | $232,710 | CTI | $238,221 | $0.97 | $1.23 | $2,269 |
| 0965 | Carpeting - Common Areas | $150,042 | | | $123,840 | CTI | $232,710 | $0.84 | $1.20 | $2,216 |
| 0980 -01 | Painting & Wallcoverings | $493,536 | | | $362,037 | Ayaz Painting, Sundew @ 397,705, Advanced Construction @ 456,856 | $123,840 | $0.50 | $0.64 | $1,179 |
| 0980 -02 | Painting & Wallcoverings - Common Area Upgardes | $67,519 | | | IN 03-0980 | | $362,037 | $1.47 | $1.86 | $3,448 |
| 0984 | Sprayed Fireproofing | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| | | | | | | | $0 | $0.00 | $0.00 | $0 |

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

EXHIBIT 'G'
PRELIMINARY CONSTRUCTION ESTIMATE

9/29/2006

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | CURRENT BUDGET Bidders (Sub used is first) | Current Budget 23-Aug-06 | 246,768 $/GSF | 194,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| 1010 | Prefabricated Fireplaces and Mantels | $205,350 | | | $121,578 | Prefab Fireplaces Inc. Fireside @ 128,019 | $121,578 | $0.49 | $0.63 | $1,158 |
| 1055 | Building and Unit Numbers | $22,050 | | $22,050 | | | $22,050 | $0.09 | $0.11 | $210 |
| 1056 | Wire Shelving | $78,750 | | | $83,461 | Premier Accessories | $83,461 | $0.26 | $0.33 | $804 |
| 1057 -01 | Bath Accessories | $0 | | | $43,603 | Premier Accessories | $43,603 | $0.18 | $0.22 | $415 |
| 1057 -02 | Extruded Aluminum Louvers | $0 | | IN 03-0739 | | | $0 | $0.00 | $0.00 | $0 |
| 1058 -01 | Fire Extinguisher- Units | $1,050 | | | $4,200 | Premier Accessories | $4,200 | $0.02 | $0.02 | $40 |
| 1058 -02 | Fire Extinguisher Common Areas | $1,950 | | | $6,360 | Premier Accessories | $6,360 | $0.03 | $0.03 | $61 |
| 1059 -01 | Mail Boxes | $5,250 | $2,265 | | $7,735 | Atlanta 100, Garden State @ 14,681, SMMP @ 19,748 | $10,000 | $0.04 | $0.05 | $95 |
| 1059 -02 | Knox Boxes | $600 | | $600 | | | $600 | $0.00 | $0.00 | $6 |
| 1060 -01 | Trash Chute | $28,500 | | | $48,960 | Trashmasters | $48,960 | $0.20 | $0.25 | $466 |
| 1060 -02 | Trash Compactor | $43,500 | | | $50,400 | Trashmasters | $50,400 | $0.20 | $0.26 | $480 |
| 1187 | Loading Dock Equipment | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1192 -01 | Cabinets | $804,615 | | | $804,615 | Allowance w/ bid backup | $804,615 | $3.26 | $4.14 | $7,663 |
| 1192 -02 | Cultured Marble Tops | $144,000 | | | $144,000 | Allowance w/ bid backup | $144,000 | $0.58 | $0.74 | $1,371 |
| 1192 -03 | Kitchen Tops (allowance for Granite and PLAM) | $367,500 | | | $367,500 | Allowance w/ bid backup | $367,500 | $1.49 | $1.89 | $3,500 |
| 1193 | Kitchen Appliances | $388,500 | | | $285,807 | GE | $285,807 | $1.16 | $1.47 | $2,722 |
| 1194 -01 | Washers & Dryers | $94,500 | | IN 03-1193 | | | $0 | $0.00 | $0.00 | $0 |
| 1194 -02 | Dryer Venting | $0 | | IN 03-1193 | | | $0 | $0.00 | $0.00 | $0 |
| 1250 | Window Treatment (Windows) | $41,550 | | EXCLUDED | | | $0 | $0.00 | $0.00 | $0 |
| 1420 | Elevators, Escalators | $252,000 | | | $255,300 | Schindler | $255,300 | $1.03 | $1.31 | $2,431 |
| 1550 | Plumbing & Piping | $892,500 | | | $1,052,700 | Mid Atlantic | $1,052,700 | $4.27 | $5.41 | $10,026 |
| 1551 | Water Submeters | $18,375 | | | $18,375 | Studebaker Submetering | $18,375 | $0.07 | $0.09 | $175 |
| 1555 -01 | Fire Protection Equipment - NFPA 13 R | $578,000 | | | $645,000 | Simplex - Grinnell | $645,000 | $2.61 | $3.32 | $6,143 |
| 1555 -02 | Fire Protection Equipment - NFPA 13 Upgrade | $0 | | | $265,000 | Simplex - Grinnell | $285,000 | $1.07 | $1.36 | $2,524 |
| 1560 | H.V.A.C. | $864,000 | | | $855,000 | Santas | $855,000 | $3.46 | $4.40 | $8,143 |
| 1600 -01 | Electrical | $900,000 | | | $1,176,500 | Power Design | $1,176,500 | $4.77 | $6.05 | $11,205 |
| 1601 | Light Fixtures | $157,500 | | | $75,000 | | $75,000 | $0.30 | $0.39 | $714 |
| 1602 | Communication & Data Cabling | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1620 | Fire Alarm Systems | IN 1600 | | IN 03-1600 | | | $0 | $0.00 | $0.00 | $0 |
| 1621 | Entry Access & Control Systems | $75,000 | | $75,000 | | | $75,000 | $0.30 | $0.39 | $714 |
| 2100 | Punch Labor | $367,500 | | $210,000 | | | $210,000 | $0.85 | $1.08 | $2,000 |
| 2200 | Handicap Accessible Unit Allowance | $262,500 | | $15,000 | | | $15,000 | $0.06 | $0.08 | $143 |
| 2240 | Open | $0 | | | | | $0 | $0.00 | $0.00 | $0 |
| TOTAL STRUCTURES - APARTMENTS (SECTION 3) | | $18,323,012 | $2,265 | $2,387,953 | $16,084,895 | | $18,435,113 | $74.71 | $94.81 | $175,573 |

Page 4 of 7

Case 2:23-cv-00257-CMR Document 1-3 Filed 01/23/23 Page 143 of 160

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

9/29/2006

| | | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | Bidders (Sub used is first) | Current Budget 23-Aug-06 | 248,788 $/GSF | 194,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| CODE | DESCRIPTION | | | | | | | | | |
| **STRUCTURES (CLUBHOUSE) - SECTION 04** | | | | | | | | | | |
| 0148 | Final Cleaning | $2,000 | $2,000 | | | | $2,000 | $0.01 | $0.01 | $19 |
| 0293 | Soil Poisoning | $0 | | EXCLUDED | | | $0 | $0.00 | $0.00 | $0 |
| 0301 | Concrete Foundations | $64,500 | | | $140,000 | Cavan | $140,000 | $0.57 | $0.72 | $1,333 |
| 0302 | Concrete Slab-on-Grade | $0 | | | IN 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0303 | Concrete/Gypsum Floor Fill w/Sound Mat | $0 | | | IN 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0304 | Concrete Stair Fill | $0 | | | IN 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0330 | Concrete Cast-in-Place | $0 | | | IN 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0340 | Concrete - Precast | $35,280 | | | $40,000 | Corrado | $40,000 | $0.16 | $0.21 | $381 |
| 0400 -01 | Masonry CMU | $4,130 | | | IN 04-0400-01 | | $0 | $0.00 | $0.00 | $0 |
| 0400 -02 | Brick | $0 | | | $21,677 | Quality Stone | $21,677 | $0.09 | $0.11 | $206 |
| 0403 | Stonework | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0500 | Structural Steel, Joists & Decking | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0540 | Light Guage Metal Framing | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0550 | Miscellaneous Metals | $3,750 | | | $3,443 | Paramount Steel | $3,443 | $0.01 | $0.02 | $33 |
| 0552 -01 | Railings - Building | $2,500 | | | IN 04-0552-01 | | $0 | $0.00 | $0.00 | $0 |
| 0552 -02 | Railings - Site | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0553 | Wall Mounted Rails | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0554 | Metal Stairs & Railings | $32,800 | $32,800 | | | | $32,800 | $0.13 | $0.17 | $312 |
| 0610 | Rough Carpentry Material | $41,000 | | | $42,400 | RPM | $42,400 | $0.17 | $0.22 | $404 |
| 0611 | Rough Carpentry Labor | $14,988 | | | $17,356 | HM Stauffer | $17,356 | $0.07 | $0.09 | $165 |
| 0612 | Roof Trusses | $12,263 | | | In 0612 | | $0 | $0.00 | $0.00 | $0 |
| 0615 | Floor Trusses | $10,900 | $10,900 | | | | $10,900 | $0.04 | $0.06 | $104 |
| 0620 | Millwork, Trim - Material | $27,250 | $5,875 | | $5,875 | Delaware Valley | $11,750 | $0.05 | $0.06 | $112 |
| 0621 | Millwork, Trim - Labor | $0 | | | $6,539 | Archer | $6,539 | $0.03 | $0.03 | $62 |
| 0650 | Exterior Siding | $0 | | | $49,039 | Quality Stone | $49,039 | $0.20 | $0.25 | $467 |
| 0650 -01 | Exterior Stucco | $0 | | | $20,772 | Quality Stone | $20,772 | $0.08 | $0.11 | $198 |
| 0650 -02 | Stucco Accessories | $1,792 | | | $14,345 | Dale Waterproofing | $14,345 | $0.06 | $0.07 | $137 |
| 0711 -01 | Waterproofing - Drain Tile | $7,980 | | | IN 02 | | $0 | $0.00 | $0.00 | $0 |
| 0711 -02 | Waterproofing - Wall | $3,000 | $3,000 | | | | $3,000 | $0.01 | $0.02 | $29 |
| 0712 | Caulking | $13,625 | | | $16,325 | Westchester, United @ 10,340 | $16,325 | $0.07 | $0.08 | $155 |
| 0720 | Building Insulation | $8,865 | | | $26,699 | Archer | $26,699 | $0.11 | $0.14 | $254 |
| 0730 | Shingle Roofing | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0740 -01 | Flat Roofing | $6,460 | | | In 0730 | | $0 | $0.00 | $0.00 | $0 |
| 0740 -02 | Metal Roofing | $5,820 | | | $1,876 | Archer, P&K carrying Archers price | $1,876 | $0.01 | $0.01 | $18 |
| 0750 | Gutters and Rainleaders | $0 | | | IN 0730 | | $0 | $0.00 | $0.00 | $0 |
| 0780 | Roof Accessories | $7,200 | | | $20,871 | Wickes | $20,871 | $0.08 | $0.11 | $199 |
| 0819 | HM Doors & Frames | $9,500 | | | In 0819 | | $0 | $0.00 | $0.00 | $0 |
| 0832 | WD Doors and Frames | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0836 | Overhead Doors | $3,150 | | | In 0819 | | $0 | $0.00 | $0.00 | $0 |
| 0840 | Miscellaneous Door Accessories | $16,800 | | | $11,606 | Silverline | $11,606 | $0.05 | $0.08 | $111 |
| 0850 -01 | Windows - Reg Glass | $7,000 | | | IN 0850-01 | | $0 | $0.00 | $0.00 | $0 |
| 0850 -02 | Windows - Tempered Glass | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0851 | Sliding Glass Doors | $0 | | | In 0819 | | $0 | $0.00 | $0.00 | $0 |
| 0852 | Storefront Glass | $6,105 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0870 | Door Hardware | $0 | | | | | $21,230 | $0.09 | $0.11 | $202 |
| 0920 | Mold Protection / Remediation | $35,425 | | | $21,230 | Machine Drywall | | | | |
| 0925 | Drywall, Metal Studs | $24,150 | | | $12,886 | CTI | $12,886 | $0.05 | $0.07 | $123 |
| 0930 | Ceramic & Marble | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0940 | Acoustical Ceilings | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0955 | Resilient Flooring & VCT | $16,000 | | | $16,960 | CTI | $16,960 | $0.07 | $0.09 | $162 |
| 0965 | Carpeting | $67,500 | | | $26,400 | Ayaz Painting | $26,400 | $0.11 | $0.14 | $251 |
| 0980 | Painting & Wallcoverings | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 0984 | Sprayed Fireproofing | $2,500 | | | $4,441 | Fireside Hearth & Home | $4,441 | $0.02 | $0.02 | $42 |
| 1010 | Prefabricated Fireplaces and Mantels | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1055 | Building and Unit Numbers | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1056 | Wire Shelving | $2,500 | $2,500 | | | | $2,500 | $0.01 | $0.01 | $24 |
| 1057 -01 | Bath Accessories | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1057 -02 | Extruded Aluminum Louvers | $1,500 | | | $795 | Premier Accessories | $795 | $0.00 | $0.00 | $8 |
| 1058 | Fire Extinguishers | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1059 | Mail Boxes | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1060 -01 | Trash Chute | $0 | | | | | | | | |

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

**EXHIBIT 'G'**
**PRELIMINARY CONSTRUCTION ESTIMATE**

7/29/2006

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | CURRENT BUDGET Bidders (Sub used is first) | Current Budget 23-Aug-06 | 248,768 $/GSF | 184,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| 1660 -02 | Trash Compactor | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1187 | Loading Dock Equipment | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1192 -01 | Cabinets | $7,500 | | $7,500 | | | $7,500 | $0.03 | $0.04 | $71 |
| 1192 -02 | Granite Tops | $10,000 | | $10,000 | | | $10,000 | $0.04 | $0.05 | $95 |
| 1193 | Kitchen Appliances | $3,000 | | | $3,700 | GE | $3,700 | $0.01 | $0.02 | $35 |
| 1194 | Washers & Dryers | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1250 | Window Treatment (Windows) | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1420 -01 | Elevators, Escalators | $50,000 | | | $50,200 | Schindler | $50,200 | $0.20 | $0.26 | $478 |
| 1420 -02 | Elevators - Finish Upgrades | $10,000 | | $10,000 | | | $10,000 | $0.04 | $0.05 | $95 |
| 1550 | Plumbing & Piping | $29,000 | | | $65,600 | Mid Atlantic | $65,000 | $0.26 | $0.33 | $619 |
| 1551 | Water Submeters | $0 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| 1555 | Fire Protection Equipment | $16,350 | | | $30,000 | Simplex - Grinnell | $30,000 | $0.12 | $0.15 | $286 |
| 1560 -01 | H.V.A.C. | $49,050 | | | $52,500 | Santa's | $52,500 | $0.21 | $0.27 | $500 |
| 1560 -02 | H.V.A.C. - Desertaire Unit | $0 | | | $17,500 | Santa's | $17,500 | $0.07 | $0.09 | $167 |
| 1600 -01 | Electrical | $25,179 | | | $50,500 | | $50,500 | $0.20 | $0.26 | $481 |
| 1601 | Light Fixtures | $24,000 | | | $2,400 | | $2,400 | $0.01 | $0.01 | $23 |
| 1602 | Communication & Data Cabling | $0 | | | | | $0 | $0.00 | $0.00 | $0 |
| 1620 | Fire Alarm Systems | $0 | | | In 03-1600 | | $0 | $0.00 | $0.00 | $0 |
| 1621 | Entry Access & Control Systems | $10,000 | | $10,000 | | | $10,000 | $0.04 | $0.05 | $95 |
| 2100 | Punch Labor | $5,000 | | $5,000 | | | $5,000 | $0.02 | $0.03 | $48 |
| 2200 | Handicap Accesibility Allowance | $0 | | EXCLUDED | | | $0 | $0.00 | $0.00 | $0 |
| 2240 | Resistance Pool | $20,000 | | $20,000 | | | $20,000 | $0.08 | $0.10 | $190 |
| 2245 | Interior Designer | $75,000 | | $75,000 | | | $75,000 | $0.30 | $0.39 | $714 |
| 2249 | Open | | | | | | $0 | $0.00 | $0.00 | $0 |
| **TOTAL STRUCTURES - CLUBHOUSE (SECTION 4)** | | $831,412 | $5,875 | $188,700 | $793,335 | | $987,910 | $4.00 | $5.08 | $9,409 |
| **TOTAL STRUCTURES - ACCESSORY & MISC. (SECTION 5)** | | EXCLUDED | $0 | $0 | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |

Page 6 of 8

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

**EXHIBIT 'G'**
**PRELIMINARY CONSTRUCTION ESTIMATE**

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | Bidders (Sub used is first) | Current Budget 23-Aug-06 | 246,788 $/GSF | 194,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | $0 | $0.00 | $0.00 | $0 |
| | | | | | | | $0 | $0.00 | $0.00 | $0 |
| | | | | | | | $2,262,164 | $9.17 | $11.63 | $21,544 |
| | **STRUCTURES (GARAGES): SECTION 6** | | | | EXCLUDED | | $0 | $0.00 | $0.00 | $0 |
| | | EXCLUDED | | | $2,262,164 Cavan | | $0 | $0.00 | $0.00 | $0 |
| 0293 | Soil Poisoning | $2,280,200 | | | in 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0301 | Concrete Foundations | IN 06-0301 | | | in 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0302 | Concrete Slab-on-Grade | IN 06-0301 | | | in 0301 | | $0 | $0.00 | $0.00 | $0 |
| 0304 | Concrete Stair Fill | IN 06-0301 | | | IN 03-0400-01 | | $0 | $0.00 | $0.00 | $0 |
| 0330 | Concrete Cast-in-Place | $20,196 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $21 |
| 0400 -01 | Masonry | EXCLUDED | | | EXCLUDED | | $2,250 | $0.01 | $0.01 | $1,037 |
| 0500 | Structural Steel, Joists & Decking | EXCLUDED | | | $2,250 Paramount Steel | | $108,900 | $0.44 | $0.56 | $0 |
| 0540 | Light Gauge Metal Framing | $90,949 | | | $108,900 Paramount Steel | | $0 | $0.00 | $0.00 | $371 |
| 0550 | Miscellaneous Metals | $32,580 | | | EXCLUDED | | $39,000 | $0.18 | $0.20 | $681 |
| 0552 -02 | 6' Vertical Alum. Fence | EXCLUDED | | $39,000 | | | $71,455 | $0.29 | $0.37 | $0 |
| 0553 | Wall Mounted Rails | $39,000 | | | $71,455 Dale Waterproofing | | $0 | $0.00 | $0.00 | $429 |
| 0554 | Metal Stairs & Railings | $118,983 | | | EXCLUDED | | $45,000 | $0.18 | $0.23 | $0 |
| 0711 | Waterproofing | EXCLUDED | | | $45,000 United Construction | | $0 | $0.00 | $0.00 | $0 |
| 0712 | Caulking | $54,569 | | | EXCLUDED | | $0 | $0.00 | $0.00 | $106 |
| 0720 | Building Insulation | EXCLUDED | | | EXCLUDED | | $11,134 | $0.05 | $0.06 | $256 |
| 0750 | Gutters and Rainleaders | EXCLUDED | | | $11,134 Wickes | | $26,887 | $0.11 | $0.14 | $0 |
| 0760 | Roof Accessories | $9,450 | | | $26,887 Nask/Best | | $0 | $0.00 | $0.00 | $0 |
| 0819 | HM Doors & Frames | EXCLUDED | | | EXCLUDED | | $0 | $0.00 | $0.00 | $1,771 |
| 0836 | Overhead Doors | EXCLUDED | | | EXCLUDED | | $185,970 | $0.75 | $0.96 | $70 |
| 0840 | Miscellaneous Door Accessories | EXCLUDED | | | $185,970 Machine Drywall | | $7,389 | $0.03 | $0.04 | $0 |
| 0870 | Door Hardware | $216,277 | | | $7,389 Ayaz Painting | | $0 | $0.00 | $0.00 | $30 |
| 0940 | Acoustical Ceilings | $15,000 | | | EXCLUDED | | $3,160 | $0.01 | $0.02 | $0 |
| 0990 -01 | Painting | EXCLUDED | | | $3,160 Premier Accessories | | $0 | $0.00 | $0.00 | $0 |
| 0984 | Sprayed Fireproofing | $2,500 | | | IN 03-1058-01 | | $0 | $0.00 | $0.00 | $0 |
| 1058 -01 | Fire Extinguisher | EXCLUDED | | | IN 03-1420 | | $0 | $0.00 | $0.00 | $0 |
| 1058 -02 | Fire Extinguisher Cabinets | $54,000 | | | IN 03-1550 | | $0 | $0.00 | $0.00 | $0 |
| 1420 | Elevators, Escalators | $50,000 | | | IN 03-1555-01 | | $0 | $0.00 | $0.00 | $0 |
| 1550 | Plumbing & Piping | $102,000 | | | IN 03-1560 | | $0 | $0.00 | $0.00 | $0 |
| 1555 | Fire Protection Equipment | $30,000 | | | IN 03-1800 | | $0 | $0.00 | $0.00 | $0 |
| 1560 | H.V.A.C. | IN 03 | | | IN 03-1601 | | $0 | $0.00 | $0.00 | $0 |
| 1600 -01 | Electrical | $20,000 | | | IN 03-1800 | | $0 | $0.00 | $0.00 | $0 |
| 1601 | Light Fixtures | | | | IN 03-1621 | | | | | |
| 1620 | Fire Alarm Systems | in 03-1621 | | | | | | | | |
| 1621 | Entry Access & Control Systems | | | | | | $2,763,329 | $11.20 | $14.21 | $26,317 |
| 1530 | Open | | | | | | | | | |
| | **TOTAL STRUCTURES - GARAGES (SECTION 6)** | $3,117,704 | $0 | $39,000 | $2,724,329 | | | | | |
| | | | | | | | $0 | $0.00 | $0.00 | $0 |
| | **BONDS & INSURANCE: SECTION 22** | | | | | | $0 | $0.00 | $0.00 | $0 |
| | | EXCLUDED | EXCLUDED | | | | $424,882 | $1.72 | $2.19 | $4,046 |
| 1750 | General Contractor Bond Premium | In Trades | | | | | $0 | $0.00 | $0.00 | $0 |
| 1760 | Subcontractor Bonds | $284,638 | $424,882 | | | | | | | |
| 1770 | General & Excess Liability | EXCLUDED | EXCLUDED | | | | $424,882 | $1.72 | $2.19 | $4,046 |
| 1780 | Builders Risk | | | | | | | | | |
| | **TOTAL BONDS & INSURANCE (SECTION 22)** | $284,638 | $424,882 | $0 | $0 | | | | | |
| | | | | | | | Exclude | $0.00 | $0.00 | $0 |
| | **PERMITS & OTHER FEES: SECTION 24** | | | | | | Exclude | $0.00 | $0.00 | $0 |
| | | | $0 | | | | Exclude | $0.00 | $0.00 | $0 |
| 1710 | Business License | | $0 | | | | Exclude | $0.00 | $0.00 | $0 |
| 1720 | Sewer Tap Fees | | $0 | | | | Exclude | $0.00 | $0.00 | $0 |
| 1730 | Water Tap Fee | | $0 | | | | Exclude | $0.00 | $0.00 | $0 |
| 1740 | Building Permits | | $0 | | | | Exclude | $0.00 | $0.00 | $0 |
| 1750 | Electrical Permits | | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| 1760 | Plumbing Permits | | $0 | | | | | | | |
| 1770 | Mechanical Permits | | $0 | | | | $0 | $0.00 | $0.00 | $0 |
| 1780 | Sprinkler Permits | | $0 | | | | | | | |
| 1790 | Open | | | | | | | | | |
| | **TOTAL PERMITS AND OTHER FEES (SECTION 24)** | EXCLUDED | $0 | $0 | $0 | | | | | |

Bozzuto Construction Co.
Project: Terrazza at Newtown Square
Owner: David Della Porta

EXHIBIT 'G'
PRELIMINARY CONSTRUCTION ESTIMATE

| CODE | DESCRIPTION | Original Budget 18-Jul-06 | Bozzuto Plugs | Allowance Items | Sub/Vendor Bids | CURRENT BUDGET Bidders (Sub used is first) | Current Budget 23-Aug-06 | 246,768 $/GSF | 194,451 $/RSF | 105 $/DU |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | $24,886,077 | $101.25 | $128.50 | $237,863 |
| SUBTOTAL | | $24,931,608 | $1,995,865 | $3,407,653 | $19,582,559 | | $0 | $0.00 | $0.00 | $0 |
| | SALES TAX | $0 | | | | | $0 | $0.00 | $0.00 | $0 |
| | DAVIS-BACON / UNION | $0 | | | | | $0 | $0.00 | $0.00 | $0 |
| | SOCIO-ECONOMIC GOALS | $0 | | | | | $0 | $0.00 | $0.00 | $0 |
| | ESCALATION | | | | | | $999,443 | $4.05 | $5.14 | $9,519 |
| | CONTRACTOR CONTINGENCY | $1,242,830 | $999,443 | | | | $1,559,131 | $6.32 | $8.02 | $14,849 |
| | CONTRACTOR FEE | $1,318,022 | $1,559,131 | | | | $27,544,651 | $111.62 | $141.65 | $262,330 |
| | GRAND TOTAL | $27,753,454 | $4,554,439 | $3,407,653 | $19,582,559 | | | | | |

Page 2 of 8

# Exhibit H

# Contractor's Consent & Lender Letter

*(to be inserted)*

EXHIBIT "D"

## SETTLEMENT AGREEMENT AND RELEASE

**THIS SETTLEMENT AGREEMENT AND RELEASE** (the "Agreement") is made this    day of March,  2015, by and among **Terrazza Community Association**, a Pennsylvania non-profit corporation (the "Association"), **Cornerstone Newtown Square Associates, L.P.**, a Pennsylvania limited partnership (the "Declarant") and **BCC Newtown Square, LLC** ("General Contractor") (collectively, the Association, Declarant and General Contractor are referred to as the "Parties").

## RECITALS

**WHEREAS,** the Association is an association for a planned community known as Terrazza at Newtown Square located at 300 Cornerstone Drive, Newtown Square, PA (the "Planned Community"); and

**WHEREAS,** the Declarant together with the General Contractor constructed the Planned Community; and

**WHEREAS,** the Declarant issued a Public Offering Statement, with certain exhibits including, without limitation, the Declaration, Bylaws, Rules and Regulations and Budget (the "Planned Community Documents"); and

**WHEREAS,** the Declarant transferred control of the Planned Community and conveyed the Common Elements of the Planned Community to the Association; and

**WHEREAS,** after transfer of Declarant control and conveyance of the Common Elements to the Association, the Association hired Kipcon, Inc. to conduct a review, inspection and evaluation of the design and construction of the Planned Community and to identify any design and/or construction related deficiencies; and

**WHEREAS,** Kipcon prepared for and issued to the Association a report titled "Transition Study," dated August 26, 2013, wherein Kipcon alleged deficiencies related to the design and construction of the Planned Community and alleged a shortfall in capital reserves (the "Transition Study"); and

**WHEREAS,** the Association demanded that the Declarant correct the deficiencies listed and identified in the Transition Study; and

**WHEREAS,** the Association retained Luft & Company, PC to perform a transition audit and provide a transition audit report (the "Transition Audit"); and

WHEREAS, for the purpose of avoiding the time, expense and distraction of pursuing, or defending against, any claims or causes of actions in litigation arising out of or relating to the Transition Study and/or the Transition Audit (collectively, the "Transition Reports"), the Parties have concluded that it is in their mutual interest to resolve those claims and causes of actions by entering into this Agreement and in doing so, no party hereto makes any admission of liability, wrongdoing, or of any facts upon which a claim of liability or wrongdoing could be based.

NOW THEREFORE, intending to be legally bound hereby, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the Parties hereto agree as follows:

## COVENANTS

1.  **Recitals Incorporated.** The foregoing Recitals are incorporated herein by reference as fully set forth herein.

2.  **Corrective Work.** In exchange for and in consideration of the Release in paragraph 4 of this Agreement, Declarant and General Contractor hereby agree to perform the corrective work described in Exhibit "A" hereto and complete such work within six (6) months from the Effective Date, or such longer time period as may be reasonably necessary to complete the corrective work, provided that after such 6-month period, Declarant and General Contractor continue to make a good faith diligent effort in performing and completing the corrective work in an expeditious manner as commercially practicable. In no event, however, shall any of the corrective work described in Exhibit "A" hereto be completed and/or performed any later than December 31, 2015. Declarant and General Contractor agree to indemnify, defend and hold harmless the Association, its board members, officers, directors, agents, attorneys, insurers, representatives, managers, employees, successors and assigns, from and against any claims, causes of action, suits, liabilities and/or judgments asserted or filed against the Association which are caused by or attributable to the corrective work undertaken by the Declarant and General Contractor pursuant to this paragraph and Exhibit "A" attached hereto.

3.  **Reimbursement Payment.** Consistent with Exhibit A, paragraph 7, on or within ten (10) days from the Effective Date hereof, either the Declarant or the General Contractor shall remit the sum of $48,030.96 to the Association.

4.  **Declarant's Unit and Assigned Parking Spaces.** Within thirty (30) days of the Effective Date, the Declarant shall cause Unit No. 144 (the "Unit") to be declared as a unit

2

within the Planned Community by the recording of an appropriate amendment to the Declaration, and further, shall assign Assigned Parking Space nos. 47 and 48 (the "Parking Spaces") located within Building 100 to the Unit.  Any and all other Assigned Parking Spaces not heretofore assigned by the Declarant as a Limited Common Element appurtenant to a unit within the Planned Community, including, without limitation, Assigned Parking Space no. 1 in Building 400, shall be assigned to the Association contemporaneously with the assignment of the Parking Spaces as hereinabove described.  In the event that one or both of the Parking Spaces assigned to Unit no. 144 are not assigned to a third-party purchaser incident to the sale and conveyance of the Unit by the Declarant, then in that event, the Declarant shall assign one or both of the Parking Spaces to the Association at no cost or expense to the Association (other than the costs associated with any recording fees, if applicable).

5.      **Release.**  For and in consideration of the terms and provisions of this Agreement, and except for the obligations of the Releasees under this Agreement, and any claims or causes of action arising therefrom, the Association, its board members, officers, directors, agents, attorneys, insurers, representatives, managers, employees, successors and assigns (collectively, the "Releasors"), hereby release and forever discharge the Declarant, the General Contractor, and their current and former principals, officers, partners, directors, agents, attorneys, insurers, representatives, employees, affiliates, consultants, contractors and subcontractors, predecessors, successors and assigns (collectively, "Releasees"), of and from any and all rights, claims, demands, actions, causes of action, suits, debts, accounts, contracts, obligations, liabilities or damages of any kind or nature whatsoever, relating to or arising from any defects, errors, omissions or representations in the Planned Community Documents and any defects, errors or omissions in the design, development, management and/or control of the Planned Community, including, without limitation, any and all claims or causes of action relating to and/or arising from the Transition Reports, any and all claims or cause of action in connection with construction defects, shortfall of capital reserves and unpaid assessments, whether known or unknown, matured or unmatured, liquidated or unliquidated whether in tort or contract or by statute, whether now existing or which hereinafter may accrue.

6.      **Covenant Not to Sue.**  Except as set forth herein, the Releasors agree that they will not make, assert, or maintain against the Releasees any claim, demand, action, or suit relating to or arising from any defects, errors, omissions or representations in the Planned

3

Community Documents and any defects, errors or omissions in the design, development, management and/or control of the Planned Community, including, without limitation, any and all claims or cause of action relating to and/or arising from the Transition Reports, any and all claims or causes of action in connection with construction defects, shortfall of capital reserves and unpaid assessments.

7.      **Exceptions to the Release and Covenant Not to Sue**. The foregoing Release and Covenant Not to Sue expressly exclude and except any and all liabilities and/or obligations of the Releasees and all rights, claims, demands and causes of action of the Releasors relating to or arising out of (i) the Declarant's ownership of any Unit and/or interest in any Assigned Parking Space within the Planned Community; and (ii) the removal, in whole or in part, of that certain roadway within the Planned Community known as and referred to in the Planned Community Documents as "Drive B," if and when any such removal may be required of the Association by any governmental authority as a result of the construction and completion of the Bryn Mawr Avenue Extension. Nothing in this Agreement is intended to or shall limit, waive, release, and/or restrict the rights, claims and obligations of the Parties with respect to the items referenced within this paragraph 7.

8.      **No Claims Assignment.** The Association represents and warrants that it has not assigned or transferred or purported to assign or transfer to any person, firm, or corporation, any claim, demand, right, damage, liability, debt, account, action, cause of action, or any other matter herein released.

9.      **Denial of Liability.** Neither the giving of any consideration, nor anything contained in this Agreement, shall be construed as an admission by Declarant or General Contractor, or their current and former principals, officers, partners, directors, agents, attorneys, insurers, representatives, employees, affiliates, consultants, contractors and subcontractors, predecessors, successors and assigns, of the validity of the claims or allegations by the Association relating to or arising out of the Transition Reports. The Parties enter into this Agreement to facilitate peace and compromise of the claims described therein. The resolution effectuated hereby is a compromise of the Parties' dispute and is not intended to be, and shall not be, construed as an admission of liability by the Declarant or the General Contractor for any purpose, or as an admission about the validity of the dispute.

4

10.    **Enforcement.**    Any action to enforce the terms of this Agreement shall be resolved by binding arbitration conducted before a single arbitrator selected by the Parties.  In the event the Parties are unable to agree upon an arbitrator, then any of the Parties shall have the right to petition the Court of Common Pleas of Delaware County for the appointment of an arbitrator.  In any such proceeding to enforce the terms of this Agreement, the arbitrator shall include, in addition to actual and any consequential damages, an award of costs and reasonable attorney's fees in favor of the prevailing party.

11.    **Authority.**  Each of the Parties hereto represents and warrants to each other that it possesses the full requisite authority to enter into this Agreement and that the person signing this Agreement on behalf of the party is fully and duly authorized to do so.

12.    **Binding Effect and Parties Bound.**  This Agreement and all covenants and releases set forth herein shall be binding upon and shall inure to the benefit of each of the Parties.

13.    **Governing Law.**  This Agreement shall be construed in accordance with, and deemed governed by, the laws of the Commonwealth of Pennsylvania.

14.    **Severability.**  Should any portion of this Agreement which is not a material term be found to be invalid for any reason whatsoever, this Agreement shall be read as if it did not contain such portion; and, the Parties hereto intend for any such invalid non-material portion to be severable from the remainder.  Moreover, a breach by one or more of the Parties of its or their obligations under this Agreement shall not void or limit the enforceability of this Agreement by any of the compliant Parties as to the other Parties hereto.

15.    **Voluntary Agreement.**  The persons signing this Agreement on behalf of the Parties hereto acknowledge that they have read the provisions of this Agreement and fully understand its terms, contents, conditions and effect, and that they have been represented by counsel and have had the opportunity to consult with counsel during the negotiations of its terms, and that they voluntarily and knowingly agree to the terms of this Agreement.

16.    **Counterparts and Electronic Signatures.**  This Agreement may be executed in one or more counterparts, each of which shall be an original as against the Party who signed it, and all of which shall constitute one and the same instrument.  The counterparts of this Agreement may be executed and delivered by one of the Parties to another by facsimile or electronic mail, and the receiving party may rely on the receipt of such executed instrument as if the original had been received.

17. **Headings and Captions.** The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof. This Agreement contains the entire agreement between the Parties and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever which are not integrated herein. Furthermore, this Agreement shall not be altered, amended, changed or modified except in writing executed by the Parties hereto.

18. **Capitalized Terms**. The capitalized terms used in this Agreement, if not otherwise defined herein, shall have the same meaning and effect as provided for in the Planned Community Documents.

19. **Effective Date.** The Effective Date of this Agreement shall be the date on which it has been fully executed by all of the Parties hereto.

**TERRAZZA COMMUNITY ASSOCIATION**

By: _Michael Guthrie_
Print Name: _Michael Guthind_
Title: _President, TCA_
Date: _3-9-15_

By: _Mary N. Queen_
Print Name: _MARY N. QUAIN_
Title: _Secretary, TCA_
Date: _3/9/15_

**CORNERSTONE NEWTOWN SQUARE ASSOCIATES, L.P.**

By: _____
Print Name: _David Della Porta_
Title: _Authorized Officer of General Partner_
Date: _3/4/15_

**BBC NEWTOWN SQUARE, LLC.**

By: _____
Print Name: _MICHAEL SCHLEGEL_
Title: _PRESIDENT_
Date: _3/4/15_

6

**EXHIBIT "A"**

**CORRECTIVE WORK**

1. Perform repair work in the planter in the courtyard of Building 200 to correct and prevent leaking into the electrical room of the underground garage.  Such repair work shall include emptying the planter of all soil and plant material, installing new waterproofing material, testing the planter by filling it with water, and then re-installing new soil and plant material substantially similar to the plant material removed.   Since the new plant material includes three trees which do not match the size of the existing trees in the adjoining planter bed, those trees will also be replaced.    Any corroded conduit, wiring and connections in the electrical room will be repaired or replaced.

2. Perform remedial work in the garage of Building 200 to prevent water infiltration into Building 200 electrical room through PECO's conduits.  PECO's contractor Infrasource has accepted responsibility for such remedial work, and such work shall be coordinated and managed by General Contractor.

3. Perform remedial work in the garages of Buildings 100 and 400 to prevent water infiltration through cracks in the walls and ceiling by injecting the cracks with a polyurethane foam injection resin designed to seal joints and cracks in concrete.  In the event this process does not prevent the water infiltration through the cracks in the walls and ceiling, other methods will be investigated and utilized to prevent such water infiltration.   In addition to the preceding measures to remediate the water infiltration, drip pans will be installed above vehicles to collect and to divert the corrosive condensation away from the vehicles.  Drip pans will be constructed of a non-corrosive material.  Existing drip pans will be replaced with such non-corrosive material.

4. Provide new ladders in all buildings 100, 200, and 400 to allow for improved attic access.  Stairs and railings will be added around the attic access hatch in 2 buildings.

5. Install two handicapped detection ramps on either side of the club house to match those existing on the opposite side of the entry drive.

6. Perform remedial work to the exterior and interior of the stair tower of Building 200 to prevent water infiltration into the stair tower.  Clean, seal and paint the interior of Building 200 stair tower that shows evidence of efflorescence with a sealant approved for such use.  The exterior stucco surface of that fire tower also shall be sealed with waterproofing materials suitable for the application.  In the event this process does not resolve water infiltration, other methods will be investigated and utilized to correct and repair such leaks.

7. Reimbursement in the sum of $48,030.96 which covers the full amount paid by the HOA to install 3 new garage doors, which included modification of the door opening, lowering sprinkler heads in each building and applying finishing coat insulation to the ceiling area.

8. Install new sidewalk leading from the entry drive to the side door entrance of building 200.  The work includes removing the existing sidewalk, pouring a new concrete sidewalk and reinstalling the existing railing, or installing new railing if the existing railing cannot be utilized, along each side of the walk as required by Fair Housing and ADA standards.  Any landscaping disturbed by this work will be restored to a condition substantially similar to the condition that existed prior to the repair work.

9. Provide and install new knobs for those missing water shut off access doors in building corridors.

10. Install drains in front of both stair tower doorway entrances in building 200 similar to the drain installed at Building 400.

11. Repair the metal roof over the Building 200 main entrance to properly align the metal plates under the flashing.

12. Cut galvanized stop bead and stucco at ground level exterior column locations which show evidence of rust staining so that the stop bead and stucco do not contact the concrete slabs. The area between the stucco and the slab will be cleaned and caulked.

An 18 month warranty period will be provided on all work performed.   In the event the water infiltration issues specified in paragraphs 3 and 6 above have not been fully resolved at the end of the 18 month warranty period, Declarant efforts will continue until the issue is resolved.   Declarant commits  to continue pursuing and  utilizing  additional processes until issues of water infiltration are resolved.

EXHIBIT "E"

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA

CIVIL ACTION AT LAW

TERRAZZA COMMUNITY ASSOCIATION　:　　No.: 2019-001944

                                      :

    v.　　　　　　　　　　　　　　　　　　　:

                                        :

CORNERSTONE NEWTOWN SQUARE　　:
ASSOCIATES, L.P.  and　　　　　　　　:
BCC NEWTOWN SQUARE, LLC　　　　　:

## ORDER

AND NOW, this _____ day of May, 2022, upon consideration of Plaintiff's Petition to Confirm Amended Award of Arbitrator, and receiving no opposition thereto, it is hereby ORDERED that said Petition is GRANTED. It is further ORDERED as follows:

1. The Amended Award of Arbitrator, dated March 28, 2022, in favor of Plaintiff, Terrazza Community Association, and against Defendants, Cornerstone Newtown Square Associates, L.P. and BCC Newtown Square, LLC, jointly and severally, in the amount of $2,516,454.02 is hereby CONFIRMED; and

2. The Office of Judicial Support is hereby directed to enter JUDGMENT in favor of Plaintiff, Terrazza Community Association, and against Defendants, Cornerstone Newtown Square Associates, L.P. and BCC Newtown Square, LLC, jointly and severally, in the amount of $2,516,454.02.

BY THE COURT:

_____ ,J.

FILED
05-27-2022 12:55 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**STEVEN L. SUGARMAN & ASSOCIATES**
BY: **Steven L. Sugarman, Esquire / Elliot H. Berton, Esquire**
IDENTIFICATION NO.  **#32473** / #53060
1273 LANCASTER AVENUE          ATTORNEYS FOR PLAINTIFF, TERRAZZA COMMUNITY ASSOCIATION
BERWYN, PA 19312-1244
(610) 889-0700
FAX: (610) 993-0498

_____

| | | |
|---|---|---|
| **TERRAZZA COMMUNITY ASSOCIATION** | : | Delaware County |
| | : | |
| v. | : | Court of Common Pleas |
| | : | |
| **BOZZUTO CONSTRUCTION COMPANY** | : | No. CV-2022-008878 |
| **BOZZUTO & ASSOCIATES, INC., t/a** | : | |
| **THE BOZZUTO GROUP** | : | |

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that in this case copies of all papers contained in the Plaintiff's Complaint has been served upon the following person(s), by the following means and on the date(s) stated:

| <u>Name:</u> | <u>Means of Service</u> | <u>Date of Service</u> |
|---|---|---|
| Caitlin P. Strauss, Esquire<br>Saul Ewing LLP.<br>1500 Market Street<br>Philadelphia, PA 19102<br><u>Caitlin.strauss@saul.com</u><br>Counsel for Defendants | Via Court E-Service<br>and E-Mail | January 18, 2023 |

STEVEN L. SUGARMAN & ASSOCIATES

By:_____
   Steven L. Sugarman, Esquire
   Elliot H. Berton, Esquire
   Attorneys for Plaintiff, Terrazza Community Association